United States Bankruptcy Court
Southern District of Texas
**ENTERED**
December 14, 2021
Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 19-35647** |
| **EP ENERGY E&P COMPANY, L.P.,** | § | |
| Debtors. | § | **Jointly Administered** |
| | § | **CHAPTER 11** |

## <u>MEMORANDUM OPINION</u>

During its bankruptcy and the COVID-19 pandemic's onset, EP Energy shut in producing wells on mineral leases granted by the MSB Owners.[1] Displeased by the cessation of production (and incident cessation of royalties), the MSB Owners now seek allowance of an administrative priority claim against EP Energy's bankruptcy estate (the "Temporary Cessation Claim"). The MSB Owners allege that EP Energy is now a trespasser on the MSB Owners' lands because EP Energy's cessation of production caused the leases to terminate. The parties also have a threshold dispute regarding this Court's ability to adjudicate the MSB Owners' Temporary Cessation Claim. Specifically, the MSB Owners argue that this Court does not have, or at least should not exercise, jurisdiction over the merits underlying the Claim. EP Energy disagrees.

This Court has jurisdiction to allow or disallow administrative expense claims against EP Energy's bankruptcy estate. Because the MSB Owners seek a distribution from EP Energy's bankruptcy estate, the Claim's validity and amount must be determined. The Court has the constitutional authority to assess the validity and value of claims against the estate.

---

[1] EP Energy Corporation and its affiliate debtors, (*see* Case No. 19-35654, ECF No. 2 at 1–3), are the Debtors in the main bankruptcy case from which the parties' dispute arose. The MSB Owners charge EP Energy E&P Company, L.P. (EP Energy) with breach of the Eagle Ford Leases. Under the Plan, the Debtors remained separate entities, each with its own legal obligations for purposes of liability. (Case No. 19-35654, ECF No. 1411 at 80–81). The MSB Owners include: Storey Minerals, Ltd.; Storey Surface, Ltd.; Maltsberger, LLC; Maltsberger/Storey Ranch, LLC; Maltsberger/Storey Ranch Lands, LLC; the Estate of Sarah Lee Maltsberger; and Rene R. Barrientos, Ltd. (Case No. 19-35654, ECF No. 1480 at 2). Collectively, the MSB Owners own roughly 40,000 acres in the Eagle Ford basin, centered in La Salle County, Texas. (Case No. 19-35654, ECF No. 1610 at 1–3). As of the petition date, EP Energy held leases on certain portions of the MSB Owners' land. (*See* Case No. 19-35654, ECF No. 1610 at 1–3).

Here however, the MSB Owners presented a futile claim against EP Energy's estate.  Two lease provisions at issue permitted EP Energy to maintain its leases following the May 2020 cessation of production.  The Continuous Development Provision authorized EP Energy to hold certain leases by continuing to drill new wells on leased acreage.  The MSB Owners do not dispute that EP Energy complied with its drilling obligations under the Continuous Development Provision.  The Temporary Cessation Clause afforded EP Energy 120 days to restore production in the event of a cessation of production.  The MSB Owners do not dispute that EP Energy restored production within the 120-day grace period.  Following the May 2020 shut-in, the leases did not terminate. Consequently, EP Energy did not trespass on the MSB Owners' lands.  The MSB Owners' request for allowance of the Temporary Cessation Claim is denied.

## BACKGROUND

As of its 2019 bankruptcy, EP Energy held and operated mineral leases in the Eagle Ford Basin located in South Texas.  EP Energy came to hold these leases through its predecessor, El Paso E&P Company, LP.  (*See* Case No. 19-35654, ECF No. 1480 at 5).  The MSB Owners are lessors under the Eagle Ford Leases.  (*See* Case No. 19-35654, ECF No. 1480 at 5).  The MSB Owners claim EP Energy breached certain Eagle Ford Leases and damaged the MSB Owners' property through EP Energy's operation of the Leases.  (*See* Case No. 19-35654, ECF No. 1480 at 5).  Based on EP Energy's conduct, the MSB Owners contend they are entitled to administrative priority claims because EP Energy's post-cessation conduct benefited its bankruptcy estate at the MSB Owners' expense.  (Case No. 19-35654, ECF No. 1480 at 18–19).  Alternatively, the MSB Owners seek a determination that at least some of their claims against EP Energy should "pass through" bankruptcy to be adjudicated in Texas state court.  (Case No. 19-35654, ECF No. 1480 at 16).

In their Motion for Allowance of Administrative Expense Claims,[2] the MSB Owners originally asserted six bases for their claims:

(1)     "Trespass damages" arising from EP Energy's entry onto, exploration of, and production from the MSB Owners' leased property without satisfying material conditions of certain leases (the "MFN Trespass Claim");

(2)     "Trespass damages" arising from EP Energy's continued exploration of and production from leases that terminated following EP Energy's cessation of production in May 2020 (the "Temporary Cessation Claim");

(3)     Both actual and "stigma" damages arising from "numerous pipeline leaks and/or hydrocarbon spills on properties operated by" EP Energy;

(4)     Unpaid, "pre Effective Date" royalties due to the MSB Owners under the Leases, as well as damages arising from EP Energy's refusal to allow the MSB Owners to inspect EP Energy's books and records (the "Audit Claim");

(5)     Damages arising from EP Energy's "excessive and unauthorized" use and taking of the MSB Owners' surface property (the "Takings Claim"); and

(6)     Damages arising from EP Energy's trespassory drilling operations following the termination of EP Energy's "Deep Rights" under certain leases.

(*See* Case No. 19-35654, ECF Nos. 1480 at 8–16; 1489-1 at 8–10).  Through a series of abatements and agreed resolutions, the MSB Owners now maintain only three of these bases for administrative expense claims: (1) the Temporary Cessation Claim; (2) the Pipeline Leak Claim; and (3) part of the Audit Claim.[3]  Only the Temporary Cessation Claim has been fully briefed and argued.

_____

[2] Originally, the MSB Owners requested the allowance of their administrative expenses prior to the confirmation of EP Energy's Plan of Reorganization.  (*See* Case No. 19-35654, ECF No. 885).  The MSB Owners then withdrew their request without prejudice.  (*See* Case No. 19-35654, ECF No. 1221).  Under EP Energy's Fifth Amended Plan of Reorganization, the MSB Owners had until the Administrative Bar Date to refile their motion for the allowance of administrative expense claims.  (Case No. 19-35654, ECF No. 1411 at 48–49; *see also* Case No. 19-35654, ECF No. 1480 at 4).  The Administrative Bar Date occurred 30 days after the Plan's Effective Date.  (*See* Case No. 19-35654, ECF Nos. 1411 at 48–49; 1454 at 1).  The MSB Owners timely filed their renewed motion.  (*See* Case No. 19-35654, ECF No. 1480 at 4).

[3] EP Energy and the MSB Owners agreed to the MFN Trespass Claim's abatement pending the resolution of an appeal in Texas state court.  (Case No. 19-35654, ECF No. 1609 at 3).  Certain of the MSB Owners—Storey Surface, Ltd., Maltsberger, LLC, Maltsberger/Storey Ranch Lands, LLC, and the Estate of Sarah Lee Maltsberger— agreed to the dismissal of their Audit Claim.  (ECF No. 55 at 1–2).  The Audit Claim, however, remains pending with respect to Storey Mineral, Ltd., Maltsberger/Storey Ranch, LLC, and Rene R. Barrientos, Ltd.  The Court dismissed the Takings Claim by agreed order.  (*See* ECF No. 65).  EP Energy also claims the MSB Owners have abandoned

### *The Temporary Cessation Claim*

The MSB Owners contend that EP Energy breached certain provisions of the Eagle Ford Leases.  These alleged breaches stem from EP Energy's post-petition, May 2020[4] decision to temporarily suspend production on 16 leases—the A, B, C, D, and E Leases, as well as the Maltsberger Ranch Leases.  (*See* Case No. 19-35654, ECF No. 1539 at 22–23).  According to the MSB Owners, EP Energy's cessation caused the Leases to terminate and revert to the MSB Owners, rendering EP Energy's continued operation and production on the Leases trespassory. (Case No. 19-35654, ECF No. 1480 at 9–10).  These trespassory operations benefited EP Energy's estate, say the MSB Owners, because EP Energy was able to continue receiving revenues from the terminated Leases.  (Case No. 19-35654, ECF No. 1480 at 9–10, 19–20).  EP Energy argues that the Leases authorized temporary (*i.e.,* up to 120 days) cessations in production, and that EP Energy resumed operations within that 120-day period.  (Case No. 19-35654, ECF No. 1539 at 26–27).

### The Merits Dispute

The parties' merits dispute centers on the interpretation of two lease provisions—the "Continuous Development" Provision and the "Temporary Cessation" Clause.[5]  Both provisions allow EP Energy to maintain the Leases in circumstances that would otherwise cause the Leases to terminate under the habendum clause, which generally dictates the duration of the Leases.  EP

---

their Deep Rights Claim.  (ECF No. 49 at 4:10–16, 6:4–7).  The MSB Owners do not dispute this contention.  (ECF No. 49 at 43:3–44:3).

[4] The price of crude oil plummeted in March 2020, causing many producers to stop production or shut in producing wells.  *See* Javier Blas, *First oil prices went negative. Now the shale oil industry is going to shut down*, L.A. Times (Apr. 26, 2020), https://www.latimes.com/business/story/2020-04-26/coronavirus-shale-oil-shutdown ("Negative oil prices, ships dawdling off California ports with unwanted cargoes, and traders getting creative about where to stash oil. The next chapter in the oil crisis is now inevitable: large sections of the petroleum industry are about to start shutting down.").

[5] EP Energy and the MSB Owners provided only one lease for the Court's review—the Barrientos A Lease. (*See* ECF No. 36-10).  Given their arguments, the parties appear to agree that the provisions at issue are identical across all the Leases.

Energy divides the Leases into two categories: those leases maintained under the Continuous Development Provision and those leases held by production and maintained under the Temporary Cessation Clause.  (*See* ECF No. 62 at 15–38).  The MSB Owners contend that the Continuous Development Provision and the Temporary Cessation Clause are far more limited than EP Energy asserts.  (ECF No. 71 at 14–22, 30–37).  And if these limitations are enforced, the MSB Owners say that EP Energy cannot take refuge in these provisions because EP Energy failed to satisfy the requirements that would allow EP Energy to rely on the provisions.  (ECF No. 71 at 19–22, 33–40).

*The Continuous Development Provision*

EP Energy identifies a subset of leases that remain in their continuous-development phase and are held under the Continuous Development Provision (Paragraph VIII in the Leases).  (ECF No. 62 at 28–29).  The Continuous Development Provision authorizes EP Energy to hold the Leases through the continued exploration and development of leased lands without achieving "production."  (ECF No. 36-10 at 31–32).  If a lease has not otherwise terminated, the Continuous Development Provision provides that EP Energy may:

> [W]*ithin* [*120*] *days after the latter of either the expiration of the primary term* (if oil or gas are being produced in paying quantities from the leased premises at the expiration of the primary term) *or the completion of any well drilled or reworked* by the lessee on the leased premises *within* [*180*] *days prior to the expiration of the primary term, lessee shall have the right to commence the drilling of an additional well* on the leased premises . . . . Likewise, *if this lease has not otherwise terminated* as herein elsewhere provided, *then within* [*120*] *days after completion of such additional well as a producer of oil or gas or the abandonment of the same as a dry hole, lessee shall have the right commence the drilling of yet another well* on the leased premises . . . . [T]he commencement and drilling of successive wells may be continued by lessee until lessee has completed a sufficient number of wells to continue this lease in force as to all leased premises as provided in *Paragraph* IX below, or until lessee elects to cease drilling additional wells thereon.

(ECF No. 36-10 at 31–32 (emphasis added)).  EP Energy alleges that so long as it drilled a new well every 120 days on leases in their continuous-development phase, EP Energy would retain those leases regardless of EP Energy's conduct in the interim.  (ECF No. 62 at 28–29).  The MSB Owners respond that the Continuous Development Provision is limited by the "Separate Lease Clause" (which is within Paragraph XI(d)).  (ECF No. 71 at 30).

> The Separate Lease Clause provides:

> > After the occurrence of any event described in *subparagraph (a)* of this *Paragraph XI*, *production from or operations conducted on each production unit shall maintain this lease in force as to, but only as to, that portion of the leased premises included within such production unit*, and production from or operations on one unit will not maintain this lease as to any other production unit.

(ECF No. 36-10 at 35–36 (emphasis added)).  The MSB Owners read the Separate Lease Clause to divide each original lease into multiple leases, each covering only a designated *production unit* (*i.e.,* specific portions of leased acreage held by a producing well).[6]  (*See* ECF No. 71 at 31). According to the MSB Owners, the Separate Lease Clause took effect at the end of the primary term,[7] as the primary term's expiration is an "event described in subparagraph (a) of . . . Paragraph XI."  (ECF Nos. 36-10 at 35–36; 71 at 31).

Subparagraph (a), the Termination Clause, identifies those events that result in lease termination: "If this lease has not otherwise terminated as herein elsewhere provided, *then upon*

---

[6] The Leases define a "production unit" in Paragraph IX as a "unit designated by lessee attributable to a well on the leased premises producing oil or gas."  (ECF No. 36-10 at 32).  Under the Leases' Production Units Provision, EP Energy was required to designate production units by filing an instrument identifying each production unit with La Salle County "within [60] days after the expiration of the primary term."  (ECF No. 36-10 at 32–34).  The size of each production unit depended on whether the unit encompassed a well producing oil (40 acres) or producing gas (160 acres).  (ECF No. 36-10 at 32–33).

[7] The "primary term" is "[t]he period of time during which a lease may be kept alive by a lessee even though there is no production in paying quantities by virtue of drilling operations on the leased land or the payment of rentals." 8 WILLIAMS & MEYERS, *Primary Term, in* OIL & GAS LAW SCOPE (2021).  The Leases' primary term is set out in Paragraph III.  (ECF No. 36-10 at 7).

*the expiration of the primary term or upon the cessation of continuous drilling operations conducted in accordance with Paragraph VIII* hereof, whichever occurs later, this lease shall terminate . . . ."  (ECF No. 36-10 at 34 (emphasis added)).  However, the lease would only terminate on land not designated as part of a production unit ("undeveloped acreage").  (ECF No. 36-10 at 34).

The MSB Owners argue the Continuous Development Provision must be read in light of the Termination Clause and the Separate Lease Clause.  The MSB Owners contend that an "event described in subparagraph (a)" occurred—the primary term expired—thereby triggering the Separate Lease Clause.  (ECF No. 71 at 30–33).  And because the Separate Lease Clause took effect, the MSB Owners posit that "production from or operations conducted on" a production unit could only sustain that specific production unit, not any other production unit or undeveloped acreage.  (*See* ECF Nos. 36-10 at 34–36; 71 at 30–33).  Thus, the MSB Owners take the position the Termination Clause and the Separate Lease Clause limited EP Energy's ability to maintain each lease under the Continuous Development Provision.  (*See* ECF No. 71 at 32–37).  Under that interpretation, EP Energy could not rely on the Continuous Development Provision to hold acreage outside a specific production unit on which continuous development occurred, and could not hold undeveloped acreage through continuous development on a production unit.  (*See* ECF No. 71 at 32–41).  For the reasons set forth below, the Court holds to the contrary.

### *The Temporary Cessation Clause*

EP Energy claims it retained the second category of leases, which were held by production, under the Temporary Cessation Clause, which is within Paragraph XI(d).  (ECF No. 62 at 15–16).  In the event production from a production unit ceases, the Temporary Cessation Clause provides:

> *This lease shall terminate as to all lands and depths included within such unit unless lessee commences drilling or reworking operations on such unit*

> within [*120*] *consecutive days thereafter* and pursues such operations with diligence on the same or successive wells with no cessations of operations more than [120] consecutive days; *and if production is restored from such unit, this lease shall remain in effect as to the lands* and depths included therein as long as oil or gas is produced from such unit, subject to the remaining provisions of this lease.

(ECF No. 36-10 at 35–36 (emphasis added)). EP Energy concedes it stopped production on designated production units in May 2020. (ECF No. 62 at 7). However, EP Energy maintains it restored production within 120 days (a fact the MSB Owners do not dispute), as required by the Temporary Cessation Clause, thereby holding those production units in force. (*See* ECF No. 62 at 16). EP Energy's position is rooted in the plain language of the Temporary Cessation Clause, as well as Texas oil and gas law. (*See* ECF No. 62 at 16). The MSB Owners argue, however, that production restoration would not alone sustain the leases following a cessation. (ECF No. 71 at 20–21). Instead, according to the MSB Owners, EP Energy had to "commence drilling or reworking operations" on the production units to avoid termination. (ECF No. 71 at 20–21). Again, the Court holds to the contrary.

<u>The Threshold Dispute</u>

Notwithstanding the dispute over the Leases' termination, the MSB Owners also challenge this Court's ability to decide the termination dispute. Instead, the MSB Owners want a Texas state court to decide the lease termination question, as well as the amount of damages associated with EP Energy's subsequent trespass. (Case No. 19-35654, ECF No. 1610 at 1–2). The MSB Owners do concede that this Court may have a "tenuous jurisdictional connection" to the Temporary Cessation Claim because the cessation occurred during EP Energy's bankruptcy. (Case No. 19-35654, ECF No. 1610 at 1). Specifically, the MSB Owners contend that this "tenuous" jurisdiction amounts only to "related to" bankruptcy jurisdiction, and that the Court should abstain from exercising this "tenuous" jurisdiction. (Case No. 19-35654, ECF No. 1610 at 9–16, 21).

EP Energy argues that the MSB Owners' Temporary Cessation Claim "aris[es] under" title 11. EP Energy bases its jurisdictional claim on the MSB Owners' invocation of "the peculiar powers of the bankruptcy court" through their attempt to recover damages on the Temporary Cessation Claim as an administrative expense. (Case No. 19-35654, ECF No. 1611 at 9–10). EP Energy also maintains that, regardless of the form of the Court's jurisdiction, abstention is not warranted. (Case No. 19-35654, ECF No. 1611 at 15–25).

After the parties briefed both the Temporary Cessation Claim's merits and the underlying jurisdictional issues, the Court took the matter under advisement.

## JURISDICTION

The District Court's jurisdiction over EP Energy's bankruptcy originated under 28 U.S.C. § 1334. Consistent with 28 U.S.C. § 157(a), the case was referred to the Bankruptcy Court by operation of General Order 2012-6. The MSB Owners' request for the allowance of administrative expense claims implicates one of the Court's "core" functions identified in § 157(b)(2)(B).

However, the MSB Owners maintain that the allowance of their Temporary Cessation Claim should be adjudicated by a Texas state court. Despite conceding that the Court has subject matter jurisdiction over their Claim, (Case No. 19-35654, ECF No. 1480 at 2), the MSB Owners still dispute the Court's authority to decide the issue. The MSB Owners base their jurisdictional objection on the fact that the Temporary Cessation Claim arises under Texas state law.

By presenting a post-petition, pre-Effective Date claim to the Court, the MSB Owners have invoked the bankruptcy court's "peculiar powers." Both title 28 and the Constitution authorize this Court to adjudicate the MSB Owners' Claim's merits, including the Claim's validity, as well as any associated damages.

A bankruptcy court's adjudicatory power comes from two distinct, yet related, congressional authorizations—subject matter jurisdiction and adjudicatory authority. First, Congress vested original and exclusive *jurisdiction* over "all cases under title 11" in United States districts courts. *See* 28 U.S.C. § 1334(a) (2020). Congress also granted district courts exclusive jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." § 1334(b). District courts can refer all cases under title 11, as well as "all civil proceedings arising under title 11, or arising in or related to cases under title 11," to United States bankruptcy courts. *See* § 157(a). Thus, a bankruptcy court derives its *jurisdiction* over cases under title 11, as well as all civil proceedings incident to those cases, from § 1334.

Second, Congress specifically granted bankruptcy courts *authority* to "hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11." § 157(b)(1). Section 157 then provides a non-exhaustive list of proceedings considered to be "core," in which bankruptcy courts are authorized to "enter appropriate orders and judgments." *See* § 157(b)(1), (2). However, the statutory scope of bankruptcy courts' *authority*, as defined by § 157(b), may exceed (in particular cases) the constitutional scope of authority Congress may delegate to bankruptcy courts. *See Stern v. Marshall*, 564 U.S. 462, 482 (2011) ("Although we conclude that § 157(b)(2)(C) permits the Bankruptcy Court to enter final judgment on [the estate's] counterclaim, Article III of the Constitution does not."). To finally adjudicate a dispute, a bankruptcy court must have both subject matter jurisdiction over the dispute under § 1334, as well as the requisite constitutional authority to enter a final judgment. If the latter constitutional requirement is lacking, a bankruptcy court may nevertheless enter interlocutory orders or recommend a final disposition to the district court. *See Exec. Benefits Ins. Agency v.*

*Arkison*, 573 U.S. 25, 36 (2014) ("The statute permits *Stern* claims to proceed as non-core within the meaning of § 157(c)."); *see also* 28 U.S.C. § 157(c).

      The Court has subject matter jurisdiction over the MSB Owners' Temporary Cessation Claim.   The fact that MSB Owners' Temporary Cessation Claim could have affected the administration of EP Energy's bankruptcy estate serves as a basis for subject matter jurisdiction. While § 1334(b) identifies three categories of proceedings over which bankruptcy courts have subject matter jurisdiction—"arising under," "arising in," and "related to"—a proceeding need only *relate to* a case under tile 11 to confer jurisdiction on this Court.  *Wood v. Wood (In re Wood)*, 825 F.2d 90, 93 (5th Cir. 1987).   A proceeding is "related to" a case under title 11 if the proceeding's outcome "could conceivably have any effect on the estate['s]" administration.  *Id.* (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)).

      The MSB Owners seek an award of an administrative expense for "trespass damages" resulting from EP Energy's post-petition, pre-emergence conduct.  *Cf. Madison Equities, LLC v. Condren (In re Theatre Row Phase II Assocs.)*, 385 B.R. 511, 521 (Bankr. S.D.N.Y. 2008) *("*[I]t has been established since the Supreme Court's decision in *Reading v. Brown*, 391 U.S. 471 (1968), that administration expenses can also be allowed for acts done in the administration of the estate that do not benefit the estate but which harm non-debtors." (quotation cleaned up)).  Should the MSB Owners' Temporary Cessation Claim be allowed as an administrative expense, EP Energy's Plan and the Bankruptcy Code would obligate EP Energy to expend estate funds to pay the MSB Owners' Claim in full.   (Case No. 19-35654, ECF No. 1411 at 78); 11 U.S.C. § 1129(a)(9).  This "conceivable" outcome brings the MSB Owners' Temporary Cessation Claim within the Court's "related to" subject matter jurisdiction.  *Cf. Wood*, 825 F.2d at 94 (finding "related to" jurisdiction where a proceeding's outcome had only the "potential" to affect the

estate).   Hence, § 1334(b) provides the Court with subject matter jurisdiction over the MSB Owners' Temporary Cessation Claim.

The MSB Owners' primary argument proceeds from the incorrect assumption that because the Temporary Cessation Claim was asserted after the confirmation of EP Energy's Plan, the Court may only exercise its "post-confirmation" jurisdiction.  (*See* Case No. 19-35654, ECF No. 1610 at 14); *see also, e.g., Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390 (5th Cir. 2001) (citing *Fairfield Cmtys., Inc. v. Daleske (In re Fairfield Cmtys., Inc.)*, 142 F.3d 1093, 1095 (8th Cir. 1998)) ("After a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan.").  Adding to this confusion is the fact that if the Leases terminated, EP Energy's trespass would have continued beyond the Plan's confirmation.  Critically, the Court's "post-confirmation" jurisdiction is far more limited than the broad pre-confirmation jurisdiction § 1334 bestows on bankruptcy courts to oversee an estate's administration.  *See id.* (explaining that once a plan is confirmed, the bankruptcy court no longer needs to "facilitate administration of the debtor's estate").  This "post-confirmation"-"pre-confirmation" distinction is the source of the MSB Owners' confusion.

Fifth Circuit cases discussing the curtailment of a bankruptcy court's jurisdiction following a plan's confirmation uniformly refer to this limited jurisdiction as "post-confirmation" jurisdiction.  *See, e.g., id.*; *Newby v. Enron Corp. Sec. (In re Enron Corp. Sec.)*, 535 F.3d 325, 335 (5th Cir. 2008); *Beitel v. OCA, Inc. (In re OCA, Inc.)*, 551 F.3d 359, 367 n.10 (5th Cir. 2008); *Galaz v. Galaz (In re Galaz)*, 665 F. Appx. 372, 376 (5th Cir. 2016).  But when a plan's "effective date" occurs *after* confirmation, the estate exists until the "effective date."  *See Ellis v. Westinghouse Elec. Co., LLC*, 11 F.4th 221, 234 (3d Cir. 2021) ("While typically the estate ends

when the plan is confirmed, the plan can extend the life of the estate to a later date such as the effective date."); *see also* 11 U.S.C. § 1141(b) ("*Except as otherwise provided in the plan* or the order confirming the plan, *the confirmation of a plan vests all of the property of the estate in the debtor.*" (emphasis added)).   Because the estate continues to exist until the effective date, the bankruptcy court retains broad jurisdiction over the estate until that date.   *See Craig's Stores*, 266 F.3d at 390 (identifying the estate's termination as delineating the line between pre-confirmation and post-confirmation jurisdiction).   This view comports with the recent Third Circuit holding in *Ellis*:

> Because administrative expenses preserve the bankruptcy 'estate,' what matters is that the claim accrues against the estate before it ceases to exist. While typically the estate ends when the plan is confirmed, the plan can extend the life of the estate to a later date such as the effective date.  Here the Plan provided that the estate's property did not vest in the reorganized debtors until the Effective Date (August 1, 2018)[, which occurred after confirmation].  The Westinghouse estate therefore continued to exist until that date, and any post-confirmation expenses qualify as administrative expense claims.

*Ellis,* 11 F.4th at 234 (citing 11 U.S.C. § 503 and *Davis v. California (In re Venoco LLC)*, 998 F.3d 94, 107 (3d Cir. 2021), *cert. denied sub nom. Cal. State Lands Comm'n v. Davis*, 142 S. Ct. 231 (2021)) (internal citations omitted).   Although cases colloquially refer to "post-confirmation" jurisdiction, the colloquial term actually means the date on which the estate ceases to exist.   In this case, EP Energy's Plan's Effective Date.

This dividing line is particularly relevant here, where the MSB Owners hope to receive a share of EP Energy's estate based on a purported benefit the MSB Owners' land bestowed on EP Energy's estate.   *Cf. Ellis*, 11 F.4th at 234 ("The . . . estate therefore continued to exist until that date, and any post-confirmation expenses qualify as administrative expense claims."); *see also Reading*, 391 U.S. at 485 (holding a post-petition tort claim to be an "actual and necessary cost" of administering the estate).   Because an "administrative expense" must benefit the estate, an estate

to benefit must exist.  *See* 11 U.S.C. § 503(b)(1)(A); *Ellis*, 11 F.4th at 234 ("Because administrative expenses preserve the bankruptcy 'estate,' what matters is that the claim accrues against the estate before it ceases to exist. . . . The Bankruptcy Code thus ties the viability of administrative expense claims . . . *to the existence of the estate, not confirmation of the plan*" (emphasis added)).  Since the estate must exist for a claimant to assert a valid administrative expense, the bankruptcy court necessarily retains broad pre-confirmation jurisdiction over the administrative expense's allowance.  *Cf. Enron Corp.*, 535 F.3d at 335 ("The *Craig's Stores* Court did hold that a bankruptcy court may lack jurisdiction over post-confirmation claims based on post-confirmation activities, but the *Craig's Stores* Court did not hold that a bankruptcy court may lose jurisdiction over pre-confirmation claims based on pre-confirmation activities, like those in this case.").

The Court's role in scrutinizing administrative expense requests under its broad pre-confirmation jurisdiction is undisturbed by the post-Effective Date Administrative Bar Date here. Congress granted bankruptcy judges significant discretion to establish administrative bar dates. *See Hall Fin. Grp., Inc. v. DP Partners Ltd. P'ship (In re DP Partners Ltd. P'ship)*, 106 F.3d 667, 672 (5th Cir. 1997) (reviewing § 503's text and the Federal Rules of Bankruptcy Procedure to conclude that bankruptcy judges have discretion in setting administrative bar dates); *Ellis*, 11 F.4th at 232 ("The bankruptcy court's power to set and enforce bar dates extends to postpetition administrative expense claims.").  Consistent with §§ 503(a) and 1129(a)(9)(A) (which requires the plan to provide for the full payment of allowed administrative expenses), bankruptcy courts may establish administrative bar dates that occur after the plan's confirmation and the effective date.  *See Caradon Doors & Windows, Inc., v. Eagle-Picher Indus, Inc. (In re Eagle-Picher Indus., Inc.)*, 447 F.3d 461, 464 (6th Cir. 2006) ("[M]ost confirmed Chapter 11 plans, if not all of them, provide mechanisms by which the reorganized company will assume the administrative expenses

of the debtor that arose during the bankruptcy and that were not paid upon confirmation of the plan."); *see also, e.g., DP Partners*, 106 F.3d at 671–72 (noting that a bankruptcy court had discretion to set an administrative bar date 60 days after the effective date); *Ellis*, 11 F.4th at 227–28, 232–33 (recognizing a bankruptcy court's ability to set a post-effective date administrative bar date). Yet a post-effective-date administrative bar date does not relieve the bankruptcy court of its obligation to assess the validity of administrative expense claims. *Ellis*, 11 F.4th at 234 ("Permitting the bankruptcy court to manage all claims against the estate is a logical result [of § 503 tying the viability of administrative expenses to the estate's existence]."). In other words, the Court retains broad "pre-confirmation" jurisdiction over administrative expense claims arising from pre-Effective Date conduct "[n]otwithstanding [the Fifth Circuit's] statement that bankruptcy jurisdiction exists after plan confirmation only 'for matters pertaining to the implementation or execution of the plan.'" *Enron Corp.*, 535 F.3d at 335 (quoting *Craig's Stores*, 266 F.3d at 390).[8]

Had the MSB Owners not asserted their Claim by the Administrative Bar Date, it would have been barred by EP Energy's Plan. (*See* Case No. 19-35654, ECF No. 1411 at 63, 87, 127). Had EP Energy's Plan omitted an Administrative Bar Date, the MSB Owners' Claim would have been barred by the discharge injunction. 11 U.S.C. §§ 524(a)(2), 1141(d)(1)(A); *accord Polysat, Inc. v. Union Tank Car Co. (In re Polysat, Inc.)*, 152 B.R. 886, 894, 896 (Bankr. E.D. Pa. 1993) (explaining that the assertion of a post-petition, pre-confirmation claim against the debtor in state

---

[8] The *Enron* court noted that a district court properly dismissed claims for lack of subject matter jurisdiction that were asserted "post-confirmation" but based on "pre-confirmation conduct." *Enron Corp.*, 535 F.3d at 335 n.9 (discussing *Newby v. Enron Corp. (In re Enron Corp. Sec.)*, G-05-0012, 2005 WL 1745471 (S.D. Tex. July 25, 2005)). This note lends no support to the MSB Owners' position as the MSB Owners asserted the Temporary Cessation Claim before the Administrative Bar Date. Because the MSB Owners asserted their Claim before the Administrative Bar Date, they essentially asserted the Claim before "confirmation," or the time at which the Claim would be discharged. *Ellis*, 11 F.4th at 234–35 (explaining that the discharge provision of § 1141 provides "teeth" to administrative bar dates imposed under § 503, and that § 1141(d)(1)'s default discharge rule may be overridden by the debtor's plan). Hence, the Temporary Cessation Claim sits in essentially the same posture as the claims over which the *Enron* court held the district court *had* § 1334 jurisdiction—the Claim was asserted "pre-confirmation" and it is based on pre-confirmation conduct. *See Enron Corp.*, 535 F.3d at 335.

court violated the discharge injunction).  EP Energy's Plan and the Code required the MSB Owners to seek the Court's intercession in the MSB Owners' pursuit of monetary relief for the Temporary Cessation Claim.  (*See* Case No. 19-35654, ECF No. 1411 at 63, 87, 127); 11 U.S.C. § 503(a), (b).  The fact that this litigation has extended beyond the Effective Date does not transform the Claim into a post-Effective Date wrong or divest the Court of § 1334 jurisdiction over the Claim.  *See Enron Corp.*, 535 F.3d at 335.  Rather, the Temporary Cessation Claim, which is based on the Debtor's post-petition, pre-Effective Date conduct, necessarily falls within the Court's broad "pre-confirmation" jurisdiction.  *See Ellis*, 11 F.4th at 233–34 (explaining that § 503 ties the allowance of administrative expenses to the existence of the estate and that administrative expenses, while still within the purview of the bankruptcy court, may be asserted after confirmation).

This Court's *authority* to finally adjudicate the Temporary Cessation Claim turns on whether the Claim's adjudication is a "core" or a "non-core" proceeding, as well as the constitutional limits identified in *Stern*.  *See* 28 U.S.C. § 157(b); *Stern,* 564 U.S. at 482.  As an initial matter, proceedings that implicate only a bankruptcy court's "related to" jurisdiction cannot be "core" proceedings.  *Stern*, 564 U.S. at 477 ("[Section 157] simply does not provide for a proceeding that is simultaneously core and yet only related to the bankruptcy case.").  To be "core," a proceeding must *arise under* title 11 or *arise in* a case under title 11.  *See* 28 U.S.C. § 157(b)(1) ("Bankruptcy judges may hear and determine all cases under title 11 and *all core proceedings arising under title 11, or arising in a case under title 11* . . . ." (emphasis added)).  As such, the fact that the Temporary Cessation Claim is "related to" EP Energy's bankruptcy does not establish that the Claim's adjudication is a "core" matter.

Under § 157(b)(2)'s plain language, the Temporary Cessation Claim is a "core proceeding."  Section 157 provides that proceedings relating to the "allowance or disallowance of

claims against the estate" are "core" proceedings. § 157(b)(2)(B). While not a pre-petition claim evidenced by a proof claim, § 503 still required the MSB Owners to present their Temporary Cessation Claim to the Court. *See* § 503(a) ("An entity may timely file a request for payment of an administrative expense . . . ."). Section 101(5) broadly defines a "claim" to include any "right to payment." § 101(5)(A). A "right to payment" is what the MSB Owners assert in their request for the allowance of an administrative expense under § 503. *See Weber v. Heitkamp (In re Hopson)*, 324 B.R. 284, 287 (S.D. Tex. 2005) (citing *Tarbox v. U.S. Trustee (In re Reed)*, 312 B.R. 832, 839 n.8 (N.D. Tex. 2004), *aff'd*, 405 F.3d 338 (5th Cir. 2005)) (identifying an administrative expense claim for attorneys' fees as a "claim" under § 105(5)); *In re Worldcom, Inc.*, 401 B.R. 637, 643 (Bankr. S.D.N.Y. 2009) ("*Worldcom I*") ("Logically, an entity who files a request [for] payment of an administrative expense under § 503(a) must be asserting a right to payment, as that term is used in § 101(5)(A)."). Hence, the MSB Owners assert that they hold a "claim" against EP Energy's estate.

This "claim" will not, however, be resolved with other proofs of claim in the claims reconciliation process. *See, e.g.,* 11 U.S.C. § 502(a), (b); Fᴇᴅ. R. Bᴀɴᴋʀ. P. 3001(a), (d), (f). Instead, under § 503(b), the Court is charged with determining the Temporary Cessation Claim's allowability. 11 U.S.C. § 503(a), (b). Because § 503 plainly requires the Court to determine whether the Claim should be "allowed," its resolution is patently "core" under § 157(b)(2)(B)'s statutory language. *See In re Worldcom, Inc.*, 02-13533(AJG), 2009 WL 2959457, at *4 (Bankr. S.D.N.Y. May 19, 2009) ("*Worldcom II*") ("The claims allowance process is central to the administration of any bankruptcy estate, and the court administering the estate is responsible for determining whether an expense was actual and necessary to preserving the estate." (internal

citations omitted)); *cf. Stern*, 564 U.S. at 475 (classifying a counterclaim asserted by the estate as a "core proceeding" under § 157(b)(2)(C)).

Moreover, the request for allowance of the Temporary Cessation Claim falls within the *jurisdictional* definition of "core proceedings."  Under § 157, "core proceedings" "aris[e] under" or "aris[e] in" cases under title 11.  *See* § 157(b)(1).  Proceedings "arising in" a case under title 11 are those that "would have no existence outside of the bankruptcy."  *Wood*, 825 F.2d at 96–97.  The Temporary Cessation Claim's adjudication is such a proceeding.  Of course, the rights on which the MSB Owners' Claim is based do not originate from title 11.  As with most bankruptcy disputes, the fundamentals of the dispute are resolved in accordance with state law.  *See Butner v. United States*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law.  Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.").  However, the MSB Owners' request for an administrative expense to be paid from EP Energy's bankruptcy estate could not exist outside of bankruptcy.  *See Wood*, 825 F.2d at 97; *accord* 1 COLLIER ON BANKRUPTCY ¶ 3.02(3)(a) (16th ed. 2021) ("An objection to a claim is classified as a core proceeding even though . . . . [I]f *A* files a proof of claim in the debtor's case and the debtor objects to the claim on state law grounds . . . , the resolution of the controversy is a core matter . . . .").  Because the MSB Owners must rely on the Court's determination of allowance, the Temporary Cessation Claim's resolution is a core proceeding that Congress authorized this Court to finally adjudicate.  28 U.S.C. § 157(b)(2)(A), (B); *see also* § 157(b)(2)(O) ("Core proceedings include, but are not limited to—(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor . . . relationship, except personal injury tort or wrongful death claims.").

Of course, *Stern* demands an inquiry into the constitutional limits on the Court's ability to adjudicate the MSB Owners' Claim.  Though they do not specifically argue that *Stern* bars the Court from adjudicating the Temporary Cessation Claim, the MSB Owners do assert that the Claim's adjudication is a "non-core" proceeding.  (*See, e.g.,* Case No. 19-35654, ECF No. 1610 at 8–9, 11–12; *see also* Case No. 19-35647, ECF No. 13 at 5, 21).  If the claim at issue is a *Stern* claim, the claim's adjudication is treated as a "non-core" proceeding.  *See Arkison*, 573 U.S. at 36.  *Stern* clarified the bounds of bankruptcy courts' constitutional authority—bankruptcy courts, as non-Article III courts, cannot exercise the "judicial power of the United States."  *See Stern*, 564 U.S. at 502–03.  A "prototypical exercise of judicial power" is "the entry of a final, binding judgment by a court of broad substantive jurisdiction on a common law cause of action."  *Id.* at 494.  Here, the MSB Owners fear that resolution of their Temporary Cessation Claim requires a "prototypical exercise of judicial power," which this Court cannot constitutionally exercise.

However, *Stern* identified instances in which bankruptcy courts can exercise power akin to the "judicial power of the United States."  These instances involve the adjudication of "public rights."  *See id.* at 488–93.  "Public rights" are rights "susceptible to judicial determination" that Congress can constitutionally refer to non-Article III courts.  *Id.* at 488–89 (quoting *Murray's Lessee v. Hoboken Land & Imp. Co.*, 59 U.S. 272, 284 (1855)).  In bankruptcy, the claims allowance and disallowance process implicates the "public rights" exception.  *See id.* at 499 (recognizing that bankruptcy courts may only exercise "judicial power" under the "public rights" exception with respect to actions that "stem[] from the bankruptcy itself or would necessarily be resolved in the claims allowance process").[9]  That is, when the claim at issue will be wholly

---

[9] Chief Justice Roberts's dissent in *Wellness International Network v. Sharif* suggests the Article III exception covering certain bankruptcy proceedings exists independent of the "public rights" exception.  *See* 575 U.S. 665, 689–90 (2015) (Roberts, C.J., dissenting) (noting that the Court's "precedents have also recognized an exception to the

"resolved in the claims allowance process," it falls within the "limited circumstances covered by the public rights exception." *Id.* (quoting *N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 69 (1982)) (internal quotation marks omitted).   In these "limited circumstances" a bankruptcy court can enter a final, binding judgment, even though the claim's resolution may involve issues of state-created contract or tort law.  *See In re Millennium Lab Holdings II, LLC.*, 945 F.3d 126, 135–36 (3d Cir. 2019), *cert. denied sub nom. ISL Loan Tr. v. Millennium Lab Holdings II, LLC*, 140 S. Ct. 2805 (2020) ("[A] bankruptcy court is within constitutional bounds when it resolves a matter that is integral to the restructuring of the debtor-creditor relationship. . . . Furthermore, the Supreme Court made it clear that, for there to be constitutional authority, a matter need not stem from the bankruptcy itself."); *accord Katchen v. Landy*, 382 U.S. 323, 329 (1966) (quoting *Lesser v. Gray*, 236 U.S. 70, 74 (1915)) ("This power to allow or to disallow claims includes 'full power *to inquire into the validity of any alleged debt or obligation* of the bankrupt upon which a demand or a claim against the estate is based.  This is essential to the performance of the duties imposed upon it.'" (emphasis added)).

Section 503 brings the Temporary Cessation Claim's merits into the "claims allowance process."  *See Worldcom II*, 2009 WL 2959457, at *5; *accord Stern*, 564 U.S. at 499.  In presenting their Claim, the MSB Owners seek "a pro rata share of the bankruptcy res."  *Stern*, 564 U.S. at 499 (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 35 (1989)).  The MSB Owners' assertion that the Claim should be adjudicated in Texas state court does not alter this aim.  Nor does the Temporary Cessation Claim's state law origin excise the MSB Owners from the bounds of bankruptcy procedure.  *See Katchen*, 382 U.S. at 333 n.9 (quoting *Gardner v. New Jersey*, 329 U.S. 565, 573 (1947)) (recognizing that the "traditional bankruptcy law" is "he who invokes the

---

requirements of Article III for certain bankruptcy proceedings," after separately discussing the "public rights" exception).

aid of the bankruptcy court by offering a proof of claim and demanding its allowance must abide the consequences of that procedure" (internal quotation marks omitted)).  Instead, the Code required the MSB Owners to present their post-petition, pre-Effective Date Claim to the Court for allowance.  11 U.S.C. § 503(a); *West v. Freedom Med., Inc. (In re Apex Long Term Acute Care--Katy, L.P.)*, 465 B.R. 452, 460 (Bankr. S.D. Tex. 2011) ("When the substantive outcome of a non-bankruptcy law claim is affected by bankruptcy law, the claim may be 'transformed' into a bankruptcy matter.").  In turn, the Court must perform one of its "essential" duties—determining whether the Claim should be "allowed."  *See Katchen*, 328 U.S. at 329 (quoting *Lesser*, 236 U.S. at 74) ("This power . . . to inquire into the validity of any alleged debt or obligation of the bankrupt . . . . is essential to the performance of the duties imposed upon [the court]." (internal quotation marks omitted)); *Worldcom II*, 2009 WL 2959457, at *4 (describing the process of determining the allowability of an administrative expense claim as "inherently a bankruptcy power").  This "essential" duty's performance requires an assessment of the Claim's validity (*i.e.,* whether the Claim is meritorious).  *See Katchen*, 328 U.S. at 329.  Congress constitutionally delegated to this Court the ability to assess the Temporary Cessation Claim's validity, as the Claim's validity is a necessary predicate to its allowance.  *See Stern*, 564 U.S. at 499.

Further, had the MSB Owners not timely submitted their Claim to the Court, it would have been barred by the discharge injunction (and the Plan[10]).  11 U.S.C. §§ 524(a), 1141(d); *Polysat*, 152 B.R. at 891–92 (citing *Shure v. Vermont (In re Sure-Snap Corp.)*, 983 F.2d 1015, 1019 (11th Cir. 1993) and *In re Benjamin Coal Co.*, 978 F.2d 823, 826–27 (3d Cir. 1992)).  Thus, the MSB Owners' entitlement to relief necessarily depends on this Court's intercession.  *See* 11 U.S.C. § 503(a), (b); *see also Worldcom II*, 2009 WL 2959457, at *4, 5 (citing *L. O. Koven & Bro., Inc.*

---

[10] (*See* Case No. 19-35654, ECF No. 1411 at 48–49, 63, 87, 126–27).

*v. United Steelworkers of Am.*, 381 F.2d 196, 208 (3d Cir. 1967)) (requiring parties holding post-petition, pre-confirmation claims to present those claims to the bankruptcy court as administrative expense claims).   And that intercession implicates the Court's "essential" duty to determine whether the Claim should be allowed.  *See Stern*, 564 U.S. at 499.

Yet the Temporary Cessation Claim's allowability (and the MSB Owners' right to payment of the Claim) also depends on the MSB Owners' entitlement to equitable relief—the Leases' termination (and subsequent reversion to the MSB Owners).  Certain rights to equitable relief do not qualify as "claims" that may be discharged in bankruptcy.  *See* 11 U.S.C. § 101(5)(B); *Sheerin v. Davis (In re Davis)*, 3 F.3d 113, 116–17 (5th Cir. 1993) (explaining that equitable remedies without monetary alternatives (*e.g.,* a liquidate damages provision in a contract as an alternative to the contract's specific performance) do not constitute "claim[s]" under 11 U.S.C. § 101(5)(B) and are, thus, not dischargeable in bankruptcy).   Hence, an element of the MSB Owners' Temporary Cessation Claim—the right to the Leases' reversion—might survive discharge because it cannot be reduced to monetary relief.  *See Davis*, 3 F.3d at 116–17.[11]  This would render an *element* of the Temporary Cessation Claim "non-core" because the right could exist outside bankruptcy.  *Contra Wood*, 825 F.2d at 97 ("A matter is core under 28 U.S.C. § 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." (internal quotation marks omitted)).

---

[11] The MSB Owners would have had to seek permission from the Court to pursue this equitable relief while EP Energy was in bankruptcy due to the automatic stay.  *See* 11 U.S.C. § 362(a)(3).  Additionally, the equitable element of the MSB Owners' Claim would still likely qualify as a "core" matter because the Claim's successful prosecution (*i.e.,* the Leases' termination) would affect the MSB Owners' and EP Energy's relationship, as well as the estate's administration.  *See* 28 U.S.C. § 157(b)(2)(A), (O); *see also Millennium*, 945 F.3d at 135 ("[A] bankruptcy court is within constitutional bounds when it resolves a matter that is integral to the restructuring of the debtor-creditor relationship."); *Apex*, 465 B.R. at 461 (explaining that bankruptcy courts have long been able to decide whether the bankruptcy estate held title to certain property).

However, the MSB Owners chose to seek an administrative expense based on EP Energy's conduct following the alleged lease termination.  Determining whether the MSB Owners are entitled to an administrative expense, as well as the amount of those claims, requires the Court to reach the equitable element of the Claim.  *See Stern*, 564 U.S. at 499 (explaining that a bankruptcy court may constitutionally decide issues that "stem[] from the bankruptcy itself or *would necessarily be resolved in the claims allowance process*." (emphasis added)); *accord Morrison v. W. Builders of Amarillo, Inc. (In re Morrison)*, 555 F.3d 473, 479 (5th Cir. 2009) (noting that a proceeding to determine the non-dischargeability of a debt requires a predicate determination of the debt's validity and amount, which may require the court to determine questions of state common law).  Thus, the MSB Owners have placed their equitable rights "squarely within the bankruptcy court's core jurisdiction." *Gomez v. Seanz (In re Saenz)*, 13-70423, 2016 WL 9021733, at *4 (Bankr. S.D. Tex. Dec. 19, 2016), *subsequently aff'd sub nom. Saenz v. Gomez*, 899 F.3d 384 (5th Cir. 2018) (quoting *Chen v. Wen Jing Huang (In re Wen Jing Huang)*, 509 B.R. 742, 754 (Bankr. D. Mass. 2014)) (internal quotation marks omitted).

Moreover, the Temporary Cessation Claim differs from those claims *Stern* precludes this Court from adjudicating.  *Stern* cautioned that bankruptcy courts are without constitutional authority to adjudicate common law claims that relate to bankruptcy only insofar as the claims' outcome could augment the estate.  *Stern*, 564 U.S. at 495 ("[Common law claims that] simply attempt[] to augment the bankruptcy estate—the very type of claim that we held in *Northern Pipeline* and *Granfinanciera* must be decided by an Article III court.").  The Temporary Cessation Claim will not augment the estate.  Instead, the Claim is for a "distribution of assets" from EP Energy's estate, as well as a "restructuring" of the MSB Owners' and EP Energy's relationship with respect to the Leases——functions "Congress may assign to non-Article III courts." *See*

*Sharif*, 575 U.S. at 690 (Roberts, C.J., dissenting) (citing 2 WILLIAM BLACKSTONE, COMMENTARIES *471–488 and *Marathon*, 458 U.S. at 71) ("[E]nglish statutes had long empowered nonjudicial bankruptcy 'commissioners' to . . . resolve claims by creditors [and] order the distribution of assets in the estate . . . . This historical practice, combined with Congress's constitutional authority to enact bankruptcy laws, confirms that Congress may assign to non-Article III courts adjudications involving 'the restructuring of debtor-creditor relations . . . .'" (internal citations omitted)); *Millennium*, 945 F.3d 126, 135 ("[A] bankruptcy court is within constitutional bounds when it resolves a matter that is integral to the restructuring of the debtor-creditor relationship."). In sum, the Temporary Cessation Claim's adjudication requires this Court to exercise only those judicial functions Congress was constitutionally authorized to assign to this Court.

At bottom, the MSB Owners' jurisdictional objections amount to equitable arguments in favor of the Court abdicating its role in administrating EP Energy's bankruptcy estate. Of course, § 1334's abstention provisions permit such relief in certain circumstances not present here. *See* 11 U.S.C. § 1334(c).[12] But the fact remains that this Court has both subject matter jurisdiction over the Temporary Cessation Claim and the constitutional authority to adjudicate the Claim.

---

[12] Abstention is not warranted here. The MSB Owners had to justify their request for permissive abstention. *Bickerton v. Bozel S.A. (In re Bozel S.A.)*, 434 B.R. 86, 102 (Bankr. S.D.N.Y. 2010) (citing *Altchek v. Altchek (In re Altchek)*, 119 B.R. 31, 35 (Bankr. S.D.N.Y. 1990)) ("The movant bears the burden of establishing that permissive abstention is warranted."). The MSB Owners' primary arguments in favor of abstention are that (1) the Court lacks jurisdiction to adjudicate the proceeding, (2) the Temporary Cessation Claim does not relate to EP Energy's bankruptcy case, and (3) Texas law predominates over the dispute. (Case No. 19-35654, ECF No. 1610 at 17–21); *see also Ramirez v. Rodriguez (In re Ramirez)*, 413 B.R. 621, 631–32 (Bankr. S.D. Tex. 2009) (enumerating the 12 permissive abstention factors). These arguments are unavailing. The Court has jurisdiction over the Temporary Cessation Claim *because* it is a core matter, and its outcome could affect EP Energy's bankruptcy estate. While the lease termination issue turns on Texas law, the issue presents a legal question that must be resolved in assessing the Claim's validity. On balance, permissive abstention is unwarranted. *Cf. Ramirez*, 413 B.R. at 632 (denying a request for permissive abstention because factors related to the administration of the estate weighed against abstention).

## DISCUSSION

The MSB Owners take issue with how EP Energy responded to the COVID-induced collapse of oil prices.  EP Energy shut in production on oil and gas wells it maintained on Leases granted by the MSB Owners.  The MSB Owners argue that EP Energy breached its lease obligations to either continuously develop the Leases or to produce oil or gas from the Leases.  The MSB Owners argue that EP Energy's breach caused the Leases to revert to the MSB Owners, thereby rendering EP Energy's post-cessation operations trespassory.  EP Energy counters that both the plain terms of the Leases, as well as Texas law, afforded EP Energy the ability to temporarily cease lease operations.  If the Leases authorized EP Energy's temporary cessation, the MSB Owners' Claim is futile.

The parties' dispute comes down to the proper interpretation of the Eagle Ford Leases.  Oil and gas leases are interpretated like contracts.  *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 210 (Tex. 2011) (quoting *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005)) ("An oil and gas lease is a contract, and its terms are interpreted as such.").  The language used by the contracting parties in the contract is presumed to convey their intent, and the judicial aim is to enforce that intent.  *Id.* (quoting *Tittizer*, 171 S.W.3d at 860).  But a contract should not be construed to produce an unreasonable or inequitable result.  *See Unit Petroleum Co. v. David Pond Well Serv., Inc.*, 439 S.W.3d 389, 395–96 (Tex. App.—Amarillo 2014, pet. denied) (quoting *Frost Nat'l Bank v. L & F Distribs., Ltd.,* 165 S.W.3d 310, 311–12 (Tex. 2005)) ("We construe contracts 'from a utilitarian standpoint bearing in mind the particular business activity sought to be served' and 'will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive.'").

The MSB Owners and EP Energy agree that the Leases' plain language resolves their Temporary Cessation dispute. They disagree over how to interpret that plain language. Generally, words in contracts are given their plain and ordinary meaning. *Id.* at 396 (citing *Petro Pro, Ltd. v. Upland Res., Inc.*, 279 S.W.3d 743, 749 n.3 (Tex. App.—Amarillo 2007, pet. denied)). When the contract itself supplies a word's meaning, that meaning will be enforced. *See In re Davenport*, 522 S.W.3d 452, 457 (Tex. 2017) (citing *Epps v. Fowler*, 351 S.W.3d 862, 866 (Tex. 2011)) ("Courts may look to dictionaries to discern the meaning of a commonly used term that the contract does not define."). "Technical words" will likewise be given their industry-specific meaning. *Emerald Oil & Gas*, 348 S.W.3d at 211 (citing *Barrett v. Ferrell*, 550 S.W.2d 138, 142 (Tex. Civ. App.—Tyler 1977, writ ref'd n.r.e.)). The parties' dispute turns on both contractually-defined terms and industry-specific definitions recognized by Texas law.

For the reasons set out in more detail below, to give each lease provision meaning the Leases must be interpreted as follows:

- The Termination Clause (Paragraph XI(a)) terminates each lease (except as to land within a production unit or units ("Retained Production Units")) on the latter of the end of the primary term or the cessation of continuous drilling operations;

- The Termination Clause and the Separate Lease Clause (see Paragraph XI(d)) together allow each lease to continue with respect to Retained Production Units on a unit-by-unit basis based solely on production, operations, or drilling within each Retained Production Unit;

- Notwithstanding the Separate Lease Clause, the Continuous Development Provision (Paragraph VIII) allows continuous development operations to hold the entirety of each lease in force so long as EP Energy complies with the Continuous Development Provision's terms; and

- The Temporary Cessation Clause (see Paragraph XI(d)) sustains each lease during a temporary cessation of production, so long as the temporary cessation is undertaken in good faith for a period of less than 120 days prior to the resumption of production.

An alternative reading would be at odds with the Leases' plain language or result in unreasonable real-world consequences.  *See Unit Petroleum*, 439 S.W.3d at 395–96.  While the Court details its legal reasoning below, a brief description of how this interpretation allows the Leases to function is appropriate.

Paragraph III imposed a primary term on EP Energy, by which EP Energy had to begin developing the Leases or producing from the Leases.  Under the Termination Clause (Paragraph XI(a)), if EP Energy did not engage in continuous development following the primary term's expiration, the lease would terminate as to any acreage not designated as part of a production unit (*i.e.,* undeveloped acreage).  Following such a termination, each production unit would be required to stand independently under the Separate Lease Clause (Paragraph XI(d)).  That is, development or production from one unit would only preserve the lease as to that unit and would not preserve any other units.

The MSB Owners' reading of Separate Lease Clause would eviscerate EP Energy's continuous development rights after the expiration of the primary term.  The Continuous Development Provision unequivocally grants EP Energy the right to maintain each "leased premises" (*i.e.,* the entire lease) in its entirety through continuous development operations.  (ECF No. 36-10 at 31–32).  The MSB Owners' reading is inconsistent with common practice, other lease provisions, and the reading of each lease as a single document (rather than the MSB Owners' proposed parsing of clauses within sentences to produce the MSB Owners' desired result).

To arrive at their interpretation, the MSB Owners read the Separate Lease Clause's reference to "any event described in subparagraph (a)" as referring any *occurrence* referenced in subparagraph (a) (the Termination Clause).  (ECF No. 36-10 at 35).  Instead, the reference to the

Termination Clause should be read as referring to any *termination event*. The Termination Clause provides several *events* that cause portions of each lease to terminate. They include:

- The primary term's expiration, at which time there are no continuous development operations occurring;

- A cessation of continuous development operations after the primary term's end;

- If after the primary term's expiration, there are no continuous development operations conducted in accordance with Paragraph VIII (the Continuous Development Provision); and

- If post-primary-term continuous development operations have resulted in the designation of production units covering the entire leased premises consistent with Paragraph IX (the Production Units Provision).

If any of these *events* contemplated by the Termination Clause occur, then each production unit will stand—and be continued in force and effect—independently of all other production units. (*See* ECF No. 36-10 at 35–36). As exemplified above, the triggering events in paragraph XI(a) are viewed in tandem—by looking to both the status of the primary term and continuous development operations. The MSB Owners ask the Court to ignore the "whichever occurs later" clause and to read the Separate Lease Clause as referencing the mere occurrence of either the end of the primary term or the cessation of continuous development. Rather, the Termination Clause and the Separate Lease Clause have no effect on EP Energy's continuous development rights.

The Leases' language makes this reading clear. Throughout the Leases, there are references to "operations" and to "continuous development operations." However, the Separate Lease Clause references only "operations," not continuous development operations. (*See* ECF No. 36-10 at 35–36). This language is unsurprising as the Separate Lease Clause deals only with Retained Production Units, not undeveloped acreage that may be held through "continuous development operations." In fact, reading the Separate Lease Clause and its reference to the Termination Clause correctly, at the time the Separate Lease Clause takes effect there will no

longer be undeveloped acreage covered by the lease.  Further reinforcing this reading is the fact that the Separate Lease Clause makes no refence to undeveloped or undesignated acreage.

Under the MSB Owners' strained reading, EP Energy could never rely on continuous development after the primary term's expiration.  This reading contravenes the rights the Continuous Development Provision unambiguously grants EP Energy.

Finally, the parties' dispute over the Temporary Cessation Clause comes down to the meaning of a single word—"and."  Under the Temporary Cessation Clause, "[i]f production should cease from any production unit, [the] lease shall terminate . . . unless the [EP Energy] commences drilling or reworking operations within 120 days . . . ; *and* if production is restored . . . , [the] lease shall remain in force."  (ECF No. 36-10 at 36 (emphasis added)).  The MSB Owners read "and" to mean "as a result or consequence."  *See And*, WEBSTER'S CONCISE DICTIONARY OF THE ENGLISH LANGUAGE 26 (1998 ed.).  Under this reading, EP Energy would be forced to conduct drilling or reworking operations anytime production ceased, no matter the duration of cessation.  (*See* ECF No. 71 at 19–22).  Reading "and" to mean "[a]lso, added to, [or] as well as" better comports with the lease read as a whole.  *See And*, WEBSTER'S CONCISE DICTIONARY OF THE ENGLISH LANGUAGE 26 (1998 ed.).  When "and" is read correctly, the Temporary Cessation Clause plainly preserves each lease for 120 days, during which time EP Energy can begin drilling or reworking operations to restore production, or *simply restore* production.  Otherwise, EP Energy would be forced to pay for the unnecessary reworking of a well capable of production.  Such a result cannot be correct.

In sum, EP Energy complied with its lease obligations when it shut in production in May 2020.  That compliance entitled EP Energy to exercise rights granted by the Leases, thereby enabling EP Energy to maintain the Leases.  The MSB Owners' interpretation of the Leases to

limit those rights is at odds with the Leases' plain language and Texas law.  The MSB Owners'

Temporary Cessation Claim is futile.

## I.      THE CONTINUOUS DEVELOPMENT PROVISION'S INTERPRETATION

EP Energy retained its continuous-development-phase leases under the Continuous

Development Provision.  EP Energy claims it adhered to the drilling schedule required for lease

retention under the Continuous Development Provision.  The MSB Owners counter that the end

of the primary term triggered limitations imposed by the Separate Lease Clause on the rights

granted by the Continuous Development Provision.  This reading would foreclose EP Energy from

maintaining leases on undeveloped acreage through continuous development on production units.

The MSB Owners reading contravenes Texas law, as well as the Leases' plain language.

While the Leases are interpreted as contracts, some "special construction rules" apply.  *PPC*

*Acquisition Co. LLC v. Del. Basin Res., LLC*, 619 S.W.3d 338, 349 (Tex. App.—El Paso 2021, no

pet.) (quoting *Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 595

(Tex. 2018)).  These special rules arise from the intersection between mineral leasing and interests

in real property.  *Id.*

The parties' dispute centers on the Leases' contractually-imposed duration, and those lease

provisions extending that duration.  In an oil and gas lease, the habendum clause defines the lease's

duration.  *Endeavor Energy*, 554 S.W.3d at 597 (citing *Anadarko Petroleum Corp. v. Thompson*,

94 S.W.3d 550, 554 (Tex. 2002)).  In its most basic form, the habendum clause provides that a

lease will continue "as long as oil or gas is produced" on the leased premises, and that production

anywhere on the lease will hold the entire lease in force.  *See id.* (explaining the function of a

simple habendum clause in a mineral lease).  However, parties may limit the habendum clause's

effect by limiting the leased area that can be maintained through production.  *See id.* at 598 (citing

3 WILLIAMS & MEYER, OIL & GAS LAW § 603.7 (2021)) ("[A] retained-acreage clause typically divides the leased acreage such that production or development will preserve the lease only as to a specified portion of the leased acreage."). Similarly, parties may extend a lease's duration absent production by agreeing that continuous development on the leased premises will hold the lease in force. *See id.* at 597 (citing 3 WILLIAMS & MEYER, OIL & GAS LAW § 617.2 (2021)) (describing a continuous development provision's effect on a lease's duration).

However, underlying these types of provisions is the well-established requirement that parties must clearly identify those events resulting in a lease's termination. *See id.* at 606 (quoting *Anadarko*, 94 S.W.3d at 554) ("[W]e will not find a special limitation unless the language is so clear, precise, and unequivocal that we can reasonably give it no other meaning." (internal quotation marks omitted)). Such provisions are called "special limitations." *Id.* ("A special limitation in an oil and gas lease provides that the lease will automatically terminate upon the happening of a stipulated event."). The MSB Owners' reading necessarily requires a finding that the Separate Lease Clause, in conjunction with the Termination Clause, constitutes a special limitation that mutes the Continuous Development Provision's effect. *Id.* But the Leases are insufficiently "clear, precise, and unequivocal" to establish that the Separate Lease Clause imposed a special limitation on EP Energy.

The Continuous Development Provision provides two circumstances in which EP Energy can retain the "*leased premises*" beyond the primary term. First, EP Energy could retain a lease by continuing to drill on the leased premises beyond the primary term, if EP Energy commenced drilling operations "within [120] days after the . . . expiration of the primary term" while "oil or gas [was] being produced in paying quantities from the leased premises at the expiration of the primary term." (ECF No. 36-10 at 31–32). Second, EP Energy could drill on the leased premises

after the expiration of the primary term if new drilling operations were commenced "within [120] days after . . . the completion of any well drilled or reworked by [EP Energy] on the leased premises within [180] days prior to the expiration of the primary term." (ECF No. 36-10 at 31–32). Whichever of these events occurred later would be the date from which EP Energy had 120 days to drill a new well *on the leased premises*. (ECF No. 36-10 at 31–32).

EP Energy could then continue to retain the leased premises through further drilling operations if the operations were commenced "within [120] days after the completion of such additional well as a producer of oil or gas or the abandonment of the same as a dry hole." (ECF No. 36-10 at 32). For example, if EP Energy drilled a well within 120 days after the primary term's expiration, it could then drill another well within 120 days of the first well's completion or abandonment. (*See* ECF No. 36-10 at 31–32). The Leases make clear that EP Energy could continue drilling "successive wells" "[i]n a like manner . . . until [EP Energy] completed a sufficient number of wells to continue th[e] lease in force as to *all the leased premises* as provided in *Paragraph IX*." (ECF No. 36-10 at 32 (emphasis added)). Essentially, so long as EP Energy drilled a well on the leased premises within 120 days after EP Energy completed or abandoned the previous well, EP Energy maintained its right to drill on the entire lease. This is what EP Energy claims it did. The MSB Owners do not dispute that EP Energy's drilling complied with the Continuous Development Provision's temporal requirements. Instead, the MSB Owners argue that drilling should be viewed on a unit-by-unit basis.

The MSB Owners propose a reading that invokes other lease provisions. In sum, their interpretation of the Leases is that portions of the Leases not designated as production units (*i.e.,* undeveloped acreage) could not be retained through continuous development operations on

existing production units.  This interpretation turns on the meaning of the Separate Lease Clause, as well as the Termination Clause.

According to the MSB Owners, the Separate Lease Clause divided each continuous-development-phase lease into individual leases ("separate leases").  (ECF No. 71 at 15, 34–36).  Effectively, designated production units would become separate leases and the remaining undeveloped acreage would also become a separate lease.  (ECF No. 71 at 15, 34–35).  Under the Separate Lease Clause, each separate lease could only be held by "production from or operations conducted on" that specific lease, "and production from or operations on one [separate lease would] not maintain" any other separate lease.  (ECF No. 36-10 at 35–36).

However, the Separate Lease Clause did not take effect upon the Leases' execution.  Rather, it had to be triggered by "the occurrence of any event described in *subparagraph (a)* [(*i.e.,* the Termination Clause)]."  (ECF No. 36-10 at 35).  This is the point on which the parties disagree—what triggering "event[s]" are "described in subparagraph (a)" (*i.e.,* the Termination Clause).

Relevant to the dispute is the portion of the Termination Clause that provides:

> If this lease has not otherwise terminated . . . , then upon *the expiration of the primary term* or upon *the cessation of continuous drilling operations* conducted in accordance with *Paragraph VIII* [(*i.e.,* the Continuous Development Provision)], whichever occurs later, *this lease shall terminate as to all lands* . . . except land within a production unit or units at that time.

(ECF No. 36-10 at 34).  The MSB Owners say this language identifies (1) the expiration of the primary term (which occurred years ago) and (2) the cessation of continuous drilling operations as triggering "event[s]."  EP Energy contends the triggering "event[s]" are termination events.  That is, a lease's partial termination based on either the primary term's expiration absent continuous drilling operations or a post-primary-term cessation of continuous drilling operations.  If the MSB

Owners are correct, they contend that EP Energy could only rely on continuous development to hold "separate leases" on which the continuous development occurred.  In other words, under the MSB Owners' reading, EP Energy could not retain undeveloped acreage if it did not conduct continuous development operations on that undeveloped acreage.  If EP Energy is correct, it argues that continuous development anywhere on the lease would hold the entire lease regardless of where the development occurred.

The MSB Owners' construction would lead to the termination of each separate lease anytime EP Energy failed to produce from or continuously develop a separate lease.  But for termination to occur based on EP Energy's failure to continuously develop a separate lease, the Leases must "expressly state" that EP Energy's failure would "automatically terminate the lease." *PPC Acquisition*, 619 S.W.3d at 360 (citing *Endeavor Energy*, 554 S.W.3d at 606).  This requirement forecloses the MSB Owners' reading of the Separate Lease Clause.

The Leases explicitly identify certain events that result in termination.  For example: (1) the end of oil and gas production on the entire lease, (ECF No. 36-10 at 7); (2) a failure to timely pay delay rentals, (ECF No. 36-10 at 25–28); (3) the latter of the end of the primary term or the end of continuous development, (ECF No. 36-10 at 34); and (4) a cessation of production for more than 120 days, (ECF No. 36-10 at 36).  Of course, the designation of production units mitigates the effect of some termination events.  That is, if a termination event occurs, the lease will only terminate on lands not within a production unit.  The MSB Owners read another implicit termination event into the Leases that cannot be mitigated by the designation of production units: the failure to continuously develop undeveloped, undesignated acreage after the primary term's expiration.

Here, the MSB Owners maintain that allowing EP Energy to retain undeveloped acreage through continuous development on production units would be inconsistent with the terms of the Separate Lease Clause. (ECF No. 71 at 37–41). Therefore, because EP Energy only conducted continuous development operations within existing production units, the leases terminated with respect to any undeveloped acreage. (ECF No. 71 at 37–41).

But the Continuous Development Provision itself authorized EP Energy to continue drilling on the "*leased premises*," without qualification, if EP Energy met the continuous development deadlines. (ECF No. 36-10 at 31–32). The "leased premises" is defined as the "land described in said *Exhibit A*," which identifies the entire leased area. (ECF No. 36-10 at 7, 68). Read plainly, the Continuous Development Provision authorized EP Energy to drill additional wells *anywhere on the leased premises* so long as the wells were drilled within the timeframe imposed by the Continuous Development Provision. *See Unit Petroleum*, 439 S.W.3d at 395–96 (explaining that the words of a contract should be given their plain and ordinary meaning).

Yet the MSB Owners would restrict the meaning of the Continuous Development Provision by applying the Separate Lease Clause. This construction requires that "leased premises," as used in the Continuous Development Provision, be redefined to refer to each separate lease, not the entire leased area. *See Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76, 79 (Tex. 1989) (citing *Dall. Power & Light Co. v. Cleghorn*, 623 S.W.2d 310, 311 (Tex.1981)) ("[A] court should not, under the guise of contract construction, imply 'terms in opposition to the express language that the parties themselves have written into the contracts.'"). The MSB Owners argue that EP Energy's continuous development operations would not entitle EP Energy to continue drilling on the entire leased premises, but rather only on each separate lease on which prior continuous development was conducted. Then, under the Termination Clause, "the cessation of continuous drilling

operations conducted in accordance with" the Continuous Development Provision would result in the termination of each separate lease that was not being continuously developed.  (*See* ECF No. 36-10 at 34).  Here, that means leases on undeveloped acreage would terminate where EP Energy only continuously developed existing production units.

Texas law forecloses this result because such a construction requires a special limitation to be read into the Leases based on an *implied* alteration of "leased premises," as defined by the Leases.  *See Endeavor Energy*, 554 S.W.3d at 606 ("[W]e will not find a special limitation unless the language is so clear, precise, and unequivocal that we can reasonably give it no other meaning." (internal quotation marks omitted)).  Effectively, the MSB Owners say that the Separate Lease Clause and the impliedly re-defined Continuous Development Provision work together to create a special limitation that terminates each separate lease as continuous development on each separate lease ends.  This is not what the Leases say, and Texas law only recognizes special limitations that are "clear[ly], precise[ly], and unequivocal[ly]" set out in a lease.  *Id.*  The Continuous Development Provision grants EP Energy the right to continuously develop the *entire leased premises*, and, under the Termination Clause, no portion of the lease terminates until *all* continuous development has ended.  (ECF No. 36-10 at 31–32, 34); *see also Rogers*, 772 S.W.2d at 79; *Davenport*, 522 S.W.3d at 457 (holding that a term's contractual definition will be enforced).

Reading the Separate Lease Clause's reference to "any event described" in the Termination Clause as a reference to *termination* events (*i.e.,* the actual termination of the lease based on the end of the primary term or the cessation of continuous drilling) harmonizes the Leases' provisions.  *See Grohman v. Kahlig*, 318 S.W.3d 882, 887 (Tex. 2010) (quoting *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005)) ("We must examine and consider the entire writing 'in an effort to harmonize and give effect to all the provisions of the contract so that none will be

rendered meaningless.'"). Under this reading, the Separate Lease Clause would only take effect if the primary term ended, and EP Energy was no longer engaged in continuous development. At that point, a lease would terminate except with respect to designated production units. The Separate Lease Clause would require those individual production units to sustain themselves through continuous production or later operations. This reading is consistent with the Production Units Provision's requirement that production units contain a producing well, as that Provision allows a producing well to hold only the leased area surrounding the well (*i.e.,* the production unit) in force through production.[13] But if the primary term ended and EP Energy continued developing a lease, the lease would not terminate and the Separate Lease Clause would not take effect, thereby allowing EP Energy to maintain the entire lease through continuous development anywhere on the lease.

This reading makes sense considering the language used in both the Termination Clause and the Separate Lease Clause. *Accord Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 258 (Tex. 2017) (quoting *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994)) ("No one phrase, sentence, or section of a contract should be isolated from its setting and considered apart from the other provisions."). The Termination Clause explicitly requires all continuous development operations, anywhere on the lease, to cease before termination occurs. And, once termination occurs, the lease terminates only on undeveloped acreage. In other words, the Clause makes no distinction between continuous development within production units or on undeveloped acreage, a distinction implicit in the MSB Owners' reading. The Clause does, however, provide for the termination of the lease on *all* undeveloped acreage after a termination event. And it would be odd to require continuous development to cease everywhere before the lease terminated as to

---

[13] Specifically, the Production Units Provision limits the leased geographical area a producing well can hold in force, creating a "production unit." (*See* ECF No. 36-10 at 32–33).

undeveloped acreage in one provision (*i.e.,* the Termination Clause), but in another provision just a few paragraphs later (*i.e.,* the Separate Lease Clause) require only that continuous development cease on undeveloped acreage to terminate the lease as to that undeveloped acreage. *See D Design Holdings, L.P. v. MMP Corp.*, 339 S.W.3d 195, 201 (Tex. App.—Dallas 2011, no pet.) (citing *United Protective Servs., Inc. v. W. Vill. Ltd. P'ship*, 180 S.W.3d 430, 432 (Tex. App.—Dallas 2005, no pet.)) ("When the provisions of a contract appear to conflict, we will attempt to harmonize the provisions and assume the parties intended every provision to have some effect.").

Furthermore, the Separate Lease Clause only identifies actions necessary to maintain *production units*, as well as limitations on the effect of those actions. Unsurprisingly, the Separate Lease Clause says nothing of undeveloped acreage or how it is to be maintained. This omission indicates the Clause was not intended to take effect until after both the end of the primary term and the cessation of continuous development, when the lease on undeveloped acreage had terminated. *See Rogers*, 772 S.W.2d at 79 (cautioning against reading terms into contracts)

The Separate Lease Clause also provides that "production from or *operations conducted on each production unit*" will only maintain that specific production unit. (ECF No. 36-10 at 35 (emphasis added)). But EP Energy's continuous development rights are invariably linked to "continuous development operations" or "continuous drilling operations." (*See, e.g.,* ECF No. 36-10 at 31–32, 34). This variance in terms further reinforces a reading of the Separate Lease Clause that precludes its effect until after the cessation of "continuous development" or "continuous drilling" on the leased premises in its entirety. *See DaimlerChrysler Motors Co., LLC v. Manuel*, 362 S.W.3d 160, 185 (Tex. App.—Fort Worth 2012, no pet.) (citing *Cherokee Water Co. v. Freeman*, 33 S.W.3d 349, 354 (Tex. App.—Texarkana 2000, no pet.)) (holding that the use of different terms evidences the parties' intent for the terms to have different meanings). That is, if

"continuous development" or "continuous drilling" operations could only maintain the separate lease on which they were conducted, the Separate Lease Clause should have said as much.

Finally, enforcing the Continuous Development Provision's plain language will not facilitate the "warehousing" of the MSB Owners' minerals. The Leases impose on EP Energy an obligation to continue developing the leased premises as would a "reasonably prudent operator." (ECF No. 36-10 at 37). This duty precludes EP Energy from indefinitely "warehousing" undeveloped acreage through continuous development elsewhere on a lease. *Cf. ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 871 (Tex. 2018) (citing *Amoco Prod. Co. v. Alexander*, 622 S.W.2d 563, 567 (Tex. 1981)) ("[I]n theory, production of an otherwise capable well could be delayed indefinitely if a producer maintains its lease under the terms of a savings clause. However, in Texas a producer makes an implied covenant to . . . reasonably develop after production has been obtained, [which is] measured under the reasonably prudent operator standard.").

The Continuous Development Provision plainly grants EP Energy the right to continue drilling on the *entire* leasehold so long as EP Energy adheres to the Provision's drilling timeline. *See Unit Petroleum*, 439 S.W.3d at 396 (reiterating that words in a contract are given their plain meaning). The MSB Owners' proposed reading would alter the Leases' defined terms and impose on EP Energy a special limitation not supported by the Leases' express text. *See Davenport*, 522 S.W.3d at 457; *see also Endeavor Energy*, 554 S.W.3d at 606. Under the Leases' terms, those leases still in their continuous-development phases did not terminate when EP Energy ceased production in May 2020.[14]

---

[14] The Court makes no factual findings as to whether any specific leases were in their continuous-development phases in May 2020. Rather, this Memorandum Opinion supplies the proper interpretation of the Leases with respect to continuous development, and the requirements placed on EP Energy to hold leases through compliance with the Continuous Development Provision.

## II.    THE TEMPORARY CESSATION CLAUSE'S INTERPRETATION

EP Energy held the remaining leases through continuous production.  The MSB Owners, however, contend that these leases terminated under the Temporary Cessation Clause. Specifically, the MSB Owners argue that the Leases required EP Energy, in the event of a cessation of production, to commence drilling or reworking operations within 120 days of the cessation. There is no dispute that EP Energy restored production within 120 days, but the MSB Owners say drilling or reworking operations were required, not simply the restoration of production.

The MSB Owners' position fails to give full effect to the Temporary Cessation Clause. Under the Clause, EP Energy could retain the Leases by drilling, reworking, or restoring production within 120 days of the temporary cessation.  Because EP Energy restored production within 120 days, EP Energy retained these leases.

The MSB Owners mistakenly read the Temporary Cessation Clause.  It provides that "[i]f production should cease from any production unit, this lease shall terminate . . . unless [EP Energy] commences drilling or reworking operations on such unit within [120] days."  (ECF No. 36-10 at 36).  According to the MSB Owners, this language clearly, precisely, and unequivocally caused the Leases to terminate after production ceased and EP Energy failed to begin drilling or reworking within 120 days.  (ECF No. 71 at 22).  This reading fails to account for the remainder of the Temporary Cessation Clause, as well as the Leases' habendum clause.  *See Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006) (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)) (explaining that provisions of a contract cannot be read in isolation, but "must be considered with reference to the whole" contract).

The relevant remainder of the Temporary Cessation Clause provides: "[A]*nd if production is restored from such unit, this lease shall remain in effect . . . . as long as oil and gas is produced*

from such unit." (ECF No. 36-10 at 36 (emphasis added)). While the provision on which the MSB Owners rely sets out what EP Energy must do to prevent termination, the remainder of the Temporary Cessation Clause identifies the event that will hold the lease in force—the restoration of production. Reading the provisions in logical progression establishes that EP Energy could retain its leases by restoring production.

So long as EP Energy produced oil or gas from a lease, the habendum clause would hold that lease in force. (ECF No. 36-10 at 7). However, to prevent an instantaneous termination in the event production ceased, the parties agreed to a savings clause, the Temporary Cessation Clause. *See BP Am. Prod. Co. v. Red Deer Res., LLC*, 526 S.W.3d 389, 394–95 (Tex. 2017) ("[S]avings clauses [are] designed to prevent the automatic termination of the lease upon a cessation of production. . . . a typical cessation-of-production clause provides that a lease will remain in force . . . if the lessee conducts drilling or reworking operations . . . ."). The habendum clause yields to the terms of the Temporary Cessation Clause, thereby delaying the leases' termination. *See Mayers v. Sanchez-O'Brien Minerals Corp.*, 670 S.W.2d 704, 710 (Tex. App.—San Antonio 1984, writ ref'd n.r.e.) (citing *Stanolind Oil & Gas Co. v. Newman Bros. Drilling Co.*, 305 S.W.2d 169, 173 (Tex. 1957)) ("The habendum clause is required by its own terms to yield to any and all other provisions which affect the duration of the lease."); (*see also* ECF No. 36-10 at 7). Under the terms of the Temporary Cessation Clause, the moment production stopped within a production unit nothing happened. Instead, the production unit would be held in force for an additional 120 days.

The MSB Owners say that the only way to avoid termination at the end of the additional 120 days was for EP Energy to "commence[] drilling or reworking operations." (ECF No. 36-10 at 36). However, under the habendum clause, each lease remained in force "as long . . . as oil or

gas [was] produced . . . or [*if the*] lease [*was*] *maintained in force and effect under other terms and provisions*" of the lease.  (ECF No. 36-10 at 7 (emphasis added)).  The second condition holding each lease in force (*i.e.,* through other lease terms and provisions) incorporates the Temporary Cessation Clause.  Hence, under the habendum clause, EP Energy could retain each lease through continuous production *or* under the Temporary Cessation Clause.

But reliance on one habendum clause condition to hold the lease in force did not foreclose EP Energy from relying on the other condition.  That is, even though EP Energy was forced to rely on the Temporary Cessation Provision when production initially ceased, EP Energy could rely on the other condition (*i.e.,* continuous production) at any subsequent point, so long as the lease had not otherwise terminated in the interim.  *Cf. Anadarko*, 94 S.W.3d at 557 (holding that a lessee need only rely on a savings clause if the lease would have "otherwise terminate[d] under the habendum clause").[15]  Contrary to the MSB Owners' characterization, EP Energy did not need to satisfy, nor rely on, the Temporary Cessation Clause to retain the leases.  *Cf. id.* ("We also hold that the cessation-of-production clause only applies if the lease would otherwise terminate under the habendum clause.").  Instead, once production was restored, EP Energy could go back to relying on the habendum clause's continuous-production condition.  In fact, EP Energy would have only needed to rely on the Temporary Cessation Provision had EP Energy been unable to restore production and, therefore, been unable to satisfy the habendum clause's continuous-production condition.  *See, e.g.*, *id.* at 556 ("[T]he [cessation-of-production] clause indicates the parties' intent that the cessation-of-production clause apply only when the circumstances require

---

[15] The *Anadarko* lease's habendum clause provided for the lease's existence "as long thereafter as gas *is or can be* produced."  94 S.W.3d at 553 (emphasis added).  Similarly, the habendum clauses here provide that the Leases will remain in force during continuous production or during a term provided in another lease provision.

the lessee 'to resume operations for drilling a well.'  In other words, the cessation-of-production clause only applies if a well holding the lease ceases to be capable of producing gas.").

This result is confirmed by the second portion of the Temporary Cessation Provision that identifies a restoration of production as an event that will cause the lease to "remain in effect." (ECF No. 36-10 at 36).  Moreover, under this second portion, there is no requirement that the "production" come from a newly drilled or reworked well.  *See Universal Health Servs., Inc. v. Renaissance Women's Grp., P.A.*, 121 S.W.3d 742, 747 (Tex. 2003) (citing *Freeport Sulphur Co. v. Am. Sulphur Royalty Co. of Tex.*, 6 S.W.2d 1039, 1041 (Tex. 1928)) ("In rare circumstances, however, a court may imply a covenant in order to reflect the parties' real intentions.  Obviously, courts must be quite cautious in exercising this power.").  Rather, a restoration of production *alone* would hold the lease in force.

The MSB Owners' reading of the second part of the Temporary Cessation Clause stems from an incorrect interpretation of the phrase "and if production is restored," specifically the word "and."  (ECF No. 36-10 at 36).  The MSB Owners take "and" to mean that production must be restored "as a result or consequence" of drilling or reworking.  *See And,* WEBSTER'S CONCISE DICTIONARY OF THE ENGLISH LANGUAGE 26 (1998 ed.).  However, harmonizing the provisions of each lease requires reading "and" to mean "[a]lso, added to, [or] as well as."  *See id.*  Under this construction of the word "and," the Temporary Cessation Clause is consistent with the habendum clause's effect, allowing EP Energy to maintain each lease through production.

Read correctly, the leases held by production did not terminate.  At the cessation of production, termination was delayed for 120 days to allow for production to be restored through reworking or drilling.  But neither reworking nor drilling were required to restore production here. Instead, EP Energy resumed production within the 120-day waiting period.  Therefore, no

termination occurred.  If the 120-day period lapsed before production resumed, the lease would have terminated at the end of the 120 days and the restoration of production would not have sustained the leases held under the Temporary Cessation Clause.

Texas law confirms that lessees can maintain a lease under a cessation-of-production clause by restoring production.  In *Skelly Oil Co. v. Harris*, a lessee completed a well capable of production after the primary term's expiration but capped the well for 41 days following its completion.  352 S.W.2d 950, 952 (Tex. 1962).  During the 41-day delay, the lessee never conducted drilling or reworking operations despite the lease requiring that "if after discovery of oil, gas or other mineral, the production thereof should cease from any cause, this lease shall not terminate *if Lessee commences additional drilling or reworking operations* within 60 days thereafter." *Id.* at 951 n.1 (emphasis added).  Nor did the lessee pay any shut-in royalties, though the lease authorized the lessee to retain the lease under the habendum clause through the payment of shut-in royalties.  *Id.* at 951 n.1, 952.  The Leases at issue here contain essentially the same conditions for holding a lease during a temporary cessation of production—that the lessee must commence reworking or drilling obligations within a set period.  *Compare id.* at 951 n.1 *with* (ECF No. 36-10 at 36).  Still, the Texas Supreme Court held that the cessation-of-production clause, in light of the shut-in royalty clause, provided the lessee 60 days to begin actual or constructive (*i.e.,* through payment of a shut-in royalty) production.  *Harris*, 352 S.W.2d at 953.  And because the lessee began production within the 60-day timeframe, the leases remained in force "so long as oil, gas or other mineral [was] produced." *Id.* at 954.  Here, the Leases' plain language demands the same result. *See Emerald Oil & Gas*, 348 S.W.3d at 211.

Construing the Leases to preclude EP Energy from relying on restored production to retain the Leases after a temporary cessation of production would also produce an odd (and perhaps

unreasonable) result.  It would undermine the purpose for which the parties entered the Leases—the production of oil or gas for the mutual benefit of both parties.  *Endeavor*, 554 S.W.3d at 597 (quoting *Rogers v. Osborn*, 261 S.W.2d 311, 315 (Tex. 1953) (Wilson, J., concurring)) ("[T]he dominant purpose of a lease is to discover and produce oil and gas."  (internal quotation marks omitted)).  Reading the Temporary Cessation Clause to require EP Energy to commence drilling or reworking to retain each lease, as opposed to simply restoring production, would undermine this purpose.  Instead of simply turning its wells back on (and turning the MSB Owners' royalties back on), EP Energy would be forced to expend additional resources to discover and complete new productive wells, or to unnecessarily rework existing capable wells, all with capable wells sitting idle.  While EP Energy was unnecessarily drilling or reworking, neither party would receive the economic benefits of the existing productive wells.  This odd result necessarily influences the Temporary Cessation Clause's interpretation.  *See Garcia v. King*, 164 S.W.2d 509, 511 (Tex. 1942) ("[T]he very purpose of the landowner in executing the lease is to have the oil and gas on the leased premises produced and marketed so that he may receive his royalty therefrom . . . . *These are material elements to be considered in the interpretation of the contract* . . . ." (emphasis added)).  In fact, given the purpose for which the MSB Owners entered the Leases, construing the Leases in a way that would delay or undermine that purpose would be unreasonable.  *See Unit Petroleum*, 439 S.W.3d at 395–96.  The following examples demonstrate the unreasonableness of this result:

| Hypothetical Event | MSB Owners' Result | EP Energy's Result |
|---|---|---|
| Oil is transported from the wellhead by truck.  Production from that wellhead is the sole production in a unit.  To access the wellhead, the truck must cross a bridge.  The bridge washes out.  Production | The lease would terminate based on a temporary cessation unless the well is reworked.  The repair of the bridge and restoration of production would not be | The lease would not terminate because production was restored prior to the lease's termination. |

| | | |
|---|---|---|
| ceases for 60 days to allow reconstruction of the bridge. | sufficient to maintain the lease. | |
| Gas is gathered at the wellheads via pipeline.  The pipeline develops a leak downstream from the unit.  The repair takes 14 days.  Production ceases for 14 days. | The lease terminates based on a temporary cessation unless the well is reworked.  The repair of the pipeline and the restoration of production would not be sufficient to maintain the lease. | The lease would not terminate because production was restored prior to the lease's termination. |
| Due to market disruptions, there are no purchasers of gas at a positive price.  There is no storage capacity.  Production ceases for 150 days to allow normalization of markets. | The lease would terminate because production was not restored and the wells were not reworked within 120 days. | The lease would terminate because production was not restored within 120 days. |

Finally, the MSB Owners' concern that EP Energy's reading of the Temporary Cessation Clause gives EP Energy *carte blanche* control over when it chooses to produce oil or gas does not justify the MSB Owners' reading.  (*See* ECF No. 49 at 36:19–37:5).  Texas law imposes on EP Energy an obligation "to conduct operations as a reasonably prudent operator in order to carry out the purposes of the oil and gas lease."  *Alexander*, 622 S.W.2d at 568.  Under this obligation, EP Energy is required to reasonably market oil or gas from the Leases.  *Anadarko*, 94 S.W.3d at 557.  This duty precludes EP Energy from unreasonably relying on the Temporary Cessation Clause to delay production to the MSB Owners' detriment.  *Cf id.* ("[W]e reject [the] contention that allowing the capability of production to sustain the lease would allow the lessees to sustain the lease indefinitely . . . .  Rather, the implied duty to [act] as a reasonably prudent operator . . . would limit the lessees' ability to sustain the lease based on a well's capability of production.").  Even if

46 / 47

EP Energy breached this obligation, the MSB Owners' remedy would be monetary damages, not lease termination.  *Id.* at 560 (quoting *Rogers*, 772 S.W.2d at 79).

The Temporary Cessation Clause tempers the effects of the habendum clause.  The Clause permitted EP Energy to temporarily cease production for 120 days without a resultant lease termination.  Because EP Energy's cessation did not extend beyond the 120-day grace period set out in the Temporary Cessation Clause, the leases remained in force under that Clause until production was restored.  Once EP Energy restored production, that production held the leases in force under the habendum clause.

## CONCLUSION

The MSB Owners' Temporary Cessation Claim is denied.  The Eagle Ford Leases remained in force following EP Energy's temporary cessation of production.  Since the Leases remained in force, EP Energy's continued operations on the Leases were not trespassory.  A separate order will be entered.

SIGNED 12/14/2021

Marvin Isgur
United States Bankruptcy Judge