Case 19-35647   Document 311   Filed in TXSB on 11/03/22   Page 1 of 16

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
November 03, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 19-35647 |
| EP ENERGY E&P COMPANY, L.P., | § | |
| Debtors. | § | Jointly Administered |
| | § | CHAPTER 11 |

## MEMORANDUM OPINION

EP Energy objects to claims filed by Bonnie Horrocks, Thomas Peterson, and Richard Horrocks. EP alleges that the proofs of claim are insufficient under Federal Rule of Bankruptcy Procedure 3001. EP argues alternatively that the claims should be disallowed under § 502(b)(1) because EP can rebut their allowability in two ways: (i) a 1978 well fire did not terminate the lease; and (ii) the Horrocks cannot amend the lease without the lessee's knowledge or consent. The Court sustains EP's objection to the three Claims. The Claims are disallowed under the lease and Utah law.

## BACKGROUND

This dispute centers around the legal impact of two events in the history of an oil and gas lease. The first is a well fire that occurred in 1978, and the second is an attempt by the Horrocks to unilaterally amend the terms of the lease in 1983.

I. **FACTUAL BACKGROUND**

Victor and Bessie Horrocks signed an oil and gas lease with Hugh Ford in 1962. (ECF No. 236-2 at 1). The lease includes about 400 mineral acres—40 acres from Section 19 and 360 acres from Section 20. (ECF No. 236-2 at 1). Under the lease's terms, Victor and Bessie Horrocks retained a 1/8 royalty interest as lessors. (ECF No. 236-2 at 2). The lease was to remain in effect for a primary term of 10 years and extend past that point only if there was production on "the

leased premises or from the lands with which the leased premises or any part thereof may be unitized." (ECF No. 236-2 at 2). Beyond the primary term, the lease would terminate only if there was no production on any part of the leased premises or lands with which the premises had been pooled and unitized for 90 days. (ECF No. 236-2 at 2). The lease contains neither a retained acreage clause nor a Pugh clause. (ECF No. 236-2 at 2).

The lease allowed for pooling and unitization, and the lease was unitized and pooled before the end of the primary term with other leases in Sections 19 and 20. (ECF Nos. 236-3, 236-4). Production in both Section 19 and Section 20 extended the lease past the primary term. (ECF Nos. 236-6, 236-7). The declarations of unitization and pooling for Sections 19 and 20 state that Hugh Ford had assigned the leases in those sections to Humble Oil & Refining. (ECF Nos. 236-3, 236-4). Through a series of transactions between 1963 and 2002, EP Energy acquired the working interest in the leases in Sections 19 and 20, including the working interest in the Horrocks lease. (ECF Nos. 236-60 through 236-75, 237-19).

The only producing well in Section 20 at the beginning of 1978 was the Asay Well. (ECF No. 236-7 at 2). A well fire in January 1978 caused the Asay Well to stop producing, only restarting production in May 1979. (ECF No. 236-7 at 1, 2). No new well in Section 20 began production during this period, resulting in a complete cessation of production in Section 20 for more than 90 days. However, a well in Section 19 covered by the lease—the Powell Well—continued production throughout the Asay Well's disruption. (ECF No. 236-6 at 1, 2).

In 1983, Coastal held the working interest in the Horrocks lease. (ECF No. 227-1 at 4). In anticipation of drilling a test well in Section 20, Coastal sent form lease ratifications to its lessors to confirm the validity of its leases in that Section after the Asay Well fire. (ECF No. 227-1 at 4). Certain transfers of the interest in the lease had not been recorded with Coastal as the lease

required, so only Victor, Bessie, and Calvin Horrocks received the Ratifications. (ECF No. 277-1 at 4). They signed the Ratifications only after altering the language of the form to read "provided the royalty interest of the undersigned is changed from 1/8 to 3/16 royalty interest." (ECF Nos. 236-49, 236-50). Coastal did not sign the Ratifications. (ECF Nos. 236-49, 236-50). Coastal did record the ratifications in the public record. (ECF Nos. 236-49, 236-50). When Coastal noticed the additional language, it issued a declaration repudiating the attempted amendment. (ECF No. 236-51). Coastal stated that it did not consent to the attempted amendment and that the "unilateral attempt to alter" the terms of the lease was ineffective. (ECF No. 236-51 at 2).

Coastal then obtained a division order opinion regarding the working and royalty interests in Section 20 in 1984. (ECF No. 236-13). The division order opinion found that the Horrocks' royalty interest was 12.5% (1/8) for oil and gas. (ECF No. 236-13 at 12). The division order opinion further found that the Horrocks amended the Ratification Agreements without Coastal's knowledge or consent. (ECF No. 236-13 at 43). Coastal (and later EP, as successor to the working interest in the Horrocks lease) continued to pay the 1/8 royalty as opposed to a 3/16 royalty until EP filed for bankruptcy. (ECF No. 227-1 at 12).

After the death of Bessie Horrocks in 1992, Coastal sent division orders to the successors to her royalty interest in the lease to confirm their interests. (ECF No. 236-58). EP sent out another round of division orders in 2011. (ECF No. 236-59). Bonnie Horrocks, Thomas Peterson, and

Richard Horrocks (or their predecessors in interest) signed both sets of division orders, which reflected fractional interests in a 1/8 royalty.[1]  (ECF Nos. 236-58, 236-59 at 2, 11, 29).

## II.   PROCEDURAL BACKGROUND

EP Energy filed a voluntary chapter 11 petition on October 3, 2019.  (ECF No. 1).  Bonnie Horrocks and Thomas Peterson filed proofs of claim on December 16, 2019.  (Claim Nos. 796, 804).  Richard Horrocks filed a proof of claim on December 17, 2019.  (Claim No. 859).  The proofs of claim specified no estimate of the monetary value, but rather indicated that the claim was "unliquidated."  (Claim Nos. 796, 804, 859).  They each also indicated that the claim was based on a lease but wrote "unliquidated" again in the space where a lessor-creditor is meant to state the "amount necessary to cure any default as of the date of the petition."  (Claim Nos. 796, 804, 859).  Bonnie and Richard Horrocks' proofs of claim attached supporting documents, including a "mineral lease story" detailing the grounds for the claim, the lease itself, the ratifications, and other documents pertaining to the Horrocks' claims.  (Claim Nos. 796, 859).  Thomas Peterson filed no supporting documents with his proof of claim.  (Claim No. 804).

The debtors' confirmed Plan provided that EP would assume the Horrocks' oil and gas lease, and the cure amount for the lease was $0.[2]  (ECF Nos. 1348, 1411 at 105).  The Horrocks did not object or raise any issue regarding the assumption of lease or the cure amount.  (ECF No.

---

[1] While the division orders do not explicitly list a 1/8 royalty rate, the 1/8 rate can be deduced by applying a basic formula for calculating a net royalty interest (net interest = acres in which party has interest / total acres in a pooled area x the royalty rate). *See* ECF No. 236-2 at 1 (providing for a 1/8 interest in the area covered by the lease, including any land with which the lease is pooled).  For example, in the 2011 division orders, Bonnie Horrocks' net royalty interest in Section 20 is listed as 0.0195.  (ECF No. 236-59 at 2).  According to the unitization and pooling declaration, the total pooled acreage of Section 20 is 640 acres.  (ECF No. 236-4 at 2).  Bonnie owned an interest in 100 acres of Section 20.  (ECF No. 236-52).  Based on the formula above, this reflects a 12.5% (1/8) royalty rate.

[2] Specifically, the Plan provided that if no cure amount was listed in the Cure Notices filed by the debtors, the cure amount for a lease was presumed to be $0.  (Case No. 19-35654, ECF No. 1411 at 105).  The Horrocks' claims were treated as leases assumed under the Plan and not listed on any Cure Notice.  (Case No. 19-35654, ECF No. 1348).

227-1 at 14). On September 17, 2020, EP filed the Satisfied Objections motion, asking the Court to disallow claims it alleged had been satisfied under the Plan, listing the Horrocks' claims among them. (Case No. 19-35654, ECF Nos. 1438-2, 1439-2). Jon Horrocks, as representative of the Horrocks Claimants, filed a response to the Satisfied Objections on October 15, wherein he objected to the assertion that the Horrocks' Claims had been satisfied under the Plan. (Case No. 19-35654, ECF No. 1473). At that time, EP removed the Horrocks claims from the Satisfied Objections. (ECF No. 227-1 at 15).

EP then objected directly to the Horrocks' proofs of claim on August 16, 2021 and filed a corrected omnibus objection on December 23, this time arguing not that the claims had been satisfied under the Plan but rather that they should be disallowed as either (i) lacking *prima facie* validity, or (ii) as a matter of law under the terms of the lease agreement and Utah law. (ECF Nos. 94, 212). On February 3, 2022, EP sent the Horrocks Claimants an email explaining that they would send adjustment payments to reflect a 3/16 royalty to "maintain a positive relationship with its royalty owners" and "avoid subjecting the Court and the parties to a contentious hearing on these issues." (ECF No. 236-29 at 1). In the email, EP expressly stated that the email and payments were not an attempt to settle or compromise and that EP reserved "all rights and defenses in connection with" the royalty dispute. (ECF No. 239-29 at 3). Despite this effort, a hearing was held on February 14, 2022. (ECF No. 248). EP paid in excess of $90,000 to the Horrocks in compliance with the February 3, 2022 e-mail. (ECF No. 239-29 at 3, 4). The Horrocks accepted the payment. The Court entered an order approving a settlement agreement between certain of the Horrocks Claimants and EP on March 18, 2022. (ECF No. 255). Bonnie Horrocks, Thomas Peterson, and Richard Horrocks (the "Remaining Claimants") did not settle. (ECF No. 255). The

Court took this matter under advisement pending additional accounting from the Horrocks' representative, Jon Horrocks.

## JURISDICTION

This Court has jurisdiction over this matter under 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(a)(2)(B). Venue is proper in this District consistent with 28 U.S.C. §§ 1408 and 1409.

## DISCUSSION

EP asks the Court to disallow the Remaining Claims on three bases: (i) the proofs of claim do not adhere to the Federal Rules of Bankruptcy Procedure; (ii) the Remaining Claims fail as a matter of law because the lease did not terminate in 1978; and (iii) the Claims fail as a matter of law because the 1983 attempt to increase the royalty rate provided in the lease was ineffective.

### I. THE PRIMA FACIE VALIDITY OF THE REMAINING CLAIMS

The Bankruptcy Code states that a creditor may file a proof of claim and that such a claim is deemed allowed unless a party in interest objects. 11 U.S.C. §§ 501(a), 502(a). Rule 3001 demands that if a claim is based on a writing, the proof of claim must attach a copy of that writing. FED. R. BANKR. P. 3001(c)(1). If a proof of claim is filed properly under the Rule, it "shall constitute *prima facie* evidence of the validity" of the claim. FED. R. BANKR. P. 3001(f). No provision of the Code or Rules demands that a proof of claim specifically list the monetary value of a claim. While Official Form 410 prompts a creditor to list monetary values, the instructions for the form do not necessarily require a creditor to list monetary values.[3] *See* Official Form 410. Section 502(b) of the Code provides an exhaustive list of the grounds for disallowance of a claim,

---

[3] The form instructs a creditor to "fill in all of the information about the claim as of the date the case was filed," which suggests that if the claim has not been reduced to a monetary value as of the petition date, this information would not be available "as of the date the case was filed." *See* Instructions for Proof of Claim to Official Form 410.

which does not include failure to comply with the Federal Rules of Bankruptcy Procedure.[4] 11 U.S.C. § 502(b). Nor is disallowance of the claim a remedy the Rules themselves provide for failure to comply with Rule 3001. *See* FED. R. BANKR. P. 3001(c)(2)(D). Instead, a debtor may make an omnibus objection to a group of claims if "the objector is unable to determine the validity of the claim because of the noncompliance." FED. R. BANKR. P. 3007(d)(6). Therefore, failure to comply with Rule 3001 does not render the claim disallowable, "rather, it strips it of any *prima facie* validity, requiring the creditor to offer the supporting documentation to carry its burden of proof in the face of an objection." *In re Armstrong*, 320 B.R. 97, 104 (Bankr. N.D. Tex. 2005).

At least in part, EP bases its objection to the Remaining Claims on its contention that the proofs of claim lack *prima facie* validity because the claim amounts are simply listed as "unliquidated" and asks the Court to disallow the claims on the basis that they do not comply with Rule 3001. (ECF No. 227-1 at 13). EP contends that the noncompliance provides the debtors with insufficient information to identify and evaluate the basis of the claim, in contravention of this Court's interpretation of Bankruptcy Rule 3001.[5] *See In re Today's Destiny, Inc.*, No. 05-90080, 2008 WL 5479109, at *7 (Bankr. S.D. Tex. Nov. 26, 2008). In *Today's Destiny*, this Court held that Rule 3001 prescribes the burdens of proof as it relates to proofs of claim and objections to claims, but the Rules cannot "add or subtract to the substantive rights provided" by the Code. *Id*.

---

[4] The language of the provision provides that the court "shall allow such claim . . . except to the extent that" and then goes on to list nine grounds for disallowance. 11 U.S.C. § 502(b)(1)-(9). No "catch all" is listed within the nine grounds for disallowance, and the list is not preceded by language that would suggest it is meant to be non-exhaustive—like "including." *See In re Today's Destiny, Inc.*, No. 05-90080, 2008 WL 5479109 at *3 (Bankr. S.D. Tex. Nov. 26, 2008).

[5] The Court interpreted the requirements of Form 10 in *Today's Destiny* as requiring a creditor to state an amount for the claim. *See In re Today's Destiny, Inc.*, 2008 WL 5479109 at *7. At the time of that opinion, Form 10 was in effect and the instructions specifically required a creditor to list an amount. *See* Instructions to Official Form 10. However, Form 10 has since been replaced with Form 410, the instructions for which differ from Form 10 and are discussed in relevant part below. *See* Committee Notes to Official Form 410. Regardless, failing to specify an amount would be a violation of the Rules, which is not grounds for disallowance under the Code. *See* FED. R. BANKR. P. 3001 (a) ("A proof of claim shall conform substantially to the appropriate Official Form.").

at *2. The Court clarified, though, that "if an objecting party cannot discern whether there is a § 502(b) objection to the claim because the claimant failed to comply with the Bankruptcy Rules, the Court does not read the Code and Rules as requiring allowance. Due process requires no less." *Id*. The standard, therefore, is not whether a creditor has listed every detail of the claim asked for in the Official Form. Rather, the issue is whether a proof of claim provides sufficient information to a debtor to satisfy Due Process notice requirements by alerting the debtor to the nature of the claim and therefore possible objections and defenses to it.

The Court declines to find that a proof of claim must list a monetary value for an unliquidated claim to survive objection on the grounds of insufficient notice. For one, doing so would be incongruous with the Code's provision which allows the Court to estimate unliquidated claims. 11 U.S.C. § 502(c). The § 502(c) estimation provision is "designed to promote a fair distribution to creditors through a realistic assessment of uncertain claims." *Matter of Ford*, 967 F.2d 1047, 1053 (5th Cir. 1992). The Senate Report to the enactment of § 502(c) as part of the Reform Act of 1978 contemplates that some claims may not yet be reduced to a dollar amount where it clarifies that one purpose of the provision is to allow claims "to be converted into dollar amounts." Senate Report to 11 U.S.C. § 502(c). The Reform Act of 1978 amended the language of this provision to account for an amendment to the definition of "claim." *Id*. The Code, as amended, defines "claim" not as a dollar amount but rather as a "right to payment" or a "right to an equitable remedy for breach of performance . . . whether or not . . . reduced to judgment." 11 U.S.C. § 101(5). Considering this context, it would be inconsistent to require a proof of claim to state a dollar amount to survive disallowance.

The Remaining Claimants' proofs of claim meet the Due Process notice standards that the Code, the Rules, and this Court demand of creditors. Though the proofs of claim did not specify

a claim amount and simply indicated that the claim was "unliquidated," the attachments to the claims provided EP with sufficient notice of the basis of the claims. Specifically, the mineral lease story indicated that the claim was based on the Remaining Claimants' belief that they were owed the 3/16 rather than the 1/8 royalty and further suggested a claim for trespass due to the Horrocks' argument that the 1978 well fire caused the leases to terminate. (Claim Nos. 796, 859). The proofs of claim also attached the lease and lease-related documents on which the Remaining Claims are based.

Though Mr. Peterson's proof of claim did not attach the supporting documentation required by Rule 3001, this failure to comply with the Rules does not provide independent grounds for disallowance—it merely strips the claim of its presumption of *prima facie* validity. In *Today's Destiny*, this Court disallowed claims which "included no documentation, statement, or explanation" even after the Court gave the claimants an opportunity to provide such documentation. *In re Today's Destiny*, 2008 WL 5479109 at *7. Mr. Peterson, by contrast, provided additional documentation to the court as part of the Horrocks group of claimants in subsequent filings and through documents submitted as evidence at the February 14 hearing. The Court finds that Due Process was satisfied by these subsequent offerings of support for his proof of claim and declines to reject the claim on Rule 3001 grounds.

EP also objected to the Horrocks' claims on the grounds that they are disallowable as a matter of law under the Code. Section 502(b)(1) states that "if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim . . . except to the extent that . . . such claim is unenforceable . . . under any agreement or applicable law. . . ." 11 U.S.C. § 502(b)(1). The Court turns, then, to whether EP's objection sufficiently raises a basis for disallowance under § 502(b)(1) of the Code. *See In re Today's Destiny*, 2008 WL 5479109 at *3.

For the reasons set forth below, the Court finds that the claims should be disallowed under § 502(b)(1) on the grounds that they are unenforceable under the plain terms of the lease and Utah state law.

## II. LEASE TERMINATION

The Remaining Claimants cannot base their claim on an action for trespass because neither the 1978 well fire nor Coastal's repudiation of the Amended Ratifications terminated the Horrocks' lease.

### A. The Well Fire

The purpose of a habendum or "thereafter" clause is "that the lease should continue as long as oil or gas or either of them" is produced from a lease. *Statex Petroleum v. Petroleum, Inc.*, 308 F.2d 815, 818 (10th Cir. 1962). The Horrocks' lease, like most oil and gas leases, provided that this clause would only apply if there was production on the lease before the expiration of its primary term. (ECF No. 236-2 at 1). If the lease survived the primary term, the lease would then terminate only if production stopped on the lease for more than 90 days. (ECF No. 236-2 at 1). As a default matter,

> "production on the portion of [a lease] included within the unit is sufficient to keep the lease alive as to all of [the lease] after the expiration of the primary term under the language of the typical 'thereafter' clause, unless the lease or unitization agreement contains a specific provision to the contrary."

*Mesa Petroleum Co. v. Scheib*, 726 F.2d 614, 615 (10th Cir. 1984) (internal quotations omitted); *see also Mathews v. Sun Oil Co.*, 425 S.W.2d 330, 333 (Tex. 1968) ("It is a rule of general application that in the absence of anything in the lease to indicate a contrary intent, production on one tract will operate to perpetuate the lease as to all tracts described therein and covered thereby.").

Some leases include either a retained acreage or Pugh clause that changes how a cessation in production affects which portions of a lease continue to be held by the lease. A retained acreage clause, for example, might provide that if, after a lease has extended past its primary term, production stops on one section of a lease but not another, then only the producing section will continue to be held by the lease. *See, e.g., Matthews v. Sun Oil*, 425 S.W.2d at 333. A Pugh clause is slightly different in that it "is designed to prohibit lease continuation beyond the primary term as to nonproducing areas not included within a productive unit." *Rogers v. Westhoma Oil Co.*, 291 F.2d 726, 729 (10th Cir. 1961). These clauses are examples of provisions an oil and gas lease could include that would narrow the impact of the habendum clause in cases where production was limited to certain areas of the lease.

The Remaining Claimants argue that because the Asay Well fire in 1978 resulted in a cessation of production in Section 20 for more than 90 days, the lease terminated with respect to Section 20. (Claim Nos. 796, 804). They use this as a basis to claim they are owed trespass damages since Coastal (and later EP) continued to operate in Section 20. (Claim Nos. 796, 804). However, the lease contained neither a retained acreage nor a Pugh clause nor any similar language narrowing the scope of the habendum clause. The records show that there was production on the lease before the expiration of the primary term, meaning the habendum clause applied, so the lease could potentially continue in perpetuity until production terminated across the *entirety* of the tract covered by the lease (including areas with which the lease has been pooled or unitized) for the prescribed period of 90 days. (ECF Nos. 236-1 at 1). Therefore, production from the Powell Well in Section 19 held the entire lease despite the more-than-90-day cessation of production in Section 20.

To the extent the Remaining Claims are based on the trespass theory, the claims are disallowed on the grounds that the Asay Well fire did not terminate the lease under the lease agreement.

### B. Coastal's Repudiation of the Amended Ratifications

The Remaining Claimants argue alternatively that Coastal's declarations repudiating the Amended Ratifications effectively repudiated the entire lease, resulting in a termination of the lease. The Court disagrees. Coastal expressly limited its repudiation of the Amended Ratifications to the Horrocks' attempt to alter the language in the Ratifications to reflect a 3/16 rather than a 1/8 royalty interest. Even if Coastal's attempt to cabin its repudiation of the Amended Ratifications effectively terminated the Ratifications, this would not have the effect of terminating the underlying lease.

A party repudiates a contract where it makes a statement of its intent not to perform under that contract. *Mobil Oil Expl. & Producing Se., Inc. v. United States*, 530 U.S. 604, 608 (2000). This theory presupposes an existing contract, which in this case is the 1962 lease. The language of the Amended Ratifications conditioned the Horrocks' acceptance of the Ratifications on changing the royalty interest reflected in the underlying lease to 3/16. Coastal's declaration that it did not accept the condition under which the Horrocks signed the Amended Ratifications arguably rendered the Ratifications ineffective because there was no mutual assent. However, Coastal's declaration in no way reflected an intent to repudiate the lease itself. The purpose of the ratifications sent by Coastal to holders of royalty interests in the Horrocks' lease in 1983 was to confirm that the fire had not terminated the leases—not to reinstate leases that had terminated because of the well fire or alter any provision of the leases as signed in 1962. Coastal's limited repudiation may have rendered the Ratifications ineffective, but the Ratifications were not

necessary to hold the lease; production from the Powell Well held the lease. So, Coastal's repudiation of the Amended Ratifications had no effect on the terms or validity of the underlying lease whatsoever, leaving the 1/8 royalty intact.

### III. THE UNILATERALLY AMENDED RATIFICATIONS

The Horrocks' attempt to unilaterally increase their royalty interest in the 1983 Amended Ratifications was ineffective. Therefore, there was no default to form the basis of a claim.

The lease concerns land located in Utah, so it is subject to Utah law. *See Trans-W. Petroleum, Inc. v. U.S. Gypsum Co.*, 559 Fed. Appx. 773 (10th Cir. 2014), *certified question answered sub nom. Trans-W. Petroleum, Inc. v. United States Gypsum Co.*, 2016 UT 27, 379 P.3d 1200 (determining that damages for breach of an oil and gas lease located in Utah was a matter of Utah state law). Under Utah state law, real property contracts must conform to the Statute of Frauds. Utah Code Ann. §§ 25-5-1, 25-5-3. Specifically,

> "every contract for the leasing for a longer period than one year, or for the sale, of any lands, or any interest in lands, shall be void unless the contract, or some note or memorandum thereof, is in writing subscribed by the party by whom the lease or sale is to be made."

Utah Code Ann. § 25-5-3. Utah courts interpret "subscribe" to mean "signed" by the party to be charged with creating the interest. *See, e.g., Forest Meadow Ranch Prop. Owners Ass'n., L.L.C. v. Pine Meadow Ranch Home Ass'n*, 2005 UT App 294, 118 P.3d 871, 875, *aff'd, ordered not precedential sub nom. Peters v. Pine Meadow Home Ass'n*, 2007 UT 2, 151 P.3d 962. A conveyance of a mineral interest is a conveyance of real property, so it must conform to the Statute of Frauds. *Flying Diamond Oil Corp. v. Newton Sheep Co.*, 776 P.2d 618, 629 (Utah 1989); *see also Wasatch Oil & Gas, LLC v. Edward A. Reott*, 2011 UT App 152, 263 P.3d 391 (applying the statue of frauds to a purported conveyance of an oil and gas interest in the form of a leasehold because it is a conveyance of real property). Further, "the rule is well settled in Utah that if an

original agreement is within the Statute of Frauds, a subsequent agreement which modifies the original written agreement must also satisfy the requirements of the Statute of Frauds to be enforceable." *Golden Key Realty, Inc. v. Mantas*, 699 P.2d 730, 732 (Utah 1985) (citing *Zion's Properties, Inc. v. Holt*, 538 P.2d 1319, 1322 (1975)).

The original lease signed by the Horrocks purported to convey a working interest in the land to Humble Oil & Refining and was therefore a conveyance of real property under prevailing law. It satisfied Utah's Statute of Frauds because the agreement was in a writing signed by the parties. The attempt to amend the lease therefore must have complied with the Statute of Frauds in order to be effective because it was a modification of an agreement which was subject to the Statute of Frauds. Though the Horrocks signed the writing with the purported amendment, the party to be charged with conveying a 1/16 royalty interest back to the Horrocks—Coastal—did not. Therefore, the Horrocks' attempt to amend the royalty interest retained in the lease from 1/8 to 3/16 is not enforceable.

The outcome is the same applying basic principles of contract law. A "meeting of the minds" is fundamental to the formation of a contractual agreement. *Richard Barton Enterprises, Inc. v. Tsern*, 928 P.2d 368, 373 (Utah 1996). The court in *Tsern* therefore held that a court could not enforce a lease modification to which the parties had not actually agreed. *Id*. Here, the lack of a "meeting of the minds" is apparent. First, Coastal, as EP's predecessor in interest, did not sign the Amended Ratifications after the Horrocks changed the language to reflect the 3/16 royalty interest. Second, Coastal promptly issued a declaration formally and unequivocally repudiating the attempt to amend the royalty interest as soon as Coastal discovered the altered language. (ECF No. 236-51). Finally, Coastal continued to only pay the 1/8 royalty based on the division order opinion it obtained immediately after the amendment attempt—payment which the Horrocks'

accepted without objection for years. These facts indicate that Coastal never intended to be bound by or consent to the 3/16 royalty.[6]

The Remaining Claimants' argument for damages based on a 3/16 royalty also falls flat in the face of the division orders they signed, which only reflected a 1/8 royalty interest. A division order is a tool used by the holders of a working interest in an oil and gas lease "primarily to protect the purchaser in the matter of payment for the oil or gas and may be considered a contract between the sellers on the one hand and the purchaser on the other." *Wagner v. Sunray Mid-Continent Oil Co.*, 182 Kan. 81, 318 P.2d 1039, 1047 (1957) (citing *Stanolind Oil & Gas Co. v. Terrell*, 183 S.W.2d 743 (Tex. Civ. App.—Galveston 1944, writ ref'd)). The purpose of division orders is to allow a lessee to move forward with some certainty as to whether they are in default under any of their oil and gas leases. By signing a division order, the holder of a royalty interest agrees to receive only the proceeds listed in that order. *CIG Expl., Inc. v. Hill*, 824 F. Supp. 1532 (D. Utah 1993), *aff'd sub nom. CIG Expl., Inc. v. Tenneco Oil Co.*, 83 F.3d 431 (10th Cir. 1996). A division order would not be a basis to argue that a lessor is bound by the royalty amount listed within it if that amount was listed was in error. *See In re Unioil, Inc.*, 962 F.2d 988 (10th Cir. 1992) (explaining that a division order is typically binding, but not where the operator of the working interest prepares an order with errors and benefits from those errors). Further, a division order does not amend the terms of an underlying lease where the order conflicts with the lease. *Id.* In

---

[6] Coastal's February 2022 attempt to satisfy the Horrocks by stating its intent to pay the 3/16 royalty on a going forward basis and make adjustment payments does not reflect consent to the amendment because the language of those emails explicitly reserves Coastal's right to argue it is not contractually bound to pay the 3/16 royalty. (ECF No. 236-23). Further, the attempt does not render the dispute over the royalty payments moot because the adjustments were only paid back to October 2013 based on a 6-year statute of limitations. (ECF No, 236-23). The applicable statute of limitations to bring an action based on profits from real property is 7 years. Utah Code Ann. § 78B-2-207 (2022); *see also Trail Mountain Coal Co. v. Utah Div. of State Lands & Forestry*, 921 P.2d 1365 (Utah 1996) (holding that the 7-year limitations period, not the 6-year, was applicable in an action for underpayment of royalties under a mineral lease agreement). As a result, the adjustment payments do not reflect the amount the Remaining Claimants would be able to recover if their theory prevailed.

fact, the 2011 division order signed by the Remaining Claimants expressly states that it does not amend the underlying lease.  (ECF No. 236-59 at 1).

The Remaining Claimants signed division orders which reflected a 1/8 royalty.  (ECF No. 236-59).  The division orders' reflection of the 1/8 royalty was not an error but rather an accurate representation of the terms of the 1962 oil and gas lease, which had not been successfully amended by the unilateral alterations in 1983.  Because division orders are, to an extent, binding on the lessors who sign them, their effect is to prevent the Remaining Claimants from now arguing that they were owed a higher royalty than that reflected in the division orders they signed.  Though the division orders are not dispositive of the royalty due under the lease, they are (i) evidence that Coastal never consented to the attempted amendment and (ii) grounds to find that, even if the Amended Ratifications had been effective, the Remaining Claimants would be prevented from arguing they were owed the 3/16 royalty from the time of the division orders onward.

## CONCLUSION

The Remaining Claims are unenforceable as a matter of law under 11 U.S.C. § 502(b)(1). Therefore, the objection to the proofs of claim is sustained, and the Remaining Claims are disallowed.

A separate order will be entered.

SIGNED 11/03/2022

_____
Marvin Isgur
United States Bankruptcy Judge