IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 19-35654-H1-11 |
| | § | HOUSTON, TEXAS |
| EP ENERGY CORPORATION and | § | FRIDAY, |
| EP ENERGY E&P COMPANY, L.P., | § | MARCH 6, 2020 |
| DEBTORS. | § | 2:00 P.M. TO 2:40 P.M. |

TRIAL ON CONFIRMATION OF PLAN
DAY FIVE (AFTERNOON SESSION)

BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                    SEE NEXT PAGE

ELECTRONIC RECORDING OFFICER: S. ANDERSON

COURTROOM DEPUTY:              TYLER LAWS

TRANSCRIPTION SERVICE BY

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

APPEARANCES

For the Debtors:                    WEIL GOTSHAL & MANGES, LLP
                                    Alfredo Perez, Esq.
                                    Paul Genender, Esq.
                                    Erin Choi, Esq.
                                    Matt Barr, Esq.
                                    Jake Rutherford, Esq.
                                    700 Louisiana, Ste. 1700
                                    Houston, TX 77002
                                    713-546-5040


For MSB Royalty Owners:             HAYNES & BOONE, LLP
                                    Patrick Hughes, Esq.
                                    David Trausch, Esq.
                                    1221 McKinney, Ste. 2100
                                    Houston, TX 77010
                                    713-547-2550

For Apollo Management               PORTER HEDGES, LLP
Holdings, LP:                       John Higgins, Esq.
                                    1000 Main Street, FL. 36
                                    Houston, TX 77002
                                    713-226-6612

                                    PAUL WEISS RIFKIND
                                    Lewis R. Clayton, Esq.
                                    1285 Avenue of the Americas
                                    New York, NY 10019-6064
                                    212-373-3566


For Access Industries:              PILLSBURY WINTHROP SHAW
                                    Hugh Ray, III, Esq.
                                    909 Fannin, Ste. 2000
                                    Houston, TX 77010
                                    713-276-7600

For Maltsberger:                    MCGINNIS LOCKRIDGE, LLP
                                    Christopher L. Halgren, Esq.
                                    609 Main Street, Ste. 2800
                                    Houston, TX  77010
                                    713-615-8539

<pre>
                          APPEARANCES
                          (Continued)


For the Official Committee  (VIA TELEPHONE)
of Unsecured Creditors:     STROOCK & STROOCK & LAVAN, LLP
                            Kenneth Pasquale, Esq.
                            180 Maiden Lane
                            New York, NY 10038
                            212-806-5400

For Elliott Associates &
Elliott International        MILBANK
                            Gerard Uzzi, Esq.
                            55 Hudson Yards
                            New York, NY  10001-2163


For JPMorgan Chase:         MAYER BROWN, LLP
                            Charles Kelley, Esq.
                            700 Louisiana St., Ste. 3400
                            Houston, TX  77002
                            713-238-2634


For the Ad Hoc Group:       MORRISON FOERSTER
                            Michael Birnbaum, Esq.
                            Jamie Levitt, Esq.
                            250 West 55th Street
                            New York, NY 10019-9601
                            212-468-8000
</pre>

HOUSTON, TEXAS; FRIDAY, MARCH 6, 2020; 2:00 P.M.

THE COURT:  All right, we're here for a determination of whether to confirm the Chapter 11 Plan proposed by EP Energy.

I'm going to give detailed Findings of Fact and Conclusions of Law, but in the end I've determined that the Plan must be confirmed under 1129 of the Bankruptcy Code and it will be confirmed.

The following constitute my Findings of Fact and Conclusions of Law:

We have jurisdiction over this matter under 28 USC Section 1334.  It is a core matter under 20 UCS Section 157.

I'm aware that the Debtors have proposed a proposed form of Confirmation Order that includes a number of Findings of Fact and Conclusions of Law.  These are in addition to those findings.  To the extent they are inconsistent, they replace those Findings; and in certain matters, the Debtor is going to be required to submit a revised proposed Form of Order in order to conform with this ruling in any event.

But these are supplemental Findings.  If there's any conflict between my oral Findings and Conclusions and those that are contained in the subsequent written Order that we issue, these oral Findings will control.

First question that I want to confront is whether

the Plan is feasible.  We spent a huge amount of time on feasibility of the Plan and the issue is a very important one.  It is one that is required by Section 1129 of the Bankruptcy Code.

Feasibility became not only a focus of the hearing, but external events, particularly the coronavirus issue, meant that we spent more time on feasibility then perhaps is normal to determine whether these recent events adversely affected feasibility of the Plan.

It was very fortunate that we had two highly credible expert witnesses who maintained their credibility throughout the proceeding.  When asked to file supplements, I believe that both of the experts filed objective and high quality supplements to inform the Court.

The test before us is whether it is more likely than not that the Plan is feasible.  In the context of this case that means that I need to start with the business plan that is proposed by management of the Debtor and which I believe did not get any material attacks on it.

I find that Mr. Parker's testimony was highly credible and I accept that as the go-forward business plan of the Debtor.

I find that the attacks on big wells/small wells were fully explained, that the Debtor has, in fact, been outperforming its business plan and that using that as a

method of looking at what the results of operations are, particularly the financial side of the business, is reasonable and appropriate.

Nevertheless, it was appropriate also to adjust that business plan by the somewhat substantial decline in the price of oil and gas from the time the forecasts were done until the time of the hearing.

Those forecasts' modifications were done by both expert witnesses and they are largely the same. There aren't any material differences between them. They both have an error in them in that both change only the input of the price of oil and make no assumptions about other flow-through matters where there could be adjustments that might save additional cash, for example.

But I think given where we were, they were totally appropriate. The result is that the best evidence that I have are those forecasts, and I'm going to use that as the best evidence that I have. I think that puts, though, the forecast on a conservative basis when I use the current strip price.

There was some discussion as to whether the current strip price or some other mechanism was the right way to forecast the Debtors' gross revenues and that has just been resolved by the experts coming together agreeing that the commodity strip price, in effect, is the right way

to look at this.

I believe that although there are slight differences, that Mr. O'Hara's is the one I'm going to use and I will accept Mr. O'Hara's forecast of what the flows would be as the way in which I look at what is going on from the point of view of the Debtors' business performance.

What those show to me are a few things:  First, it is undisputed that the Debtor will have substantial cash reserves throughout the forecast period, if you exclude capital events of refinancing.  It's going to generate some negative cash flow in the early years of operation and the later years, substantial positive cash flow.  The Debtor starts off with about $400 million worth of cash and the cumulative loss at any point -- the highest point of the cumulative loss is a $35 million cumulative loss, leaving the Debtors with a substantial amount of cash to assure that all of their performance requirements are fully funded.

The real issue comes down to whether the Debtor will be able to engage in the three financing techniques that are required under the Plan.  This is realistically the only hard call that I need to make about whether the forecasts are right, with the exception of what to do about the MSB matter.  We'll get to that in a moment.

What I heard from the experts was Mr. O'Hara saying that he believed that the Debtor would not be able to

refinance in the future because the leverage levels were not re-financeable at current -- in current capital markets and he saw no reason why the current capital markets would change.

He gave no reason for his conclusion that they wouldn't change, but he, I think more than anything, assumed that they wouldn't change.

Conversely, the Debtors' expert testified that the right way to look at capital markets was not the short-term way to look at them.  In context, what we need to understand is that Mr. O'Hara is relying really on capital markets only since 2018, Debtors' expert was looking at capital markets from 2015, a five-year period, and says that you don't just look at short-term blips in the capital markets.  This isn't the same efficient market situation that we have with the NYMEX strip.  This is whether capital markets come and go into industries and his testimony was that the best way to look at that was at a longer-term horizon.  That was bolstered by a few additional pieces of testimony that he gave.

First, he points out -- and it's un-contradicted in the evidence that the Debtor could start its refinancings long before the refinancings were actually due.  That means that the capital markets return at any point into a level that is more normal over a five-year time horizon, that the

Debtor would be able to refinance, we don't need to worry about what the capital markets will be on the precise day of the refinancing.

And second, he talked about various techniques that could manage the amount that needed to be refinanced, particularly in the early years.  There's a few different ways that that could occur that would assist the Debtor in maintaining its feasibility.  One is, the Debtor could borrow senior money.  It wouldn't necessarily need to convert existing junior debt into senior debt.  It could borrow senior money because it has a tranche of in excess of $300 million over and above the 1-1/8ths' that it's allowed to borrow that would be senior to that.

Second, the Debtor has cash reserves, which would help to refinance, as well, with the intermediate refinancing.  That would then reduce the amount of refinancing that would be required.

By the time you get to the longer term refinancing, the Debtor is then in very substantial positive cash flow numbers under Mr. O'Hara's forecast in terms of cash flow from operations, levered free cash flow.

All of that said, I find it more likely than not that Mr. DeSouza's conclusions are correct, that over the five-to-six year time horizon for refinancings, the Debtor will, in fact, be able to refinance.

With respect to the only other major feasibility issue -- and that is:  What do we do about MSB?  I'm going to divert and I'm going to go over to MSB's objections for a moment, and then feed them on back into the feasibility question.

With respect to MSB, and whether they can concurrently terminate the Debtors' operations, I find that the Debtor failed to perform under the MSB Agreements as required prepetition.  There is already a judgment entered.  The Debtors are appealing that and I find it more likely than not that the Debtors will be found to have breached.

Having said that, the type of breach that is allowed, I find would yield a monetary remedy and not a non-monetary remedy under the terms of the documents.

Moreover, I find that MSB more likely than not has elected to remedy on a monetary finding with respect to the A Lease.

Those are not conclusions that should be carried forward into that litigation.  In that litigation, it will be up to the courts that are hearing it, to determine whether they have, in fact, elected and waived their right to a termination, or whether they would ever be entitled to a termination.  I am simply finding more likely than not that those types of defaults would lead only to monetary relief, not non-monetary relief in terms of the termination

of the lease, and that as to the A Lease, at least, the Debtors -- excuse me, MSB has elected the remedy of a monetary result.

There are other issues that have been raised by MSB as to whether post-Confirmation matters could also lead to a default.

First thing I'm going to say is I am directing and mandating that paragraphs be added to the Confirmation Order that are consistent with the initial colloquy that we had at the beginning of this hearing.  The Debtors must fully comply on an administrative basis in cash with all of their cash obligations that have arisen from the petition date through the effective date, and the Debtors must post-effective date comply with all of their obligations under the agreements with MSB.

That is true for both monetary and non-monetary obligations.  The Debtors may not pick and choose what to do in the MSB Lease.  They must perform fully under the MSB Lease.  If they breach post-petition, then MSB may take what remedies are appropriate under state law.  To the extent that those remedies are monetary relief, they'll get monetary relief.  To the extent they're entitled to non-monetary relief, they get non-monetary relief.

I don't believe that I have heard of anything yet that is likely to lead to a termination of the lease if the

Debtors, in fact, do what I'm going to order them to do.

Accordingly, I find it's unlikely that the MSB Lease will actually terminate.  Once again, that forecast of events is not a declaration on which one should rely from a collateral estoppel or a *res judicata* point in the State Court litigation, State Court -- I call it State Court litigation.  It may even be before me.  Wherever that litigation is, these are Findings that are merely more likely than not Findings, so that we can determine whether or not the Plan is feasible.

The actual cash flows off the fields probably aren't enough to upset the overall cash flows anyway, but that's merely a supplemental finding and isn't necessary for my finding that it's more likely than not that the Plan is feasible.

Was the Plan proposed in good faith? is the next issue I want to address on a global basis.

For those of you that have been in the earlier hearing where I made my comments, I really haven't changed my mind about that.  This is a case in which the sponsors played a heavy role in the management of the Debtor on a prepetition basis up until about four months prior to the petition.

All of the evidence I have seen is that although they were aggressively involved in the company -- and I

don't mean aggressively in a negative sense -- they were involved.  They attended every board meeting.  They sent observers to board meetings.  They participated in what was going on.  They were out buying debt.

They did all of that in compliance with the law and I have seen nothing in the way of evidence -- absolutely nothing that the sponsors engaged in any conduct that was illegal.

Now the standard for good faith is not legal and illegal, but if it was illegal, then it wouldn't be in good faith; and I've seen nothing that was illegal that occurred.

In July of 2019, the board determined that they would no longer allow the largest board members who were purchasing Apollo, who were purchasing debt, to remain on the board and to attend meetings.

Access still attended meetings because that was a decision that was made by Ms. Flaton that their debt holdings were relatively immaterial to their equity holdings, is her testimony.  From the time that Ms. Flaton took over the Special Committee, I find that she, in fact, was in charge.  I find that she was not unduly influenced.  I find that she acted independently, and I find that she controlled the Debtors' decisions, along with the other members of the Independent Special Committee, as to what should happen.

This largely comes down -- and I want that to be clear to everybody -- to a credibility call.  So what I have are a lot -- and you know, Mr. Hughes just did a fantastic situation of describing all the circumstantial evidence that could lead to abuse in a case like this.  And I find there was circumstantial evidence that could lead to abuse.  I just find there wasn't abuse.  And I find that largely on the complete credibility of Ms. Flaton.  Everything she said to me was truthful.  I sort of question that she didn't Google people before they met them.

(Laughter.)

THE COURT:  But maybe she didn't.  But beyond that very slight piece of rust on her armor, Ms. Flaton's testimony was very, very credible to me.

And so I'm faced with a situation where, yeah, I've got a situation where the insiders, especially Apollo, are playing a major role.  They're getting lots of inside information.  They're out there buying the debt.  And all of that is legal, but the Plan isn't proposed by them.  They come in and they negotiate with somebody, Ms. Flaton and others, who turn out really to be independent third parties, based on the credibility that they built up with me.

That Debtor controlled by them -- same entity, different people in control -- proposed the Plan.  With a different head of the Special Committee, different

witnesses, this decision could be different.  I think this burden is on the Debtor.  And if all I had was the circumstantial evidence without a really credible witness over here, this decision might be different.  But it isn't and it isn't even a very close call for me to say that circumstantial evidence without meat on the bones and with a very credible witness does not amount to anything other than a good faith Finding.

I find the case is filed -- excuse me, that the Plan was proposed in good faith.

The next issue that I want to go to is what do I do with $177 million?  The $177 million is the charge that is imposed under the terms of the 1-1/8th agreement.  And in the facts of this case it's a charge imposed solely because the Debtors filed bankruptcy.

That does not make it disallowed today.  It does not make it illegal today.  But there's no question in my mind that a charge that is imposed solely upon the filing of a bankruptcy case is inconsistent with the public policy of the country, inconsistent with what everyone has assumed is true in bankruptcy and that is that you can't unreasonably block someone's ability to file bankruptcy.

And so I want to read Section 1124 of the Bankruptcy Code and interpret it when it has ambiguities in a way that avoids something that would violate public

policy.  The bottom line is I never need to get to the question of whether the 177 would, in fact, violate public policy if imposed, or whether it violates any applicable law because under my reading of 1124, it doesn't come into existence because I'm going to read 1124 as narrowly as I can to avoid an interpretation that would allow something to violate public policy.

So I want to take a minute and I want to go through how I'm looking at that.

(Pause in the proceedings.)

THE COURT:  Under 1124, the Debtor is relying on subsection (2) in order to make a determination that they are treating the 1-1/8ths as unimpaired.  The Debtor must prove five things:

First, that under the Plan they are curing any default that occurred before or after the commencement of the case under this title, other than default of a kind specified in Section 365(b)(2) of the Title or of a kind that Section 365(b)(2) expressly does not require to be cured.

There are a few sub-questions on this.  First, does the Debtor need to cure under (2)(a) during the temporal time frame for a cure under the agreements?  I find that it does not.

I find that under 1124(a)(2), the Court must

determine whether there has been a cure in the context of the specifics of the case.  I needn't decide for sure whether 365(b)(2) is referenced and 1124(2) would include a debt contract, since it refers to executory contract provisions of the Code.  I think it probably would, but more importantly, the cure that is required for the cure of the filing of the bankruptcy is to end the bankruptcy.

And so I find in the context of a pure *ipso facto* default that one can cure in the language in 1124(2) that default, by going effective, so that the Debtor is no longer in bankruptcy.

There are other matters that need to be cured, too, potentially.  And the 1-1/8ths focus primarily on whether the significant subsidiaries cross-default under the provision of Section 6.01, in fact, created a default.

First, I find that itself is an *ipso facto* default and is not enforceable.  But second, when I parse the words, I find that there isn't any longer a default once the Plan does effective, and so it is cured by its own terms.

You have to read subsection (e) pretty carefully.  And so I find that there are two potential defaults, not in this case, but one is if there is a failure, one, to pay any indebtedness within any applicable grace period after final maturity.  In this case the argument is:  It matured by the filing of the bankruptcy, the Plan cures it so that there

are no adverse consequences in my mind so there is a cure.

And number two applies to the acceleration of any debt by the holder thereof because of the default and I find that this was not done by acceleration, it was done, instead, by maturity on the filing of the bankruptcy case and that the other lenders by virtue of the Plan and our Order, again, have no adverse effect.  And because there is no adverse effect on the 1-1/8ths, it is a cured default.

With respect to (2)(b), you must reinstate the maturity of such claim or interest if such maturity existed before such default.

This is one where the 1-1/8ths say that the Debtor is inserting additional words, and that they're inserting the words "reinstates the maturity of such claim or interest as such claim existed before such default."

The use of the small "c" claim in 1124(a)(2) -- excuse me, 1124(2)(b) is a matter of some discussion within the Fifth Circuit right now.  Does that mean an allowed claim?  What kind of claim are we referring to here?  It refers to claim of a small "c" and the Fifth Circuit in its recent opinion on unimpairment tries to explain what "claim" means in that context.

In the context, I think of a reinstatement, the claim that you're looking at is the claim as it existed immediately before the filing of the petition.  And because

I believe that the claim that has to be reinstated is that claim and not some claim that may have arisen one second after the filing of the petition, I find that this does, in fact, reinstate the maturity of the claim as it existed before such default.

There's no dispute that the default was the transmission of the petition to the Clerk of the Court. Before the petition was transmitted, the 177 claim did not exist. After it was transmitted, it came into automatic being. And what needs to be reinstated here is the maturity of the claim without the 177.

What does "c" mean? "c" requires that the Debtor compensate the holder of such claim or interest for any damages incurred as the result of any reasonable reliance by such holder on such contractual provision or such applicable law.

We haven't held the hearing yet on whether the Plan does that. I'm going to allow the 1-1/8ths to demonstrate that they are entitled to compensation. If there are any damages -- so far, I've not seen any, but we haven't really had that evidence yet.

The Confirmation Order will provide that the 1-1/8ths may violate claim for any damages. Those damages are not 177, right? I've certainly not seen that. The Debtors are arguing they've paid all the attorney's fees and

that's all the damage.  I don't know.  I'm going to require in the Confirmation Order that there be a hearing, if required to determine it if the parties can't agree on it, but they are, in fact, entitled to be compensated for any damages that might have been incurred.

(d) is, again, a compensation for any actual pecuniary loss from a non-monetary obligation.  I haven't seen that, same result.

And (e) is it does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

To be clear -- and I want this to be clear in the Confirmation Order, the requirement of paying the fee could arise again in the future potentially.  That is fully assumed.  It remains a full obligation.  The contractor remains a full obligation.  If the Debtors have a future default this fee may get imposed for whatever reason is appropriate under the documents.  And there will be no change in their legal, equitable, or contractual rights.

What do we do with the Intercreditor Agreement? The Intercreditor Agreement -- and the most relevant provision is in Section 2.01 of the Intercreditor Agreement. When you read the Intercreditor Agreement as a whole, what it is trying to protect are the rights of the 1-1/8ths in common collateral.

The introductory paragraph of 2.01(a) is not written as a work of art.  It is difficult to know what the word "distribution" means.  It is difficult to know what "in respect of any collateral" means.  But I conclude that that ambiguity of what "in respect of any collateral" means has to be interpreted by reading the context of the document.

And that is that the funds that are received under the Intercreditor Agreement have to come out of, or from, or impair, or un-impair, or do something with the collateral.

In this case there is more going to the holders of secured claims, but they're giving up rights that don't in any way adversely affect the 1-1/8ths.  Nothing that they are getting comes out of the collateral.

Counsel made an argument that I think makes an awful lot of sense.  If somehow those claims were simply sold to a third party, some of their value might be attributed to the collateral of what you got for it, but the rights against the collateral would be unchanged.  And I think that in respect of the collateral has to somehow be more directly related to the collateral than to the rights that pertain to the collateral, which is what might have attributed more value.

I do accept, as I did all of the rest of her testimony, Ms. Flaton's testimony, I think it was honest.  Yeah, they're getting more because they're a secured

creditor, but that does not mean that what they're getting is in respect of the collateral.  It simply means that they had different legal rights and a priority scheme.

The big picture here is that what is happening there doesn't have one iota of a negative effect on the 1-1/8ths.  And because it has not one iota of a negative effect on them or on their collateral, I think it is not done in respect of the collateral.

That said, I'm persuaded by Mr. Jenkins that my initial reading of the parenthetical at the end of 2.01 was probably wrong.  And that the parenthetical would refer to both proceeds of any sale, collection or other liquidation and any other proceeds that might have been in respect of the collateral.

So to the extent that I am in error about what "in respect of collateral" means, then I think the proceeds distribution would pick that up.  And I want that clear that I'm limiting my findings to what "in respect of collateral" means and not to the sales proceeds paragraph.

(Pause in the proceedings.)

THE COURT:  The releases, exculpations and injunctions under the Plan, I find that the releases -- because parties can opt out of them and many did -- are consensual releases.  To the extent that they are third-party releases, they are enforceable.  They're allowed in

this Circuit and we're going to enforce them.

I find, as we discussed on the Record, that the injunctions under the ICA provisions are not permissible.  I have made my findings that the distributions do not invoke the ICA.  Those distributions will be made in accordance with the Plan.  Making the distributions in that manner does not violate the ICA and that will constitute a judgment of the Court, enforceable by the Court, but that's different than issuing an injunction.  I've not seen good cause for the issuance of an injunction.

(Pause in the proceedings.)

THE COURT:  So I don't have any other matters that I thought were of pre-imminent concern that required me to make any additional oral Findings of Fact or Conclusions of Law, but if any party believes that there are additional oral Findings or Conclusions that are required in addition to the more standard ones that I would expect to see in a Confirmation Order, any party that wants those should make me make them, and go ahead and make that request now on a specific basis.

I find that by not requesting it, you're not going to waive any rights, but if you want them so that you have a more complete appellate record, I'm happy to make them.  I'm not saying make them or waive your rights.  Whatever the law does about that, does.  I'm not imposing any extra

requirement.

Anybody believe that I've not made complete Findings that you want more of?

(No audible response.)

THE COURT:  All right.  How long is it going to take the Debtor to propose -- I want all of the critical parties to sign off on this Order and then I'm going to hold a hearing -- unless you can get everybody to sign off on the bottom line that the form of the Order is consistent with our ruling, I'm going to hold a hearing so that I can hear objections to the form of the Order.

How long do you need to get that done?

MR. BARR:  Matt Barr of Weil Gotshal on behalf of the Debtors.

Judge, we're hoping that we would be able to work on that over the weekend and give the parties maybe, you know, the weekend and if we can find some time maybe late in the day on Monday or first thing on Tuesday, so that Your Honor could clear up anything that needs to be cleared up, if anything.

And then have the Order entered as quickly as possible.

THE COURT:  So why don't you ask your partner when I have time on Monday?

Mr. Perez, when do we have time?

MR. BARR:  Mr. Perez, when does he have time?

MR. PEREZ:  I think, unfortunately, you're going to have time late in the day.

THE COURT:  Okay.  Seriously, do you know what Monday looks like?  I'm in a trial in an unrelated case where you're lead counsel, at least for the Record why I'm asking you.

MR. PEREZ:  Your Honor, I believe it's -- I mean, I think we're going to go all day on Monday.

THE COURT:  So do you want to do it at 4:30?

If there anyone who wishes to can attend by phone. I'm hoping that we can, in fact, get an Order signed off on as to form, but if not, we'll set the hearing at 4:30 on Monday for entry of the Order.

I have to say now that this is, I believe, the hardest fought Confirmation Hearing I've had in 17 years. And the total professionalism with which a major dispute was handled by all counsel really made this one of the more interesting and rewarding experiences that I've ever had on the Bench.

And so my -- you know, the Debtors won, but I think the whole system won.  We got to hear an awful lot. Hopefully we've ruled the right way, but it was really a pleasure to see the professionalism of everyone here, everyone that fought Confirmation.  You know, when you have

really good lawyers fighting against Confirmation, you still feel like you should confirm, it gives you a whole lot more confidence you're doing the right thing then when you have to make excuses for a lawyer that doesn't know what he's doing -- I didn't have to make excuses for anybody.

It was just -- I just want to thank everybody for the wonderful experience you-all gave to me.

Mr. Barr?

MR. BARR:  Yes.  I know I speak on behalf of the management team and the 500-plus employees at the company and everybody involved and all the professionals, we thank you and your staff very, very much for what you-all have done for us, which was give us the opportunity and sometimes patiently sit and listen to things over and over again, or read them over and over again.

But we felt it was important because this was not taken lightly.  These are companies.  These are people's jobs.  These are livelihoods.  And we very much appreciate and thank you for everything that you've done here, and we're hoping that we'll get that Order to you with little dispute on Monday so we can go effective as soon as possible.

THE COURT:  Thank you, Mr. Barr.

MR. BARR:  Thank you.

THE COURT:  And we're in adjournment.

Thank you.

COURTROOM DEPUTY:  All rise.

(Afternoon Session concluded at 2:40 p.m.)

*  *  *  *  *

*I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.*

*/S/ MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*

*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET\*\*D-337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #61868a*

*DATE FILED:  MARCH 6, 2020*