IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 19-35654-H1-11 |
| | § | HOUSTON, TEXAS |
| EP ENERGY CORPORATION and | § | FRIDAY, |
| EP ENERGY E&P COMPANY, L.P., | § | MARCH 6, 2020 |
| DEBTORS. | § | 10:30 A.M. TO 11:51 A.M. |

TRIAL ON CONFIRMATION OF PLAN
DAY FIVE (MORNING SESSION)

BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                    SEE NEXT PAGE

ELECTRONIC RECORDING OFFICER: SUZANNE GUEVARA

COURTROOM DEPUTY:              TYLER LAWS

TRANSCRIPTION SERVICE BY

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

APPEARANCES

For the Debtors:                    WEIL GOTSHAL & MANGES, LLP
                                    Alfredo Perez, Esq.
                                    Paul Genender, Esq.
                                    Erin Choi, Esq.
                                    Matt Barr, Esq.
                                    Jake Rutherford, Esq.
                                    700 Louisiana, Ste. 1700
                                    Houston, TX 77002
                                    713-546-5040


For MSB Royalty Owners:             HAYNES & BOONE, LLP
                                    Patrick Hughes, Esq.
                                    David Trausch, Esq.
                                    1221 McKinney, Ste. 2100
                                    Houston, TX 77010
                                    713-547-2550

For Apollo Management               PORTER HEDGES, LLP
Holdings, LP:                       John Higgins, Esq.
                                    1000 Main Street, FL. 36
                                    Houston, TX 77002
                                    713-226-6612

                                    PAUL WEISS RIFKIND
                                    Lewis R. Clayton, Esq.
                                    1285 Avenue of the Americas
                                    New York, NY 10019-6064
                                    212-373-3566


For Access Industries:              PILLSBURY WINTHROP SHAW
                                    Hugh Ray, III, Esq.
                                    909 Fannin, Ste. 2000
                                    Houston, TX 77010
                                    713-276-7600

For Maltsberger:                    MCGINNIS LOCKRIDGE, LLP
                                    Christopher L. Halgren, Esq.
                                    609 Main Street, Ste. 2800
                                    Houston, TX  77010
                                    713-615-8539

3

<u>APPEARANCES</u>
<u>(Continued)</u>

For the Official Committee   (VIA TELEPHONE)
of Unsecured Creditors:     STROOCK & STROOCK & LAVAN, LLP
                            Kenneth Pasquale, Esq.
                            180 Maiden Lane
                            New York, NY 10038
                            212-806-5400

For Elliott Associates &
Elliott International        MILBANK
                            Gerard Uzzi, Esq.
                            55 Hudson Yards
                            New York, NY  10001-2163

For JPMorgan Chase:          MAYER BROWN, LLP
                            Charles Kelley, Esq.
                            700 Louisiana St., Ste. 3400
                            Houston, TX  77002
                            713-238-2634

For the Ad Hoc Group:        MORRISON FOERSTER
                            Michael Birnbaum, Esq.
                            Dennis Jenkins, Esq.
                            Jamie Levitt, Esq.
                            250 West 55th Street
                            New York, NY 10019-9601
                            212-468-8000

4

HOUSTON, TEXAS; FRIDAY, MARCH 6, 2020; 10:30 A.M.

COURTROOM DEPUTY: All rise.

THE COURT: Good morning, please be seated.

All right, we're going to go back on the Record, continued hearing from yesterday for the EP Confirmation hearing in 19-35654.

Do you need new appearances or are we okay?

ELECTRONIC RECORDING OFFICER: No, we're fine.

THE COURT: Okay. Mr. Jenkins?

MS. LEVITT: Your Honor, if I may? Jamie Levitt from Morrison and Foerster on behalf of the Ad Hoc Group.

Yesterday, Mr. Genender gave you some citations to Mr. O'Hara's testimony with respect to the state and capital markets. For the sake of completeness under Rule 106, we just wanted to expand out the citations and we can -- I can give it to the Court or just read them into the Record, whatever --

THE COURT: Whichever way you want to do it. I did, so you know, I read the citations this morning. So, the ones he gave to me I've now read. And if you want to hand them to me, I'll read them over the lunch break. If you want to read them into the Record, you can read them into the Record, whichever one you prefer.

MS. LEVITT: I think for the sake of everyone's time, I'll just hand them up to the Court, but I'll read out

the citations so that Counsel for the Debtors can take look.

We just wanted to add line -- page -- this is from February 27th in the afternoon, page 97, line 16 through page 98, 3.

And then --

MR. HUGHES:  Page 97, line 26?

MS. LEVITT:  97, 16 through 98, 3.  And then Mr. Genender had given you some pages in the 107 and 109. We just went a little before and after.  Page 106, line 1 through 109, line 21.

And then I will add that as the Court, like, recalls yesterday, Mr. O'Hara also testified as to the state of capital markets and the trading down of issuances.  I don't have that transcript yet, but I wanted to note it for the Record.  And I will hand up the marked transcripts of those.

THE COURT:  If it helps any, so far what I was given by Mr. Genender didn't tell me anything I didn't already have in my notes.

MS. LEVITT:  Okay.

THE COURT:  But let me go ahead and take what you've got and hopefully that will be the same, but it might be different.

MS. LEVITT:  Thank you, Your Honor.

THE COURT:  We'll see.

Mr. Hughes?

MR. HUGHES:  Yes, Your Honor.  I wanted to follow up on one thing.  You had asked me about the trading prices and I was working off of an imperfect memory.  I thought it was in the mid 20's.  I did find on MSB 500, two pages that I think Your Honor also had focused in on during the trial that talked about an Evercore presentation that, you know, the market implied the 1.5 is a fulcrum.

THE COURT:  Right.

MR. HUGHES:  And this seems to indicate the prices were in the low to mid 50's with a mid-20 percent yield.  I had a copy here with the pages --

THE COURT:  No, I accept that representation. Thank you.

MR. HUGHES:  I think there was another presentation that I have to have --

THE COURT:  I was just trying to put your argument into context by thinking through that.  But thank you.

Mr. Jenkins?

MR. JENKINS:  Thank you, Your Honor.  Dennis Jenkins of Morrison Foerster again on behalf of the MoFo Ad Hoc Group and the Successor Trustee.

Your Honor, I'd like to start by pointing out that it's been clear through this process that there have been many very thoughtful and good people working hard to

restructure the Debtors here.  And they've made great progress.

But there's more work to do and this Plan can't be confirmed today in our view.

I think many of us have used this analogy before, but I think a lot of us think of the bankruptcy process like a freight train that takes a lot of energy to get that train moving.  And then once it's moving, there's a big reluctance to step in front of it or slow it down.

But there are times where circumstance and the law requires it and this is one of those times, Your Honor.

The key -- and I think Your Honor had a sense of this Friday when you suggested the parties go out into the hallway.  If there's a silver lining to that, it's that the parties are organized and either represented here in the courtroom or through organization that's participated with the Debtors between the Ad Hoc Group, which I represent, and its members and the four backstop parties.

Those two groups hold approximately just slightly less than 80 percent of the 1-1/8th lien notes, the 1-1/4 lien notes, the 1-1/2 lien notes, and the unsecured notes.

And so, the Debtors have access all the parties they need to finish the work that's been started here, Your Honor.  But as I said at the outset, in my opening, this Plan can't be approved for kind of two headline issues.

First, this Plan impairs Class IV, the 1-1/8th lien notes and it's not feasible.  I'll speak -- I want to come first -- well, let me say, in my opening I spent a lot of time explaining why I believe the holders of the 1-1/8th lien notes are impaired.

And I hadn't planned on going through all of that again, but I do need to go through some of it, given the discussion yesterday.

If I'm covering ground, Your Honor, that is well trod already and we can save time, please chime in and I'll move things along.

THE COURT:  I would rather get this right than save time.  So if it's something you want to cover, you cover it.

MR. JENKINS:  Great.

THE COURT:  If you don't want to cover it, then -- I have paid attention, but it's helpful to focus attention. And so you're not going to offend me by doing that at all.

Do I have a copy of the PowerPoint though that I can take notes on?  I did that and it was sort of helpful with --

MR. JENKINS:  Oh, sorry Your Honor.

THE COURT:  -- the Debtors' PowerPoint.

MR. JENKINS:  Can I approach?

THE COURT:  Absolutely.

MR. JENKINS:  Thank you.

(Pause in the proceedings.)

THE COURT:  I'm not encouraging you to go long, but I don't want to discourage you.

MR. JENKINS:  No, many of us have flights.  So I think we will definitely make those, Your Honor.

But let me go back to the headline issue here, Your Honor.  It's the 177 million principal amount that's not being reinstated.

I'll speak to feasibility later, but the Debtors have provided no analysis of the feasibility of their Plan that includes this amount.

So let me back up and start with a little context for that, Your Honor.  Mr. Parker testified that when he arrived at the company in 2017, he already knew that bankruptcy was a possible outcome for EP Energy, given its leverage.

In 2018, the Debtors increased that leverage significantly.  First, with the issuance of just over a billion dollars of the 1-1/2 lien notes in January, followed by our notes, the 1-1/8th lien notes, in May for a principal amount of a billion dollars.

The 1-1/8th lien notes were issued with -- as I mentioned previously -- very Debtor-friendly covenants.  And Mr. D'Souza testified during this proceeding that the

Debtors' feasibility analysis depends on the ability to use these covenants to the Debtors' advantage.

For example, if you describe the ability to conduct up to your exchanges -- or in other words, move junior debt ahead of the 1-1/8th lien noteholders in terms of priority in the future.

The premium in Section 6.2 of the indentures -- which Debtors now seek to avoid -- is designed to protect the holders in precisely this circumstance.

Now yesterday we walked through the -- Debtors walked you through some, but not all -- in fact, many of the more important provisions of that section. So I'd like to take a little time and walk through the provisions of that, Your Honor.

Let me make sure I can use this. How do you turn it on?

(Participants confer to set up equipment.)

MR. JENKINS: Thank you.

So it's a cumbersome provision and I'm going to highlight, you know, I would have liked to just read it all, but that's not going to be as helpful or timely here today. So let's focus on the provisions that matter most.

And to back up a little bit, this Section 6.01 is the provision that lists the defaults. Section 6.2 is the provision that speaks to remedies and acceleration. And

yesterday there was some discussion -- and I highlighted this in my opening, Your Honor, there is a provision in this indenture that the Debtors highlighted yesterday in Article 3.

We're not talking about that provision.  It's a separate provision and Your Honor is well aware of how make wholes work.  That provision is triggered upon a repayment, prepayment, redemption.

We're dealing with an entirely different provision in Section 6.02 that works as follows:

"First if there's an event of default specified in Section 6.01 (f) or (g) with respect to holdings occur, the principal premium, if any, and interest on all the notes will become immediately due and payable without any declaration or any act on the part of the Trustee or any holders."

So this provision has two sections.  One is -- there's three ways acceleration can occur for this provision here.  One could be that there is a default and the holders get together and send a notice to the Trustee.

There could be a default that by the terms of this indenture, automatically accelerates -- and that's the one I've highlighted here.

And there's also, with respect to this premium we'll get to in a minute, it applies in an acceleration for

any purpose under law, whether it's happened pursuant to the contract or whether it's happened because they've directed the Trustee.

So there's three separate ways that acceleration can come to play here.  But we'll just focus for a minute on this one here that's obviously been an event of default because the bankruptcy has occurred and that has caused an acceleration.  And the principal interest premium became immediately due and payable.

Next -- and this goes to the premium that we've been talking about.

"If the applicable premium becomes due and payable, it shall be deemed to be the principal of the notes and interest shall accrue" --

Hang on a second, this -- did I miss?  Yeah, I did.  Somehow that skipped.

So we move ahead, Your Honor, to I believe, the critical provisions of this premium are in the third and fourth paragraphs of 6.02.  And here in the third paragraph we read:

"If the notes are accelerated or otherwise become due prior to their stated maturity in each case as the result of an event of default, including but not limited to an event of default specified in Section 6.01 (f) or (g) with respect to holdings including the

acceleration of any portion of the indebtedness, evidenced by the notes by operation of law" --

That was the one I was just talking about in terms of acceleration by law.

"The amount of principal of accrued and unpaid interest and premium on the notes shall then be due and payable and shall equal -- be equal to 100 percent of the principal amount of the notes plus the applicable premium.

"And then if the applicable premium is not applicable at that time, it goes to the next premium that's due."

This provision triggers automatically upon an acceleration and default.  And it increases the principal automatically.

In the next provision that the parties agreed to, it says:

"If the applicable premium becomes due and payable, it shall be deemed to be principal of the notes and interest shall accrue on the full principal amount of the notesm including the applicable premium from and after the applicable triggering event, including in connection with an event of default specified in 6.01 (f) or (g) with respect to holdings.

"Any premium payable above shall be presumed to be

liquidated damages sustained by each holder as the result of the acceleration of the notes and the issuance agree that it's reasonable under the circumstance currently existing."

They also agree the issues in bold language: "The issuers expressly waive to the fullest extent they may lawfully do so the provisions of any present or future statute or law that prohibits or may prohibit the collection of the foregoing premium in connection with any such acceleration."

They also agreed, Your Honor, they agreed: "To the full extent they could that the premium is reasonable, the product of an arm's-length transaction and B, the premium shall be payable notwithstanding market rates.  There shall be a course of conduct between holders and issuers giving specific consideration to the transaction for this premium.  And the issuer shall be estopped hereafter from claiming differently than they agreed to in this paragraph."

And then finally: "The issuers expressly acknowledge that their agreement to pay the premium to holders as herein described is a material inducement to holders to purchase the notes."

THE COURT:  So let's assume that this language -- we don't have to go through all that -- said if

you filed bankruptcy you owe us a half a billion dollars. That simple sentence.  What's the difference between that and this?

MR. JENKINS:  Your Honor, I think that when we come to how this -- so today I think the procedural context is going to matter.  The question of whether this is due, it's allowed for purposes of today.  It's state law which say that's an unreasonable liquidated damages clause, then we'll have that day in Court --

THE COURT:  I'm talking -- no, I'm --

MR. JENKINS:  -- where you might say that that's unreasonable.

THE COURT:  No, I'm asking -- I mean, they make the argument that for the purposes of figuring out whether you are impaired or un-impaired that essentially what your client has done -- and I forget exactly the wording they used -- was clever drafting to impose a penalty on somebody that files bankruptcy and that we should simply ignore that for the purposes of un-impairment because it violates public policy.

So my question is:  What's the difference between going through all of this language in the situation we are in, and simply -- we'll use 177 million -- and simply saying if you file bankruptcy you have to pay us an extra $177 million?

Isn't that what this says and isn't that something we should ignore?

MR. JENKINS:  No, I don't think -- no, I don't think it does, Your Honor.  I do think circumstances and amount matter.  I think what the Bankruptcy Code generally says is that you look to state law whether it's default interest or anything else.  There are certain remedies that you have and that the Bankruptcy Code generally honors those.

You are right that there are times when public policy comes into play and other matters matter.

THE COURT:  Yeah, but I want you to assume we re-wrote all this and we have a paragraph that says if the Debtors filed bankruptcy, they owe an extra $177 million.

Is that any different from this?

MR. JENKINS:  It is.  This is a liquidated damages provision.  It presumes that you are harmed by a particular event in a way that can be articulated and in advance they agree -- they were --

THE COURT:  Liquidated damages from filing bankruptcy.  This assumes that filing bankruptcy entitles your client to liquidated damages.  It is a premium on filing bankruptcy.

MR. JENKINS:  It's a premium -- it's a premium that results from damages that is triggered by certain

events.  It so happens in this instance that it is bankruptcy, but it could be any number of circumstances, Your Honor.

THE COURT:  But, no let's assume that -- but one of them is bankruptcy.

MR. JENKINS:  One of them is bankruptcy.

THE COURT:  So let's assume that we simply have the simpler statement that says if you file bankruptcy, you owe us $177 million as liquidated damages for filing bankruptcy.

Are you really going to tell me that's enforceable?

MR. JENKINS:  Your Honor, I'm not going to tell you that's enforceable.  I'm telling you that's not what this is.  This provision --

THE COURT:  Okay, so if it said that -- if it said, "If you file bankruptcy, you owe us $177 million as liquidated damages," you agree you couldn't do that?

MR. JENKINS:  I'm not sure that I agree with that. I think that what I would say, Your Honor, is that we are in the context of saying are you impairing me or not and I have legal rights.

THE COURT:  I agree.

MR. JENKINS:  And the Bankruptcy Code says, look, your contract is what it is.  And we go through an analysis

under 1124 to say:  Are you being impaired or aren't you on account of that legal right?

We then look behind that to say there's some reason that we're not going to respect that state legal right behind that and that could be 502, it could be state law, something else.

But I think the Bankruptcy Code starts at a place where you respect the bargain that the underlying parties --

THE COURT:  I agree with that.

MR. JENKINS:  Yeah.  And then if there is some state law, or other reason or policy, I agree there could be any number of those things.  And frankly, part of the reason we came to Your Honor in January was to set up where dynamically we could have a discussion about that, but that's not the context we're here in today.

THE COURT:  Okay.

MR. JENKINS:  Thank you, Your Honor.

So, Your Honor, so we've gone through these provisions and as I was just mentioning. we believe the backstop parties agreed -- I'm sorry, not the backstop parties, but the Debtors entered into this agreement in 2018 in a context where none of their indentures prior to 2018 had this provision.

It was something that at the time people were aware of and entering into.  It was different than all of

the others.

So as I mentioned, the issues here are not simple. That's why we came to Your Honor in, you know, we filed a Proof of Claim in December.  We came in January.  We tried to tee this up for resolution.

And then -- oh, this keeps going off on me.  Mike, can you go to the next one, next slide?

(No audible response.)

MR. JENKINS:  So if you recall, Your Honor, at that hearing Your Honor agreed to allow the claim for purposes of this hearing.  And you proposed at that time what the issue would be for today:  Can a Plan provide for payment of less the full amount of the allowed claim and still leave it unimpaired?

In other words, after taking account of the basis Your Honor's talking about for claim allowance under state and federal law, does 1124 independently provide the power to reduce a claim?

I think the answer, as I will outline here for Your Honor, is clearly no.

Now the opening, Your Honor, as I was walking you through the application of 1124(2), you asked me a good question.  You said, "When does the claim arise under Section 6.2 of the indenture?"

And I will admit at the time when I was answering

that I was actually conflating three different questions as I answered that.  I think there's three questions baked into this, Your Honor.  When does the claim arise, when it is liquidated, and when is it allowed?

And let me just address those because I think it'll help us understand us what's happening in 1124.

So first, Your Honor, when did the claim arise?

Can we go to -- here we go, so it slides up, Your Honor.

If we review Section 101 of the Bankruptcy Code and the definition of claim, we have it right here.  I'll read it.

"It's a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, or right to equitable remedy for breach of performance if such breach gives rise to such right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, legal equitable, secured or unsecured."

Your Honor, by that definition, the claim or in other words the right to payment under Section 6.02 of the indenture arose on May 28th, -- 23rd, 2018 when the notes

were issued and the indenture was signed.

On that date, there was clearly at a minimum unliquidated contingent claim for such amount.

So what's the second question?  The second question is:  When was the claim liquidated?  This is governed by the terms of the indenture.  We went through this briefly here, Your Honor.

And the claim itself was liquated, as we pointed out, automatically upon the filing of the bankruptcy -- not a second before, not a second after -- but simultaneously with the filing of the bankruptcy.

And so the answers to these two questions obviously is important and it comports with the definition of a creditor under the Bankruptcy Code.

Under Section 101 a creditor is a holder of a claim, quote:

"At the time of or before the order for relief."

So it contemplates these holders being creditors with respect to this claim at issue here.

I know Your Honor has given a lot of thought to make wholes so I'll just pause here to point out the difference between liquidation of a make whole and this claim just to show how they're different.

Obviously a make whole, traditional make whole, is liquidated upon repayment, pre-payment, redemption when

those events happen.  That can happen, obviously, after bankruptcy when you're re-instating -- when you're not re-instating, but when you're paying off or redeeming notes.

But here, this claim arose before bankruptcy when it was signed, and it was liquidated exactly the second of the bankruptcy, not a second after.

So finally when was the claim allowed?  Of course, the claim is allowed pursuant to 502 of the Bankruptcy Code. Of course, we agree today that it's on January 30th that the claim's allowed for purposes of today.

But 502 governs the timing of claim allowance, right?  So Section 502 provides that even if a claim is liquidated months after the petition date, 502(b) provides that the claim is allowed, quote:

"As of the date of the filing of the petition."

At the January 30th status conference, Your Honor the Court ruled that for purposes of confirmation, quote:

"We will treat the UMB as an allowed claim in the amount for which it was filed."

The Proof of Claim asserts that the claim of $1,177,000,000 and change that we've been talking about was quote:

"As of the petition date."

There's no basis for treating any of this claim today as a post-petition claim.

So let me come back to 1124.  I believe your questions were important because 1124, Your Honor -- let's come to the next slide here.  So this slide, Your Honor, this is the slide that you saw yesterday and we put back in the language that wasn't there.

But if you look at 1124, it speaks to a class of claims or interest is impaired under a Plan unless with respect to each claim.  So this applies to each claim, right?  Clearly the claim for purposes of 1124 today is the $1.177 billion amount.

The claim arose when the notes were issued and the claim was fully liquidated as of the petition date.

Section 1124 does not address what the allowed amount of that claim should be.  Using 1124 to disallow claims will lead to confusion and miss application of the provision.

Instead the allowed amount of the claim should be determined first under applicable state law or other provisions of federal law as we just discussed.  And I believe that's consistent with the Fifth Circuit's opinion in *Ultra*.  That is why the procedural posture of the claim today, Your Honor, is so critically important.

We proposed a full resolution of these issues prior to confirmation.  Filed a complaint in January. Agreeing to convert to a contested matter if the Debtors

filed an objection of the claim instead of an answer.  But the Debtors didn't want to do that.  This was their choice to set it up this way today.

So how should you apply 1124 to this case, Your Honor?  The Debtors are moving under a very narrow exception, right?  So 1124(1) says you can't alter the legal contractual equitable rights.

1124(2) provides a very narrow exception for that. For what?  You have to first find a contractual provision or applicable law that allows the holder of the claim, quote:  "To demand or receive accelerated payment", close quote, after default.

In other words, you can impair only this type of provision under 1124(2).  If it isn't one of these types of provisions, you can't impair it.

So we're not dealing with that type of contractual provision here and I think Your Honor acknowledged that yesterday.  This isn't acceleration of future interest. It's a liquidated damages claim.  We still get interest on top of whatever the principal amount is.  It's not a -- it's not like the principal that had a maturity date before -- one day before the bankruptcy and that it is accelerated is put back at the original maturity date.  This is different. This is not an acceleration of any future payments.  It is the liquidation of a damages claim.

But even if Your Honor concludes the damages clause is about a contracture right for accelerated payment, the Debtors must still comply with all the elements of 1124(2)(a) through (e).

So let's go through those.  1124(2)(a) requires that you cure all defaults.  We don't think that's possible and I'll come back to that in a minute.

But 1124(2)(b) reads, "The plan must reinstate the maturity of such claim as such maturity existed before such default."

The reference here is to "such claim" in 1124(2)(b).  It does not say a portion of the claim.  It's all of it, the full allowed amount of 1.177 billion. Whatever the claim is, it must be reinstated.

So even if 1124(2) applies here, it does not limit the claim at all.  The plain language is clear in that regard.

Now Your Honor mentioned this yesterday --

THE COURT:  So, so what was the maturity of the 177 immediately before the bankruptcy got filed?

MR. JENKINS:  The maturity of that?

THE COURT:  Before the bankruptcy got filed.

MR. JENKINS:  Yes, sir.

THE COURT:  Because the default was the filing of the bankruptcy.

MR. JENKINS:  Right.  You're highlighting --

THE COURT:  So before the bankruptcy got file -- and I'm not sure of the answer to this --

MR. JENKINS:  Yeah.

THE COURT:  -- what was the maturity of the 177?

MR. JENKINS:  So this is why I don't think this provision applies at all.  So -- as I said before, you have to be applying this to one, it has to accelerate.

THE COURT:  So what was its maturity?

MR. JENKINS:  So as I said before, the claim arose when the parties executed the agreement and it was liquidated as of the petition date.

THE COURT:  Yeah.  So what was its maturity immediately before the petition?

MR. JENKINS:  So, Your Honor, that's an interesting question.  I don't know, it didn't -- you could say that there were conditions to it being, obviously it's an unliquidated claim with conditions before it liquidates, right?

So you can point to those I suppose, but it doesn't have a maturity date in that sense and that's why it's a square peg in a round hole for 1124 entirely.

THE COURT:  Okay.

MR. JENKINS:  The reference to such claim, as I mentioned, Your Honor, is the entire claim.  The Plan

proponents want to read language into the Code that doesn't exist, as Your Honor highlighted yesterday.

They want to reinstate the maturity of such claim or interest as such claim and maturity existed before such default.  But that's not what the Code says.

Even if there was same basis in 1124(2)(a) and (b) to disallow an otherwise allowed claim, Section 1124(2)(c) requires an award of damages for reasonable reliance on Section 6.2 of the indenture.

The 177 million would be these damages in such case.  Here, the Debtors' plan doesn't provide for any damages.  There's just no provision in any portion of their Plan for reliance on that provision.

Presumably, the Debtors had hoped that cure and de-acceleration would magically undue the amount payable under Section 6.02, But there's no support for that under the law.

To the extent the Debtors can cure the three events of default here -- and I'll come back to that -- the cure as defined under Section 1124(2)(a) and 1123(d) in no way reduces principal amount of the claim.  There's no support for that under the language of the Code or any applicable law.

Moreover, Section 1124(2)(b) requires instatement of the entire claim as we've noticed -- whatever it is.

There's no ability to disallow claims by this provision.

In addition, the Debtors totally ignore the fact that once principal is increased under the indenture, it -- this cannot be undone without the consent of every holder of the indenture.

The provisions by its term provide that there can be de-acceleration -- this is outside of bankruptcy.  So, the holders with 50 percent of the vote can de-accelerate, but once the principals been accrued, it requires the vote of every noteholder to then reduce it.

THE COURT:  Or me, right?

MR. JENKINS:  Your Honor, I would never say that you could --

THE COURT:  Well, no, no.  The statute says that I can order the de-acceleration without anyone's consent.

MR. JENKINS:  Yes.  Yes, but it doesn't change the principal amount.

THE COURT:  No, I understand that part of the argument.

MR. JENKINS:  Yes.  Yes, Your Honor.

THE COURT:  But in terms of the part of the argument that we need 50 percent of the noteholders to agree to it, I don't need to worry about that, I don't think.

MR. JENKINS:  No that's true, Your Honor.

THE COURT:  Okay.  Yeah, I just meant--

MR. JENKINS:  Sorry.  There are different ways to de-accelerate obviously you being one of them.

THE COURT:  Okay.

MR. JENKINS:  So, Your Honor, the main point here is that the noteholders under the indenture retain the option to de-accelerate outside the circumstance you mentioned and they do not have to reduce any of the principal.  It's all at their option.

So nothing in 1124 alters that result.  The Debtors ask this Court to adopt the position that reinstatement and cure alone relieve the Debtor of the consequences of that acceleration.

But Section 1124(2) is clear that reinstatement and cure can't erase all the consequences of acceleration. A Debtor must still comply with clauses (c) through (e). There would be no reason to include clauses (c) through (e) if clauses (a) and (b) erased all the consequences of acceleration and default.

Now, Your Honor, I said I'd come back to default. And our position here is that they can't cure all the defaults.  But let's take a look at what those defaults are.

There's defaults under 6.01(a) for failure to pay -- well, I'm sorry.  It should have been, I think it's (b) for payment of principal.  The interest is being paid. So (b) is payment of principal when due, which obviously all

the principal came due on the filing of the bankruptcy.

(e) is a cross-default and (f) is the typical bankruptcy default.  So let's talk about those for a minute, Your Honor.

If you look at clause (e), for example, the cross-default, we don't think the Debtors can cure this. What (e) says is there's a:

"If there's a failure by holdings or any significant subsidiary to pay any indebtedness other than other certain company indebtedness with any applicable grace period after a final maturity or the acceleration of such indebtedness by the holders thereof, because of a default in each case, it's the total amount of such indebtedness unpaid or accelerated exceeds 125 million."

That has been triggered here, Your Honor.  Under the indentures governing the 1-1/4 lien notes, the 1-1/2 lien notes and the unsecured notes, these Chapter 11 cases accelerated all of that debt into the billions.

Under the Plan these 1-1/2 lien notes and each of the unsecured notes will not be paid.  And the respective indentures governing them will be canceled.

On the petition date, therefore, more than 125 million of indebtedness came due as a result of the filing of these cases.  This provision begins measuring the

default from the, quote, "final maturity," close quote, or acceleration, quote, "by the holders thereof because of the default" (close quote).

Your Honor, final maturity is not stated maturity. It's any final maturity.  Acceleration of indebtedness accelerates the maturity and such maturity becomes the final maturity unless the debt is somehow de-accelerated.

If it's not de-accelerated, then it is clearly the final maturity date.  That is certainly the case with respect to the 1-1/2 lien notes and unsecured notes under the Plan.

The final maturity will indeed be the petition date.  In addition, this provision allows for an alternative measure from the date of acceleration by the holders thereof because of the default.

This provision does not require a request or direction for acceleration.  They may accelerate by any method including by entering into an agreement for automatic acceleration.

The Debtors of (indiscernible) and Elliott want to rewrite the provisions to apply only where the debt is accelerated at the request or direction of holders thereof following or after a default.

But where the parties intended this language in the indenture, they use it.  For example, in 7.02(g) of the

indenture in paragraph 5 of the note, they provide the Trustee is under the no obligation to exercise rights or powers, quote, "at the request or direction of any holder without an indemnity."

So where the drafters intend to require the act to be in some particular form over another, they say so.  It does not say so here.  This provision has clearly been triggered, Your Honor.

Now, Your Honor, we don't believe that the cure can be met here.  I'll got to slide 13 or the next slide here.

Your Honor, the cure for this is provided in the indenture itself.  It's in the second paragraph of 6.02. And it provides that:

"If within 20 days after such event or default arose, the issuers deliver an officers certificate to the Trustee stating that one of three things had happened. Then the consequences of the default go away."

And so one of those is:

"The indebtedness or guarantee that's the basis for such event of default has been discharged or the holders thereof have rescinded or waived the acceleration notice or action giving rise to the event or default."

Or, the last one:

"The default that is the basis for such event or default has been cured, it being understood that under no event shall an acceleration of the principal amount in notes as described above, be at all waived or rescinded upon happening of any such events."

So, Your Honor, this provision provides how it is to be cured. And they haven't met this.

So the question comes --

THE COURT: So if we look back to (2)(a) of 1124 are you telling me that one can contract around the ability that (2)(a) gives to cure a default by putting in a time limit in a contract that limits 1124(2)(a)'s application to defaults that remain curable as of the confirmation date on a time basis?

MR. JENKINS: So, what I think -- and I think Your Honor was getting at this yesterday under 11 -- how far does 1124(2)(a) go to an indenture that's not an executory contract, when you asked this question.

So I think the first question is does 1124(2)(a) apply to this particular provision. It says that you have to cure any default, right, except the certain enumerated ones.

THE COURT: Right.

MR. JENKINS: So if you started the provisions saying you must cure this, well then, yes, you must cure it

within that time frame unless an exception applies.

THE COURT:  But I'm saying (2)(a) doesn't impose a time frame.  The contract imposes a time frame.

Can a contract modify the plain language of (2)(a) to add a temporal major to the cure of the default?

Let's take a simpler default example, you know. And let's assume that it was a default if the Debtor changed its name.  And that any defaults had to be cured within 20 days.  And the Debtor waits to confirmation to change its name back to what it was before.

MR. JENKINS:  Right.

THE COURT:  May the contractual provision that says you only have 20 days to do it, is that grafted onto the (2)(a) provision that says you can simply cure it?

MR. JENKINS:  So I think 1124(2)(a) has to be read in the context of 1123(d) as well, Your Honor, right?  So this isn't telling you how the cure occurs.  It just says you must cure it.  And then you must go to state law and say how do you cure it?  And so I don't think --

THE COURT:  But do you also have to go to state law and say:  When do you cure it?  I mean, it's the when that's bothering me, not the how.

I agree that your contract gives them the deadline for curing.  1124(2)(a) seems to not impose a deadline.  And obviously in a bankruptcy case, you can't do anything in

20 days.

So does that mean one can contractually override (2)(a) by putting time deadlines for cures in contracts? Maybe it does, but --

MR. JENKINS: Right, I mean I don't -- I don't read it to say it's overriding it. I think that's already baked into the provision. And part of the reason, Your Honor -- and I'll come back to more of the policy basis for this.

Your Honor, 1124 is designed to narrowly circumscribe (2), an allowed plan that goes forward where it's not impairing someone.

THE COURT: Right.

MR. JENKINS: Right? You can still do many things under 1129. From a Bankruptcy standpoint, you can say -- look there's a lot that you can do. We have lots of tools in our tool bag.

But if we're going to use this tool, it's very narrow and it should be read very narrow because they can always come back and use their other tools, but we have to respect underlying state rights and underlying legal rights, except in these narrow circumstances.

So I believe, yes, I would not read that we're drafting anything into it. I'd say it already contemplates it.

THE COURT:  Thank you.

MR. JENKINS:  Thank you, Your Honor.

So, Your Honor, we already touched upon whether or not 1124(2)(a) applies at all to an executory -- to a non-executory contract.  And I think Your Honor raised that yesterday.

And I think there was some indication in Moody's that Your Honor wasn't ready to apply or was at least contemplating how to apply this provision to a non-executory contract like an indenture.

So, Your Honor, let me just address that if you think it would be helpful?  As I think about it, Your Honor, I think that what Your Honor was thinking about under 1124(2)(a) was that as you look here and it says, okay, we're going to talk about defaults of a type specified in 365(b)(2).

Well, obviously the types that you're talking about there in 365(b)(2) because of 265(c) and (e) don't apply to executory contracts.  All right, so when you go to 365, there's the provisions that say look you can't assume a contract that's a non-executory contract for financial obligations like this.

So certainly that question comes before.  Does this even apply?  I think though, Your Honor, if we're being completely intellectually honest with that I think that this

provision is a response to that fact that you can't assume those kind of contracts and that you can't prevent those kind of defaults under a non-executory financial contract.

So I come back to the point, Your Honor, that I think the way you have to read this is in the context of the Code and this provision in that it is a very narrow exception.

THE COURT:  So under that reading, if it was a default to file bankruptcy in a contract, in a mortgage, in a note, no such contract could then be dealt with under 1124(2)?

MR. JENKINS:  Right, so that's why I'm saying if we're being intellectually honest, it must mean something different.  This has to be -- this provision has to be a response to that prohibition in 365 in some way, right?  But it doesn't really say much.  Neither does the legislative history.

But if you're going to read this in the context of the Code and how this provision works.  I think, one, you need to read it narrowly and, two, I think the type of things that this would be focused on is the type of events that you simply can't cure like a bankruptcy event.

So you ask the question:  Is a bankruptcy an event of default.  Well how do you cure that?

THE COURT:  Well I guess you can cure it by just

going effective, right.  Now you're not in bankruptcy any more.

MR. JENKINS:  But yet that occurred, right?  You can never undo the fact that you filed.

THE COURT:  It occurred, but you cure it by going effective, I'm asking.

MR. JENKINS:  Yeah, I don't think -- I don't think that's right.  I think, though, that this provision would say, look, here you don't need to cure that.  It's uncurable.  But either because under (a) you don't have to cure it or because as you're pointing out you're reinstating it and putting it back.

Either way, the result is the same.  But I think as I think about it, Your Honor, once that event is triggered, you can't -- you can't undo that.  It's not curable.  But I think this in (a) and (b) responds to that either because you read it to say that you don't have to cure it, technically, because it's uncurable or because you've put back the maturity.

THE COURT:  Right.

MR. JENKINS:  So, Your Honor, I think also that even if you find that 365(b)(2) were to apply, that sent you into those particular provisions -- sorry.

I think the case that I cited in my opening, *In Re: Lynchburg Enterprises,* is instructive as to how to

deal with 365(b)(2).

If you recall in that case, the Court there upheld a cross-default that prevented a Debtor from assuming a pharmacy agreement where the pharmacy agreement had cross defaults triggered by defaults of its closely held affiliates that owned the hospital for which the pharmacy agreement was servicing.

The Court held that the cross default was not an *ipso facto* clause captured by 365(b)(2), even though the related defaults were tied to the financial condition of the Debtors closely held affiliates.

Now the key lessons I took from that case, I think should be taken from that case, Your Honor, are when you approach 365(b)(2) and there it was in the context of assumption of an executory contract.

Key lessons:  You have to carefully scrutinize the facts and circumstances to determine, quote "enforcement of the provision would" -- determine whether, quote:

    "Enforcement of the provision would contravene an
     overriding federal bankruptcy policy and thus
     impermissibly hamper Debtors' reorganization."

But in that respect they said -- the Court said federal bankruptcy policies offended where the non-Debtor parties seeks enforcement of a cross-default provision in an -- excuse me -- in an effort to extract priority payments

under unrelated agreement, especially where maximizing returns by treating unrelated, unsecured agreement as a *de facto* priority obligation.

And third, enforcement as the Court said, quote: "Enforcement of a cross-default provision should not be refused.  Were to do so would thwart the non-Debtors parties' bargain," close quote.

I think that's helpful.  You have to look at the facts and circumstances even in the context of assumption. And I don't -- and I would say in the context of 1124, it's even more narrow as you consider the policies because you always have 1129(b).  You have other tools in the tool kit. You must respect state and underlying contract rights unless, in a very narrow circumstance 1124 allows you the little bit to thread that needle.

So here, Your Honor, I'd like to say the Debtors entered into this agreement.  To somehow say this was a surprise is past the -- doesn't even pass muster, Your Honor.

These provisions --

THE COURT:  I actually don't think they're arguing it's a surprise.  It's not a surprise to me; it's not a surprise to them.

MR. JENKINS:  Oh.

THE COURT:  I'm just not sure it's the right

thing --

MR. JENKINS:  Well, fair enough.

THE COURT:  I'm not sure it's the right thing to do, but I don't think it's a surprise.

MR. JENKINS:  Fair enough.  Not -- may not be a surprise, but what they certainly don't want to do is comply with it.  And this was something that the Debtors agreed to and now --

THE COURT:  I agree they --

MR. JENKINS:  -- to have remorse or whatever you want to call it, they don't want to live up to the bargain.  But they want all the benefits that go along with it.

So I'm going to move on, Your Honor, to the Intercreditor Agreements.  I'd like to clarify a few points on how the Plan impairs the holders of the 1-1/8th lien notes and Successor Trustee under the Intercreditor Agreements.

I want to start off by correcting something that was said yesterday, Your Honor.  One of the Debtors' counsel had said that this was not -- it was only a Intercreditor Agreement for lien priority, not a subordination agreement.

That is just wrong.  And I'm going to explain to you why.  So the priority lien Intercreditor Agreement has two provisions in Section 2.01(b) and 2.01(c) that I'd like to highlight here.

In 2.01(b) it reads in relevant part:

"The priorities provided for herein shall not be altered or otherwise affected by any refinancing or either the second lien or the first lien obligations, by the release of any collateral."

So you can release the collateral, but the obligation stick.

"Or any guarantees for any first priority lien obligations or second priority lien obligations or by any action that any representative of a secured party may take or fail to take in respect to any collateral."

Section 2.01(c) that follows says:

"Notwithstanding any provision of the UCC of any jurisdiction or any other applicable law or any defect or deficiencies in the failure to perfect any liens or any other circumstances whatsoever, the liens on the common collateral securing the first priority lien obligations will rank senior."

So even if your liens are invalid, the waterfall and turnover provisions of this agreement apply.  This isn't the ordinary situation where you have only lien priority, lien subordination.

In that case, you would say, look, our liens come first and as long as our liens are valid, we get paid first.  But this has provisions saying, Your Honor, look, if it

turns out our liens aren't valid, we still agree that we get paid first.

So, you have here a provision that has elements of lien and claim subordination.

THE COURT:  You get paid first out of the collateral, not you get paid first, period.

MR. JENKINS:  Even if the -- even if it turns out you don't have a lien.

THE COURT:  Correct, but it still -- so you may have a -- the way I'm reading this and I want you to tell me through this.

MR. JENKINS:  Okay.

THE COURT:  If you file a lien and it turns out you put it in the wrong county.

MR. JENKINS:  Right.

THE COURT:  Between you and the parties to the ICA, that lien remains valid and when that property is sold, any proceeds of that property still go first to your client. I think that's what this says.

I don't see, yet -- and this may be Mr. Carlson not taking me to the right place as he said, where it says that payments not on account of what was the assumed collateral also go to you first.

So let's assume they just have some free and clear cash and they want to pay another creditor.  I don't see any

circumstance under where you get to complain about that.

MR. JENKINS:  So that might -- I'd have to look back.  That might be true.

THE COURT:  Okay.

MR. JENKINS:  But let's say that you take a situation where you're 100 percent secured or you think you're 100 percent secured and it all goes away, right?  And you don't have the liens.

And so, all of the liens go away and you go to a bankruptcy priority scheme and you say well who gets what under the Plan, you're agreeing that first liens get paid first, second liens get paid second.

THE COURT:  No, in that type -- I know that's a shorthand a lot of people use.  But let's be really clear. First liens don't get paid first in a bankruptcy case. First liens get paid first out of the collateral in a bankruptcy case.

And what this does -- so if you have something that isn't collateral, the first lienholders don't get paid first.

What I think this says is, that the first lienholders get paid first as to what you and the second lienholders have all agreed to be the collateral.

MR. JENKINS:  Right.

THE COURT:  And I don't think there's a question

about that.

MR. JENKINS:  Right.  So, I don't have the provision ready at hand to say what happens in the event of distributions.  There is one, but I don't think -- I think the point I want to make here, Your Honor, is because this has elements that go beyond typical straight lien subordination, what is at play here -- and as we go through this -- are provisions that deal with both proceeds from collateral and distributions on account of collateral.

That this isn't just straight lien priority, but we want this to be as broad as possible.  That's the point I'm trying to make and I think that's the more relevant one for here today.

THE COURT:  So it's interesting when I read that section yesterday with Mr. Carlson going through it, there's some provisions up towards the top -- and we can pull it all out -- that talk about, I forget the exact word, respecting collateral.

But then when it actually says what to do, it only refers to proceeds of collateral and not to anything about respecting collateral.  So can we look at that and --

MR. JENKINS:  Yeah, --

THE COURT:  -- I want you to tear that apart for me a little bit.

MR. JENKINS:  -- we will.  I think I probably have

that lined up here.

THE COURT:  Okay, great.

MR. JENKINS:  Let me just see here the easiest way to do that, Your Honor, without getting too side-tracked here.

THE COURT:  I can just open it, if you want me to. You're referencing is the PX-124?

MR. JENKINS:  Yeah.

(Pause in the proceedings.)

THE COURT:  I'm on page 13 of PX-124.

MR. JENKINS:  So you're reading Section 2.01?

THE COURT:  Right.

MR. JENKINS:  Right.  So, Your Honor, what I think this applies to here -- and there's two provisions here that matter.  One is the waterfall, one is the turnover and they have different application.

THE COURT:  Okay.

MR. JENKINS:  But one on the waterfall here applies and I think I kind of called out the key provisions here.  But so in Section .02 -- 2.01(a) it provides -- this waterfall provides that:

"If there's an event of default that has occurred and is continuing; two, a distribution is made in any insolvency or liquidation proceeding with respect to any grantor; and, three, the distribution is," quote,

"made in respect of any collateral," close quote, or proceeds of any sale collateral or other liquidation of any collateral.

When those conditions are satisfied, --

THE COURT:  Right.

MR. JENKINS:  -- you must comply with the waterfall.

THE COURT:  No, no.

MR. JENKINS:  And you're focused on --

THE COURT:  No, I think that's not right.  When those conditions are satisfied, you then have to comply with the waterfall as to proceeds, which is a defined term.

MR. JENKINS:  Yep.

THE COURT:  And it's defined to be proceeds of any sale, collection or liquidation of any collateral and all proceeds of any such distribution of the sale, collection or liquidation or proceeds.

MR. JENKINS:  Right.

THE COURT:  But it does not talk about something -- and this is in respect to the collateral, which is where I thought we were until I heard the argument yesterday.

MR. JENKINS:  Right.  So you're right, it is -- so I think Your Honor is right in the sense that what we're talking about is two things.  All proceeds of any sale,

collection or other liquidation of any collateral, that's one bucket.  And the second is all proceeds of any such distribution.

Well, what is such distribution?  That's the distribution of Bob being made in respect of any collateral.

THE COURT:  Where does it say that?

MR. JENKINS:  So --

THE COURT:  I think it's just saying and we're defining that as proceeds.  It says:

"Proceeds of any sale, collection or other liquidation of any collateral are defined are proceeds."

MR. JENKINS:  Right, so why -- why would you add the words "are all proceeds of such distribution?"  If I'm already saying I'm going to give your proceeds from the sale liquidation, I could stop there.

THE COURT:  No, we --

MR. JENKINS:  I'm talking about proceeds of such distribution.

THE COURT:  -- no the word "proceeds" hadn't been defined yet.

MR. JENKINS:  Fair enough.

THE COURT:  So, what's the definition of proceeds?

MR. JENKINS:  The definition of proceeds here means "proceeds of any sale, collection or other liquidation of collateral."  That's one.  And what else?  So that's the

first bucket.

The second bucket is, "And all proceeds of any such distribution."  So the distribution has to be in this context, the distribution it's talked about.  Because distribution modifies the distribution up above.

The distribution and respect of collateral. That's the only thing it could mean, Your Honor.

THE COURT:  I understand the argument.  I'm not sure that you're right.  But I understand the argument.

MR. JENKINS:  Right.  I mean to read it -- to read it, Your Honor, so if I think of it this way.  I have a sale of widget and I get the proceeds from that.  I've sold it and now I have the proceeds from that widget.  That's clearly proceeds of that particular collateral, right?

And then I have this second bucket.  Well, proceeds of what?  What would be the distribution in that context where I sell it and I'm holding the money in my hand?

There's no distribution.  I have the money in my hand.  That's the proceeds of the collateral.  So now I can only be talking about the distribution up above that we've meant to capture here in respect of collateral.

THE COURT:  Okay.

MR. JENKINS:  So, Your Honor, let me backup just a little bit here to remind Your Honor that the types of

distributions we're worried about here.

The allowed 1-1/2 lien note claims will receive pro-rata share of 100 percent of new common shares and a right to participate in rights offering.

Certain non-eligible offerees, kind of smaller holders in that class, can receive a combination of cash and new common shares for non-eligible offerees.  And then there's payments of fees incurred by the 1-1/2 lien notes, indenture trustee in cash.

So as we just went through, Your Honor, I highlighted how the waterfall works and is triggered.  One of the arguments the Debtors made yesterday was with respect to the definition of event of default.

So let me just turn to the next slide.  Under this, Your Honor -- and we spoke a little bit, I think you had a colloquy yesterday a little bit about this.

As under this agreement here, an event of default is defined as an event of default under and as defined in any of the applicable documents.

The Debtors want to read out a portion of this.  Certainly there's a cross-default.  So if there's an event of default under the indenture, they said yesterday if that event of default goes away, then you don't have an event of default that's continuing because the event of default under the indenture has gone away.  So no longer do you have an

event of default under the indenture.

But if they want to read out the second half of this.  The event of default includes -- incorporates by reference all of the terms of that provision, Your Honor.

So the events of default are as exactly defined. It's like taking that language out of the indenture and every other appropriate agreement and just typing it in here.  It's incorporated by reference here.

So, Your Honor, I don't think that even if -- even if you only had the word "under" here, I don't think Your Honor can undo an agreement or an event of default between two non-Debtor parties.

I think that even under is enough here.  But that's not even -- you don't even need to get to that because you've just defined all of them here.  And so the occurrence of the bankruptcy triggered event of default under the indenture.  It also occurred under this agreement. And you can't change that between two non-Debtor parties, Your Honor.  This is -- the parties agreed that this would be a subordination agreement and treated under 510 of the Bankruptcy Code.

And I think that must be respected.  So an event of default will be occurring and continuing.  And I don't think Your Honor has the ability to undo that in this particular agreement.

So I believe that the waterfall provisions will apply.  Now, Your Honor there's a second provision.  We'll go to the next slide here and this is the turn over provision.

So as I mentioned, the turnover provisions differ.  It doesn't have any aspect of event of default in it at all.  Here, Your Honor, what we're dealing with under Section 2.04(b) of the prior lien and ICA and it says:  Each of the second lien parties, if they realize any proceeds or payments in respect of any collateral and there's a number of things.  If they receive it, one, pursuant to any of the documents; two, by the exercised of any rights available to it or any of them under; or three, in any insolvency proceeding for exercise of remedy.

THE COURT:  Right.  Let me just backup for a minute just to be sure that I've got my facts right.

Their position is we are receiving something because we have a claim, but none of what we're receiving comes out of what's called common collateral.

Your position is they wouldn't get more on their claim unless it was secured.  So even if we are left with our common collateral, that's still in respect to collateral.

Now I just want to make sure I've got the argument right.

MR. JENKINS:  That's absolutely right.

THE COURT:  Okay.

MR. JENKINS:  And that's a big distinguishing factor from the *Momentive* (phonetic) case they've cited, right.  So in *Momentive* where the Court focused on you're getting a distribution on account of the claim well they could do that.  The Court could do that there because the unsecured creditors were paid in full.

So when you're talking about the second lien noteholders in that case, the Judge said yeah whether you getting, everyone is getting paid here, it must be on account of the claim.  That's not the case here.  We heard testimony from Ms. Flaton that they are getting more on account of their secured claim.

THE COURT:  We heard testimony -- that's exactly right.  They are getting more because their claim is secured, but they're not getting anything out of what's secures the claim.

MR. JENKINS:  Right, two different things.  It's not -- they're not getting proceeds of collateral.  They're getting it on account of or in respect of that claim in the collateral.

THE COURT:  So factually I think everybody is in agreement on those facts.  And it's a question of how we read the document, right?

MR. JENKINS:  I think that's right, Your Honor.

THE COURT:  Just be sure that the Debtor is in agreement with that.

Is that right?

(No audible response.)

THE COURT:  Okay, thank you.

MR. JENKINS:  Great.  So, Your Honor, -- can we turn to the next slide?

I'm not going to go through all of the provisions, Your Honor.  But this lays out each of the provisions of the Plan and the proposed order that basically seek to either enjoin or give releases or impair rights under the Intercreditor Agreements.

And they're quite strong, Your Honor.  And I'll just refer you to them rather than reading all of the language.  But we think that all of these impaired claims under the Intercreditor Agreement and go way too far because we just don't believe that Your Honor has jurisdiction even to enter this type of Order or Plan that does these things.

So during the hearing, there was discussion regarding the extent to which the Plan or the Confirmation Order can alter the legal equitable or contractual rights of parties to the Intercreditor Agreement.

Your Honor, the answer is simple.  Not at all.  If they do the class is impaired.  Elliot's counsel argued for

an order that prevented distributions under the Plan from being paid or turned over to them -- or over to our holders pursuant to the waterfall and turnover provisions of the applicable Intercreditor Agreements.

Now I believe, Your Honor certainly has the ability to enter an order that provides for how Plan distributions occur under a Plan.  But, if you do that in a way that alters the legal, equitable, or contractual rights of the parties to the Intercreditor Agreements, that's impairment by definition.

This is not some existential threat to restructurings.  It simply means that Debtors need to -- may need to proceed under 1129(b).

THE COURT:  And I -- this may be one that Mr. Uzzy is going to want to participate in.  And I'll let him.

I think I should not order a distribution that is inconsistent with the Intercreditor Agreement.  I think I'm prohibited from doing that by the Bankruptcy Code under 510.

And so if I confirm the Plan, I will be finding that it is consistent with the Intercreditor Agreement as a matter of fact.  That it is rather consistent with the Intercreditor Agreement as a matter of fact and law.

That is different than me enjoining someone from enforcing their rights.  I'm simply declaring whether or not the rights have been honored.  And I think I can declare

whether they have been honored without enjoining somebody from doing it and then if they want to violate the finding and the judgment, that's a different story.

Do you agree with that?  And I don't know if Mr. Uzzi agrees with that.

MR. JENKINS:  Yeah, I think what Your Honor is saying is you can thread a needle here and say look there's so far that this goes, I find based on the facts before me and the reading of the agreement that I can enforce under 510 the Intercreditor Agreement.

Or I find that the Intercreditor Agreement works a particular way.

THE COURT:  Right.

MR. JENKINS:  Yeah -- so.

THE COURT:  And that's going to be a final judgment.  Your client is going to be a party to it. Mr. Uzzi's clients are going to be a party to it.  And people have to comply with that final judgment, whichever way it goes.

That is different than an injunction against enforcing the ICA, which I have a hard time thinking I would enforce and joined the ICA.

MR. JENKINS:  Right.  I think that's right, Your Honor.  The only difference opinion I might have with Your Honor in that is whether or not we agree that it complies or

not.

THE COURT:  Of course.

MR. JENKINS:  And whether it's -- yes.

THE COURT:  Of course.  I mean that would then -- let's assume for a moment I rule against you on it, you can then appeal that question, win it on appeal, sue under the ICA and you're okay.

Or Mr. Uzzi can do the same thing if I rule against him.

MR. JENKINS:  Right.

THE COURT:  But whichever determination I make, I think is going to bind you and Mr. Uzzi's client to that judgment subject to whatever appeal there is.  And you're bound not by an injunction -- which I again I think isn't what I should be doing -- but rather by a determination whether the Plan is in compliance.

MR. JENKINS:  Right.  I've already answered that question.

THE COURT:  Right.

MR. JENKINS:  But I will point out that these provisions go way beyond that.  And --

THE COURT:  I got it and I'm --

MR. JENKINS:  Okay.

THE COURT:  -- I need to -- I haven't read them.  But I'm telling you what I think I ought to be doing and it

sounds like you're not in disagreement with that.  And we'll see what Mr. Uzzi is in when he gets a turn up here.

MR. JENKINS:  Great. Thank you, Your Honor.

Let's see, I think we've covered some of this. Let me skip ahead.

So let me just briefly move to the change of control that I think the next -- is it the next slide?  Yes, this one.

Again, I just listed out the provisions of the Plan that we think are findings that there is in fact no change of control.

If Your Honor recalls during the proceeding, we objected to the inclusion of any evidence with respect to change of control other than for purposes of determining whether the Plan was more or less likely to be feasible.

But not for purposes for some declaratory judgment that in fact the provision under the indenture with respect to a change of control have been met now or it will be met at some point in the future.

I think Your Honor can review and say:  Is that likely to happen; is it not likely to happen?  Are you able to refinance if it does happen?  That's all fine and that's what the evidence came in for.

But what they intend to do with these provisions is get essentially a declaratory judgment that, in fact, no

change of control pursuant to the indenture had occurred.

I don't think that's right.  There's no case or controversy and we don't think Your Honor has jurisdiction to decide that now.  But for purposes of whether the Plan is feasible -- and that's what we're arguing during the evidentiary portion of this -- it can come in for that narrow view of is it more likely and not to be feasible.

So, these provisions go way beyond that and they may also have implications for when you're aggregating events over time under those provisions.  If you look at those --

THE COURT:  In terms of the aggregation of events, what is your position on what they showed me yesterday for a change in the confirmation order that says:  There is not a change of control at confirmation, nor do the forecasts under the Plan, if precisely followed, result in the change of control?

MR. JENKINS:  I don't believe they've produced enough evidence to show that, Your Honor.  And we objected to the evidence for that purpose.

We're not objecting to whether or not that happened -- there's no case in controversy, they can't seek a declaratory judgment of that now.  It is what it is.

And another indenture, if in event of default or if a change of control occurs on the effective date when all

the shares change hands, they have under there, I believe, it's like 30 days to determine what happens and put out a notice and or not.

But whatever that -- whatever happens, happens. But they can't here predetermine that when no one's set up a case of controversy. It's just beyond the scope of what we think Your Honor can enter here and now.

Now, Your Honor, with respect to -- there was one mention yesterday with respect to 1123(a). We'll rely on our papers. I only want to mention one thing. They suggested we didn't have standing as 1-1/4 lienholders.

At the very opening statement that I provided, I laid out of the holdings. It's well over, I think, $1.13 billion that our group holds in the 1-1/8th, 1-1/4 and the 1-1/2 lien notes.

So I do think there's clear standings. So I'll just leave it at that. It's in the Record and we'll rely on our papers for that.

Your Honor, with respect to feasibility, which I said was the other headline issue here. This presents the Court with a number of important feasibility questions. And perhaps no question is more important than this.

Why didn't the Debtors provide the Court with an analysis of downside scenarios? The Debtors projections assumed December 6th strip pricing and provided no

sensitivities, providing no margin for error in a downside scenario.  That has to be a strategic choice.

In a case with sophisticated actors and advisors with billions of dollars at stake, the only reasonable inference is that the Debtors didn't want you to see those scenarios because their Plan is not feasible in any pricing downside scenario.

Recent events in the additional reports provided at the end of this hearing support that conclusion.  Clearly leverage is a key factor here and critical to the Debtors ability to refinance its debts as they come due.

We know the Debtors' projected leverage and emergence is projected to be 2.8 times.  What do we know about where the Debtors' leverage will be in 2023 and 2024 when the company must access capital markets?

In an Evercore presentation to the Debtors' board of directors, in April 2019, Evercore compared the Debtors' debt levels to other public E&P companies concluding that, quote:

"Healthy E&P companies have met leverage of approximately 1.5 times."

Mr. Avinash acknowledged having been involved with the preparation of this presentation.

Mr. O'Hara testified that at February 3rd strip prices, including all hedges the Debtor have disclosed, the

Debtor will not de-lever by 2023 when they will need to look for capital markets to refinance the 1-1/4 lien notes.

Mr. D'Souza agreed that using February strip. the Debtors do not de-lever until 2025.  And both Mr. D'Souza and Mr. O'Hara agree that current strip pricing is the best estimate of future oil and gas pricing we have for these purposes, even if it is imperfect.

Mr. O'Hara and D'Souza both testified that markets take account of all past and present information in building strip prices.

Now Mr. D'Souza provided historical analysis of forward and spot prices, but he cherry-picked a select number of years and then admitted that it was purely historical and not predictive.

The disputes here primarily focus on whether the Debtors will be able to access capital markets to refinance the 1-1/4 lien and the 1-1/8th lien notes in 2023 and 2024.

Mr. O'Hara's -- let's go to slide 21.

(Pause in the proceedings.)

MR. JENKINS:  Mr. O'Hara's testimony is rather straight forward.  He testified based on February 6th strip pricing and the tightness in capital markets, the Debtors are unlikely to be able to refinance or pay their funded indebtedness as it comes due.

According to Mr. O'Hara, quote:

"The cash flow of the business in years 2022, 2023 and 2024 will likely be negative. And the net leverage in 2023 as the company goes to refinance its maturities in 2024 will be approximately the same 2.8 times level."

Mr. O'Hara also testified that capital markets are not currently not available for a companies with that type of profile. And he didn't believe they would be when the Debtors need to refinance.

Testimony that the 1-1/8th lien notes are trading at 60 cents on the dollar indicates the market agrees.

To support this uncontroverted evidence from Mr. O'Hara is Mr. D'Souza's analysis, which we believe is flawed in three respects. He did a market analysis of issuances over a number of years.

The issuance market is fundamentally changed from Mr. D'Souza's analysis. So looking back before October 2018, let alone 2015, which Mr. D'Souza was looking at, doesn't make sense.

Some of the comps that D'Souza looked at are completely irrelevant for other reasons such as location, capital structure, and different business model. And even for companies able to access the markets recently in 2019 and 2020, their yields have gotten significantly wider suggesting they would not be able to obtain the same financing today.

In addition, to support his opinion that the Debtors' will be able to refinance in 2023, in the face of all of this evidence, he makes two -- he makes two appeals.

Mr. D'Souza asks us to trust Mr. Parker's ability to pull levers as needed, to adjust the oil and gas prices as they are lower.  But Mr. D'Souza blindly accepted Mr. Parker's business plan and is providing no opinion on its achievability.  He can therefore provide no opinion on any other Plan.

Instead, he's asking us not to look behind the curtain and trust that Mr. Parker will pull all the right knobs and levers to make this work.

Finally and most amazingly, Mr. D'Souza suggested that if all else fails, the Debtors can resort to liability management transactions.  Liability management.  Very interesting phrase.

It really means another restructuring, out-of-court restructuring.  Mr. D'Souza testified that his opinion is greatly influenced by the ability of the Debtors to do, quote, "up-tier exchange" when the 1-1/4 lien notes come due.

In other words if the Debtors can't access capital markets, as Mr. O'Hara testified would be the case, in which case they will not be able to conduct a normal refinancing of outstanding indebtedness.  They'll approach then existing

1-1/4 lienholders and ask them to accept new notes and obligations with liens senior to the 1-1/8th lien notes.

They will not pay such obligations in accordance to the holders' legal rights as they come due.  They'll negotiate a restructuring of the debt through an exchange.

The Debtors have not, and indeed cannot, provide evidence today that holders of those notes in 2023 or 2024 will agree to take less than payments in full and cash.

Proposing a further negotiated out-of-court restructuring is the key to supporting feasibility simply insufficient and actually supports the argument the Debtors are, in fact, already contemplating further restructuring of the capital structure.

This is addressed in the plain language of 1129(a)(11) of the Bankruptcy Code.  The Plan is not feasible if after confirmation there's need for further financial reorganization not set forth in the Plan itself.

Ironically, of course, this up-tier restructuring strategy is touted as being available on account of the Debtor family covenants of the 1-1/8th lien notes.  Of course, Debtors want these covenants without the burdens that come with them.

Now I think it's also very instructive what Mr. D'Souza did not do here.  Given the high leverage profile and challenging capital markets, the Debtors should

have considered the importance of an equity cushion to the ability of the Debtors to refinance.

But Mr. D'Souza did not conduct any evaluation, so he has no idea what the equity cushion of the company is today.  Instead, Mr. D'Souza relies on an implied or negotiated TEV or ignores it completely in connection with his refinancing analysis.

Second, Your Honor, Mr. D'Souza did not perform or conduct any sensitivities of the Debtors' business plan.  In fact, he blindly accepted the company's business plan without any consideration of its feasibility or achievability, despite having experts at Evercore, with the requisite oil and gas experience to test the company's model.

To be clear, that is not because Mr. D'Souza or the Debtors more generally do not believe in sensitivity testing.  The Debtors have a history of producing sensitivities in everything from management presentations to the company's public SEC filings.

In this feasibility analysis, however, Mr. D'Souza chose to provide an opinion for only one specific instance.  Debtors' business plan, as it existed on December 6th, is strip prices as of the same day.

I think I'm going to read here from the transcript, Your Honor.  It says:

"You aren't interested in the sensitivity that showed how prices changed -- changes could effect net leverage and free cash flow."

Mr. D'Souza answered:

"I analyzed the projections that were in the business plan or Exhibit E of the Disclosure Statement.

"Q   Without running any sensitivity for a price change?

"A   I did not sensitize prices in my analysis, correct.

"Q   Yes, you don't know what cushion there is with respect to these business plan projections that would still render the plan feasible?

"A   I do not know."

Your Honor, the current swings in the market and drop in oil and gas prices prove why this strategy was a bad one.  This means Mr. D'Souza's analysis not only in his words blindly accepts Debtors' December 6th price assumptions, he's also locked in to a business plan that Mr. Parker testified has since changed.

As the Court heard, oil expert Joseph Spellman explain, those changes to Debtors business plan basically subbing in small wells for bigger have implications for the company.

And while Mr. Parker testified he can always

adjust Debtors' plan further as markets dictate, he conceded that scaling back capital expenditures invites bigger problems down the road.

It is truly remarkable that Debtors' sole expert on feasibility is being pad over 20 million in this case, but he did not perform customary sensitivity or analyses or customary evaluation.

While Mr. D'Souza chose not to conduct any sensitivity analysis to test the company's assumption underlying this Plan, the real world is testing those assumptions for him.  And as Mr. O'Hara testified, the worlds proving Debtors' Plan is not feasible.

Debtors' cannot deny that lower strip pricing adversely affects their model and projections.  So they ask us to view the current market shock as only a short term event.

The Debtors also suggested that there's no cause for concern because the far end of the strip hasn't changed that much.

In sum, Mr. D'Souza's opinion is that we can ignore downside changes in pricing and trust that Mr. Parker's changes to the business plan will work and if all else fails the company can do another out-of-court restructuring in the future like an up-tier exchange.

For all the foregoing reasons, this opinion should

be discounted and given no weight.

Finally, Your Honor, and I've come full circle at this point, there's simply no evidence that the Debtors' Plan is feasible if this Court today finds that 1124 does not reduce all or any portion of the 1.177 billion of the 1-1/8th lien notes claims.

None of the Debtors' witnesses consider the full claim in any of their analysis.  Mr. Perez argued yesterday that you would have to suspend reality to approve the payment provided in Section 6.02 of indenture.  But the Debtors are really asking us to suspend reality where oil and gas markets and pricing are today.

December is good enough, they say.  Your Honor, this is about a burden of proof.  The Debtors have the burden here to present a Plan that works.  They chose one day.  That's what their Plan was tied to.  They could have done sensitivities.  They could have provided Your Honor with more to give more margin of error.

They didn't.  That was their burden and they didn't fulfill it.

In conclusion, Your Honor, the Debtors' plan is not confirmable and this Court should deny confirmation so the Debtors can focus on a more appropriate and feasible plan that gives the Debtors the fresh start it sorely needs.

THE COURT:  Mr. Jenkins, thank you.

Mr. Uzzi?

(Pause in the proceedings.)

THE COURT:  Just to reiterate, Mr. Uzzi, it seems to me that I should make Findings of Facts and Conclusions of Law as to whether the Plan under 510 complies with the ICA.  And I shouldn't confirm the Plan if it doesn't.

If I do confirm the Plan, it will have those Findings of Facts and Conclusions of Law and a determination that the distribution were made in compliance with the ICA.

That's a pretty far cry different in my mind from an injunction.  So tell me why there should be an injunction, rather than a judgment that you can rely on.

MR. UZZI:  Well, Your Honor, I don't -- I don't like to focus on the words on a piece of paper, you know, because sometimes it gets mixed up.  So substantively what we're looking for --

THE COURT:  So substantively I'm not sure there's much of a difference because I'll enforce my own judgment.

MR. UZZI:  Well that's -- we just want -- what we -- because of the -- people throw words around unimpairment, you can't, you know, impair my rights, so I have a right to go -- and not that Mr. Jenkins is saying this.  I'm just speaking hypothetically.

THE COURT:  Right.

MR. UZZI:  You know, I have a right to do whatever

I want and I can go now if I'm unimpaired into a state court.  And, you know, our position is no, we're not impairing your rights under the contract, but we are seeking finality with respect to legal determinations in this Court.

And so the request for an injunction was simply to, you know, is to channel everything back into this Court.  Obviously they have a right to an appeal.  We're not asking to take away from that.

But if they disagree with -- first of all, to start with we agree that we need from Your Honor to determine the rights under the Intercreditor Agreement.  And if Mr. Jenkins is right, then the consequence is the Plan is not confirmable.

And then, what we need is once you make those determinations that it stays in the vertical track out of this Court, it doesn't go to some, you know, state court or other federal court, it goes up on appeal.

THE COURT:  Thank you.

MR. UZZI:  Thank you, Your Honor.

THE COURT:  Is there any rebuttal -- sorry, does anyone else wish to make any presentation?  I thought from yesterday the answer was no, other than a potential --

MR. UZZI:  Your Honor, just one while I'm at the podium.  Your Honor, I've made the same mistake in saying what 1123(d) says and it's just like 1123(d) tells you how

you're supposed to cure a contract.

And just, I read it and it actually doesn't say that.  It just refers to how to calculate the amount, I think is to cure default the amount necessary to cure.

So when you're talking about the calculation of damages, that's what 1123.  But when you're talking about -- and this is really in the context of the temporal arguments of cure.

THE COURT:  Right.

MR. UZZI:  I don't 1123 says you look to the contrary.  I mean, cure is cure.  I think 1123 only tells you how to calculate monetary -- calculate the amount of monetary --

THE COURT:  It also -- it also doesn't include 1124.

MR. UZZI:  Yeah, okay.  Thank you.

THE COURT:  Thank you.

Any rebuttal at all?

(No audible response.)

THE COURT:  Thank you.

At 2:00 o'clock, I'll announce the decision.  Thank you-all.

(The parties thank the Court.)

COURTROOM DEPUTY:  All rise.

(Recess taken from 11:50 a.m. to 2:00 p.m.)

(Morning Session concluded at 11:50 a.m.)

*  *  *  *  *

I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.

/S/ MARY D. HENRY

CERTIFIED BY THE AMERICAN ASSOCIATION OF

ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**D-337

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

JTT TRANSCRIPT #61868

DATE FILED:  MARCH 7, 2020